# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**IN THE MATTER OF**
**GRAND JURY INVESTIGATION**

No. 18-GJ-34

**UNDER SEAL**

## REPLY BRIEF BY ANDREW MILLER TO GOVERNMENT'S OPPOSITION TO MOTION TO QUASH GRAND JURY SUBPOENA

### ARGUMENT

**I.  Robert Mueller Was Not Properly Appointed As An Inferior Officer Of The United States Because Congress Has Not Vested The Power To Appoint Special Counsels In The Attorney General**

The Appointments Clause of Article II provides that:

 [The President  shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established **by Law**: but the Congress may **by Law vest** the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, sec. 2 (emphasis added).  The Appointments Clause provides that, as a default rule, all Officers of the United States must be nominated by the President, confirmed by the Senate, and then appointed by the President. Recognizing, however, that principal officers will usually need the help of inferior officers to do their jobs,[1] the Appointments Clause also allows Congress to create **by Law** other officers and **by Law to vest** the appointment of inferior

---

[1] Although an officer may be inferior in hierarchy to a superior, that does not necessarily mean such an officer is an inferior officer for Article II purposes and indeed may be a superior officer herself requiring Senate confirmation as will be discussed, *infra*.

1

officers in the President alone, in the Courts of Law or in the Heads of Departments.  Such

vesting laws, like the Vesting Clauses of the Constitution, must clearly state that they are **vesting**

inferior officer appointment power in the Head of a Department or that power remains with the

President and the Senate.  In this case, Congress has not "**by Law**" clearly **vested** in the Acting

Attorney General the power to create an inferior officer Special Counsel.  As a result, Robert

Mueller's appointment is unlawful.[2]

The government argues to the contrary relying principally upon *United States v. Nixon,*

418 U.S. 683 (1974) and *In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987).  Govt. Br. at 11.  But

those authorities predated the separation of powers jurisprudence of the U.S. Supreme Court

developed since 1990.

The 1974 Nixon Tapes case, for example, was issued two years before the Supreme

Court's landmark opinion in *Buckley v. Valeo*, 434 U.S. 1 (1976) revitalized the Appointments

Clause.  Prior to 1976, Appointments Clause cases did not receive careful judicial scrutiny much

like the Commerce Clause cases after the New Deal.  *Buckley v. Valeo* changed all of that, and it

was followed by five landmark Appointments Clause Supreme Court decisions all of which

postdate and qualify both *Nixon v. United States* and *In re Sealed Case,* 829 F.2d 50 (D.C. Cir.

1987).  These five new decisions, many inspired or concurred in by former Supreme Court

Justice Antonin Scalia were: *Morrison v. Olson,* 487 U.S. 654 (1988) (Scalia J. dissenting);

*Freytag v. Commissioner of Internal Revenue,* 501 U.S. 868 (1991) (Scalia J., concurring in part

and concurring in the judgement); *Weiss v. United States,* 510 U.S. 163 (1994) (Scalia, J.

---

[2] *See* Calabresi, Steven G., *Congress Has Not Created an Inferior Office of Special Counsel Since 1999* (June 19, 2018). Northwestern Public Law Research Paper No. 18-17. Available at SSRN: https://ssrn.com/abstract=3199143

concurring); *Edmond v. United States*, 520 U.S. 651 (1997) (Op. of Scalia J.); and *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010) (Op. of Roberts C.J.).

Since 1990, the Rehnquist and Roberts Courts have greatly increased the scrutiny with which they evaluate the limited and enumerated power of federal officers and institutions to act under the Constitution moving from what amounted to rational basis scrutiny to something closer to strict scrutiny. This stricter textualism and emphasis on limited and enumerated powers in both separation of powers and federalism cases animates cases such as *Buckley v. Valeo,* and its Appointments Clause progeny. Accordingly, this Court should look through the lenses of those modern decisions in adjudicating this case.[3]

These two dozen separation of powers and federalism cases demonstrate why the government's reliance on decisions to appoint various and sundry Special Counsels by Ulysses S. Grant, Teddy Roosevelt, or the Nixon Administration are of dubious precedential value, both constitutionally and statutorily in today's era when the idea that our government is one of constitutionally limited and enumerated powers has become paramount. *See, e.g.*, *Free Enterprise Fund v. PCAOB,* 561 U.S. 477 (2010) (Roberts, C.J. on the separation of powers); *NFIB v. Sebelius,* 567 U.S. 519 (2012) (Roberts, C.J. on federal government power). General Grant, Teddy Roosevelt, and the Nixon Administration may have had little use for constitutional

---

[3] The Supreme Court's stricter scrutiny of limited and enumerated powers is also evident in many other contexts as well. See, e.g., *INS v. Chadha,* 462 U.S. 919 (1983); *Bowsher v. Synar,* 478 U.S. 714 (1986); *Gregory v. Ashcroft,* 501 U.S. 452 (1991); *New York v. United States,* 505 U.S. 144 (1992); *Printz v. United States,* 521 U.S. 898 (1997); *United States v. Lopez,* 514 U.S. 549 (1995); *U.S. Term Limits v. Thornton, 514 U.S. 779* (1995); *Clinton v. City of New York,* 524 U.S. 417 (1998); *United States v. Morrison,* 529 U.S. 598 (2000); *City of Boerne v. Flores,* 521 U.S. 507 (1997); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996); *Alden v. Maine,* 527 U.S. 706 (1999); *Free Enterprise Fund INC v. PCAOB,* 561 U.S. 477 (2010); *NFIB v. Sebelius,* 567 U.S. 519 (2012); *Holder v. Shelby County,* 570 U.S. 2 (2013); *Medellin v. Texas,* 552 U.S. 491 (2008); *National Labor Relations Board v. Noel Canning,* 573 U.S. ___ (2014); *Zivotofsky v. Kerry,* 576 U.S. ___ (2015); and *Trump v. Hawaii,* 585 U.S. ___ (2018).

restrictions on governmental power, but the modern Supreme Court places great stock in them. Viewed through the governing modern case law, the illegality of this Special Counsel is straightforward.

### A. The Statutory Language

In determining whether Congress by law created certain officers and has **vested** in the Head of a Department the power to appoint inferior officers such as a Special Counsel with vast powers greater in many respects than U.S. Attorneys, a clear statement by Congress in the text of a statute is required rather than trying to figure out the grammatical tense of a past participle to divine the meaning of "attorney specially appointed" and "attorney specially retained" in 28 U.S.C. 515(a) and (b) as the government asserts.   Govt. Br. at 15.   *Cf. Gregory v. Ashcroft,* 501 U.S. 452 (1991) (holding a clear statement in federal law is required where the federal law in question encroaches on state sovereignty).

Consider three laws, which do clearly vest in the Head of a Department the power to appoint inferior officers.

### (1)  28 U.S.C. Section 592(d)

Any application for the appointment of an independent counsel under this chapter shall contain sufficient information to assist the division of the court **in selecting** an independent counsel and **in defining** that independent counsel's prosecutorial jurisdiction so that the independent counsel has adequate authority to fully investigate and prosecute the subject matter and all matters related to that subject. Emphasis added.

This provision of the since expired Ethics in Government Act of 1978 clearly **vests** in the Special Division, which the Supreme Court said in *Morrison v. Olson,* was a court of law, the power to "**select**" new inferior officer Independent Counsels and "**define**" the scope of their jurisdiction.

4

That is a clear textual grant of power to appoint inferior officer Independent Counsels, albeit in a Court of Law rather than the Head of Department.[4]

### (2) 5 U.S.C. Section 3105

Each agency **shall appoint** as many administrative law judges as are necessary for proceedings required to be conducted by sections 556 and 557 of this title. ***

This law clearly **vests** in the Administrative Agencies, which are the heads of departments under *Free Enterprise Fund Inc. v. PCAOB*, with the power to "**appoint**" new inferior officer Administrative Law Judges.  The Supreme Court construed this language as authorizing such appointments in its recent ruling in *Lucia v. SEC*, 585 U.S. ____ (2018).

### (3) 28 U.S. Section 546(d)

"(d) If an appointment [of an interim U.S. Attorney] expires under subsection (c)(2), the district court for such district **may appoint** a United States attorney to serve until the vacancy is filled.  The order of appointment by the court shall be filed with the clerk of the court."

Again, this statute clearly **vests** the power with the local federal District Court to "appoint" new officer interim U.S. Attorneys.

The three statutes  discussed above clearly **vest** the Head of a Department or a court of law with the power to appoint inferior officers in the same way that: Article I, Section 1 of the Constitution vests all legislative powers herein granted in Congress; Article II, Section 1 of the Constitution vest the executive power in a President of the United States of America; and Article III, Section 1 vests the judicial power of the United States in one Supreme Court and in such inferior courts as Congress may from time to time ordain and establish.  Moreover, the

---

[4] It should be noted that the Ethics in Government Act of 1978 created the Office of Independent Counsel to which various officers were appointed as Independent Counsels over approximately two decades.  In order to be an Officer, one has to be appointed to an Office.

government concedes that the statutes in *Morrison* and *Intercollegiate Broadcasting* "did explicitly delegate appointment authority." Govt. Br. at 28.

In contrast, none of the three sources of statutory empowerment, which Acting Attorney General Rod Rosenstein relied upon in appointing Special Counsel Robert Mueller **vest** in the Acting Attorney General any power to "select" or "appoint" new inferior officer Special Counsels under 28 U.S.C. 509, 510, and 515 as discussed in our opening brief. Rather, the Attorney General can and has appointed Special Counsels who are currently confirmed U.S. Attorneys for special investigations and prosecutions. Miller Opening Br. at 11.

In attempting to string together bits and pieces from other statutes to justify the appointment of the Special Counsel not listed in either the Special Counsel regulations or Rosenstein's Order appointing Mueller, the government takes us to task for not citing a provision of the U.S. Code that is not even about **officers** or attorneys, but which concerns instead law enforcement **officials** connected with the Federal Bureau of Investigation. Govt. Br. at 14.  28 U.S.C. Section 533 says:

> "The Attorney General may appoint **officials** –
> (1) To detect and prosecute crimes against the United States;
> (2) To assist in the protection of the person of the President; and
> (3) To assist in the protection of the person of the Attorney General.
> (4) To conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General. ***"

28 U.S.C. Section 532, which precedes Section 533, is entitled "Director of the Federal Bureau of Investigation," and it spells out the Attorney General's authority over the FBI. Section 533 clearly deals with FBI officials and agents, not Special Counsels. Section 534, which follows 533, is about preserving evidence in criminal cases. The Government conveniently cites only to Section 533(1) and not to its principal provisions about protecting the person of the President and

the Attorney General; and then with a straight face, claims that this FBI-centric statute is "similar [to the] "default statute" that allowed the Secretary of Transportation to "appoint and fix the pay of officers and employees of the Department of Transportation." *Id.* at 656-658, 666 (quoting 49 U.S.C. § 323(a)). Section 533 is far more specific." Section 533 is anything but "similar" to the "default statute" of 49 U.S.C. 323(a). And precisely because it is "far more specific" in focusing on FBI agents and operations, it should not to be read as a carte blanche authority under Article II to hire any number of powerful Special Counsels unrelated to FBI operations. Not surprisingly, neither the D.C. Circuit in *In re Sealed Case* nor Rod Rosenstein in his order appointing Robert Mueller to be Special Counsel cited this newly invoked Section 533 as a source of authority to appoint Special Counsels.

As for relying on the agency wide "housekeeping statute," 5 U.S.C. 301, as authority (Govt. Br. at 16) to appoint Special Counsels, that statute merely allows any government agency to promulgate "regulations" for managing its *current* employees; it certainly does not vest any authority in an agency to hire officers or employees, let alone outside Special Counsels.[5] In the absence of a clear statement like that in 1) 5 U.S.C. Section 3105 as to appointing Administrative Law Judges; 2) 28 U.S.C. Section 546(d) as to appointing Interim U.S. Attorneys; or 3) 28 U.S.C. 592(d) of the EIGA as to selecting Independent Counsels; the Attorney General has no power **vested** in him by Congress to create new inferior officer Special Counsels. The creation of such officers must first come from Congress "by law" under Article II and then, and only then, may their appointment be vested by another law in the Head of the Department.

---

[5] 5 U.S.C. 301 states:

> The head of an Executive department or military department may prescribe *regulations* for the government of his department, the conduct of its <u>employees,</u> the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public. (Emphasis added).

The current textually driven Supreme Court will not likely infer the *vesting* of inferior officer Special Counsels from vague statutes, legislative history, or unchallenged past practices absent a clear statutory statement by Congress.  If the Attorney General could appoint private Special Counsels like Robert Mueller without Congress expressly **vesting** in him the power to do so, the Attorney General could appoint a whole shadow Justice Department of inferior officer Assistant Attorney Generals, a Solicitor General, and shadow inferior officer U.S. Attorneys in each of the 93 federal Districts.  The Government's asserted power to appoint Special Counsels under these unpromising statutescan lead to dangerous if not absurd results.

### B.  Past Practice And Caselaw Do Not Suggest That The Attorney General Has Historically Had The Power To Create New Inferior Officer Special Counsels

The government cites a laundry list of historical uses of Special Counsels, none of which is relevant to the Robert Mueller appointment. Govt. Br. at 20-21. *See also* **Historical Encyclopedia of U.S. Independent Counsel Investigations** 147 (Gerald S. Greenberg ed. 2000).  Many of them involved the appointment of special counsels by the President himself, including Presidents Grant, Garfield, Theodore Roosevelt, and Harry Truman.  Suffice it to say that the President, unlike the Attorney General, has constitutionally vested authority to execute the laws, and accordingly can select officials to aid him in that function.  The Attorney General is a creation of Congress and cannot rely on independent constitutional authority.  Accordingly, the precedents the Government cites in which presidents have ordered the appointment of Special Counsels are not relevant to the scope of Acting Attorney General Rod Rosenstein's power under 28 U.S.C. Section 515. Moreover, as the Supreme Court held, decades of the exercise of power mistakenly thought to be constitutional because of its expedience can be struck down. *INS v. Chadha,* 462 U.S. 919 (1983) (sixty years of legislative vetoes held unconstitutional).

That brings us to the Watergate Scandal of 1973 and 1974, which brought about the resignation from the presidency of Richard M. Nixon. We dwell on this at some length because of the great weight the government places on *United States v. Nixon,* 418 U.S. 683 (1974) in its brief   President Nixon was investigated by two unconstitutionally appointed Watergate special prosecutors picked by Attorneys General who mistakenly relied on 28 U.S.C. 509, 510, and 515, on the faulty premise that those statutes empowered them to pick Special Prosecutors.  President Nixon never challenged the constitutionality under the Appointments Clause of the two Watergate special prosecutors so that constitutional issue was not decided in 1974.  In fact, it was not until two years later in 1976 that *Buckley v. Valeo* exhumed the Appointments Clause and brought it back to life.  In doing so, it reversed the D.C. Circuit's unanimous opinion sanctioning the Appointments Clause violations in the manner in which the members of the Commission were appointed.  Not surprisingly, no court in 1974 thought about the rigorous application of Appointment Clause to Special Prosecutors.  The Nixon ruling simply does not stand for the proposition that Special Counsels like Mr. Mueller are lawful because that issue was not litigated before the Court.

In 1978, Congress passed the Ethics in Government Act (EIGA), which provided that whenever allegations of wrongdoing were brought against the President or a high executive branch official, the Attorney General of the United States was directed to present those allegations to a three-judge special court appointed by the Chief Justice and called the Special Division.  The Special Division would then hire an Independent Counsel to investigate the matter, to clear those who were innocent of wrongdoing, and to prosecute those who were guilty of crimes.  The Independent Counsel was thus first created "by Law" as required by Article II, and then the appointment of that officer was vested "by Law" in a Court of Law, who could only

9

be removed from office for good cause, and not at will like most other executive branch officers. During its controversial existence for some two decades, more than twenty independent counsels were appointed, including Lawrence Walsh to investigate Iran/Contra and Kenneth Starr to investigate Whitewater.

There was a substantial debate in the 1980's and 1990's over whether the EIGA was constitutional, but in *Morrison v. Olson,* 487 U.S. 654 (1988) the Supreme Court upheld the constitutionality of the statute in a seven to one opinion.   Chief Justice Rehnquist wrote the majority opinion and Justice Scalia wrote his famous dissent, now widely accepted as correct.[6]

It is against this backdrop that the second main case the Government relies on arose, which is *In re Sealed Case,* 829 F.2d 50 (D.C. Cir. 1987). This case arose when the Iran-Contra Independent Counsel, Lawrence Walsh, who had **already been appointed** under the Ethics in Government Act of 1978 by the three judge Special Division, subpoenaed Oliver North – a top White House aide who had broken the law by selling government property to the Iranians and giving the proceeds to an anti-communist group in Nicaragua called the Contras.   Attorney General Ed Meese and the top leadership of the Justice Department in 1987 were of the view that the EIGA independent counsel law was unconstitutional, but they wanted the North prosecution to succeed.   To accomplish this, the Attorney General invoked whatever powers he had under 28

---

[6] As Professor Akil Amar testified, "Outside the Court, Justice Scalia's Morrison dissent has carried the day in legal and expert-opinion circles left, right, and center. . . .In public remarks in 2015, Justice Elena Kagan . . . declared that Justice Scalia's Morrison dissent was 'one of the greatest dissents ever written and every year it gets better.' Duke University's Walter Dellinger, another distinguished constitutional scholar and public servant who served as Acting Solicitor General and Head of the OLC under a Democratic president has likewise emphatically embraced Justice Scalia's dissent. . . . Professor Dellinger in June 2012 minced no words: 'Justice Scalia had it right in *Morrison v. Olson.*'" *Testimony Before the Senate Committee on the Judiciary* (September 26, 2017) (footnotes cited omitted).

U.S.C. 509, 510, and 515 to give Lawrence Walsh a parallel Justice Department appointment as an Independent Counsel promising only to remove him for cause.  This maneuver was designed to allow the Supreme Court to both throw out the EIGA as unconstitutional and yet at the same time validate any convictions of Oliver North, or others who Lawrence Walsh would go on to prosecute, to stand.

Thus, in *In re Sealed Case*, the D.C. Circuit was confronted with an investigation by the Court-appointed Independent Counsel, Lawrence Walsh, who had also been given a parallel Justice Department appointment just in case the Supreme Court held the EIGA to be unconstitutional.   As events transpired, the Supreme Court upheld the legality of Lawrence Walsh's appointment under the EIGA in *Morrison v. Olson*, and the D.C. Circuit upheld the Attorney General's delegation of power to Walsh independently of the EIGA.  The D.C. Circuit was careful to say in *In re Sealed Case* that: "5 U.S.C. Section 301 and 28 U.S.C. Sections 509, 510, and 515 do not explicitly authorize the Attorney General to create an Office of Independent Counsel virtually free of ongoing supervision, [but] we recognize them as accommodating the delegation at issue here." *Id*. at 55. (emphasis added).

Properly understood, the strict and narrow holding of *In re Sealed Case* read in light of the facts of that particular case, is that the Attorney General can *delegate* full prosecutorial authority *to an independent counsel, properly appointed under the EIGA*, and, upheld on constitutional grounds, in *Morrison v. Olson*.  This is not at all the same thing as saying that 28 U.S.C. Sections 509, 510, and 515 can independently empower the Attorney General to create infinite numbers of new independent officer Special Counsels. *In re Sealed Case* should be confined to its holding on the facts of that case rather than its erroneous dicta, which the

Government argues empowers the Attorney General to appoint a whole shadow Justice Department of inferior officers.

## II.  Even If Mueller Is An Inferior Officer, He Was Not Appointed By The Head Of The Department As Required By The Appointments Clause, Namely, Attorney General Jeff Sessions, And Thus He Is Unconstitutionally Occupying the Special Counsel's Office.

Even if Robert Mueller could be appointed as an inferior officer under Article II, the Constitution requires that he, like all other inferior officers, be appointed by the appropriate Head of Department.  The Head of the Department here for all relevant time periods was and is Attorney General Jeff Sessions.  Mr. Mueller was instead appointed as Special Counsel on May 17, 2017, by the Deputy Attorney General Rob Rosenstein, who purported to be authorized to act as the Acting Attorney General, presumably because Attorney General Sessions had decided to recuse himself from any matters arising from the presidential campaign.  A mere recusal from a matter, however, does not make the Deputy Attorney General the Acting Attorney General; only General Sessions has the constitutional authority to appoint a Special Counsel as an inferior officer.  Accordingly, the Special Counsel is acting *ultra vires* in this grand jury proceeding and in all his prosecutorial actions.

### A. Sequence Of Events

1. On February 9, 2017, Attorney General Jeff Sesssions was sworn into office having been confirmed by the Senate.

2. On March 2, 2017, Attorney General Sessions announced that he was recusing himself from "any matters arising from the campaigns for the President of the United States," to include those of President Trump and Hillary Clinton in the general election and any other candidates in the primaries.  *See* Exhibit 1.[7]  In doing so, General Sessions further stated that:

---

[7] https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal

*Consistent with* the succession order for the Department of Justice, Acting Deputy Attorney General and U.S. Attorney for the Eastern District of Virginia Dana Boente shall act as and perform the functions of the Attorney General with respect to any matters from which I have recused myself to the extent they exist. (Emphasis added).[8]

3.  On April 25, 2017, Rod Rosenstein, who was nominated by President Trump to be the Deputy Attorney General on February 1, 2017, was confirmed by the Senate and was soon thereafter appointed by the President and sworn into office.

4.  By virtue of being sworn in as the Deputy Attorney General on April 25, the then Acting Deputy Attorney General Dan Boente no longer was the Acting DAG.

5.  On May 16, 2017, Robert Mueller was interview by President Trump for the position of FBI Director but was not hired.

6. On May 17, 2017, the very next day, Rosenstein issued an Order stating :

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice,and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order * * * [that] Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

*See* Exhibit 2.[9]

---

[8] Sessions' use of the phrase "consistent with" rather than "pursuant to" suggests that Sessions may not have regarded the succession order to be binding simply because of his mere recusal.  In other contexts, "Presidents since Richard Nixon have maintained that the WPR [War Powers Act] is unconstitutional.  Nonetheless, as of September 2012, 132 reports have been submitted to Congress by the President consistent with the reporting requirements enumerated in Section 4 of the WPR.  In each such instance, the President reserved the right to question the constitutionality of the WPR by stating he or she is submitting the report "consistent with" the WPR, rather than "pursuant to" that law." (footnotes cited omitted). Comment, *The War Powers Consultation Act: Keeping War Out Of The Zone Of Twilight*, 64 Cath. U. L. Rev. 1007, 1030 (Summer 2015).

[9] It is not exactly clear when Mr. Mueller received his commission and was sworn into office as the Special Counsel since the press announcement that day also stated that Mr. Mueller "agreed to resign" from his private law firm to avoid any conflicts of interest.  Moreover, it is also not clear when 28 C.F.R. 600.4 was complied with requiring the Attorney General (or a legitimate Acting Attorney General) to consult with the Assistant Attorney General for Administration to

**B.  There Was No Vacancy In the Office of the Attorney General When Attorney General Sessions Recused Himself On March 2, 2017, And Hence Rod Rosenstein Was Never the Acting Attorney General Nor Vested With Any Authority To Appoint A Special Counsel**

The controlling statute on vacancies in the Department of Justice is 28 USC 508:

(a) In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General **may** exercise **all the duties of that office,** and for the purpose of <u>section 3345 of title 5</u> the Deputy Attorney General is the first assistant to the Attorney General.  (Emphasis added)

Note that the first part of subsection (a) merely refers to the Deputy Attorney General (DAG)'s authority to exercise "*all* the duties of that office." It does not confer by operation of law an "Acting" officer title or status upon the DAG. Further note that another section, 28 USC 510, allows the Attorney General (AG) to delegate his powers on any matter at his discretion and could certainly do so to the DAG if he is recused on a particular matter, but in any event, the Attorney General remains the Head of the Department for Art. II purposes.

Moreover, the "Acting" designation is carefully defined and triggered by operation of law only pursuant to 5 U.S.C. 3345 which is referenced in the second part of Section 508, and which in pertinent part provides: "Acting Officer" is first assistant to that office if the holder *dies, resigns, or is otherwise unable to perform the functions and duties of the office* \*\* \* \*." (Emphasis added). In the instant case, Sessions did not die, resign, or was absent, so the question becomes whether he was "otherwise unable to perform the functions and duties of the office." Sessions was neither "unable " under Section 3345 to perform his duties nor did he have a "disability" under Section 508, both terms being synonymous.  Sessions was not and is

---

"ensure an appropriate method of appointment and to ensure that a Special Counsel undergoes an appropriate background investigation and a detailed review of ethics and conflicts of interest issues" and whether and when he was also appointed as a "confidential employee" pursuant to 5 U.S.C. 7511(b)(2)(C) as the regulation required.  After all, Mueller was interviewed just the day before by the President for the position of FBI Director before Rosenstein's announcement. https://www.justice.gov/opa/press-release/file/967231/download.

not physically sick or hospitalized in intensive care like Attorney General Ashcroft was during

that famous hospital bed visit in March 2004.[10]

So the question is whether Sessions is "unable" to perform his duties under 508 or

"disabled" or did he decide that he doesn't want to because he felt conflicted to be in charge of

the Russia investigation.  Regardless, Sessions is still "able" act and be the Head of the

Department and to perform all his duties including the power to appoint a Special Counsel under

Article II, and then to step aside from any supervision of the Russia investigation due to his

conflict, and delegate all his supervisory power over the properly appointed Special Counsel to

the DAG as authorized by Section 510

The district court in *Moog v United States* was faced with a similar question regarding the

lawfulness of then-Deputy Attorney General William P. Barr's assuming the title and powers of

"Acting Attorney General."   In that case, the law required that the Attorney General must

personally sign Civil Investigative Demands for False Claims Act investigations and instead of

---

[10] In his recent book, James Comey recounts the episode where former Attorney General
Ashcroft was hospitalized in intensive care with acute pancreatitis, an illness that could cause
"organ failure and death in severe cases like his." The White House wanted him to sign off on a
renewal to the controversial Stellar Wind NSA program.  Chief of Staff Andrew Card and White
House Counsel Alberto Gonzales went to the hospital to get Ashcroft's signature.  Knowing this
was to occur, Comey, then Deputy Attorney General who opposed the renewal, rushed to the
hospital and asked Mueller to join him. Gathering  around Ashcroft's bedside, the Attorney
General expressed his concerns about the program to Card and Gonzales.  According to Comey:

> Spent, he [Ashcroft] fell back on his pillow, his breathing labored. "But that doesn't
> matter now,' he said, "because I'm not the attorney general."  With a finger extended
> from his shaking left hand, he pointed at me. "There is the attorney general."

James Comey, "A Higher Loyalty: Truth, Lies, and Leadership" (2018), p. 90.  Whether Comey
became the de jure or de facto Acting Attorney General at that time is unclear, but what is clear
is that Ashcroft's temporary illness is the kind of "disability" envisioned in Section 508 and
3345, not a voluntary recusal from a single matter pending before the Justice Department.

his signature, the Deputy AG did so as "Acting Attorney General" because then-Attorney

General Richard Thornburg had an apparent conflict of interest by owning stock in the company

and should be recused.  The district court quickly dispatched the government's argument that the

Attorney General was "disabled" under Section 508:

> The next link in the government's argument—that the Attorney General's recusal renders him disabled under 28 U.S.C. § 508(a)—is equally problematic.  It is readily apparent that the section contemplates **a complete inability of the Attorney General to perform his duties, such that the Deputy Attorney General must step in and exercise "all the duties of that office."**  Were the statute construed as the respondent urges, every conflict of interest on the part of an Attorney General would require his deputy to assume all the duties of office, clearly a nonsensical result.

*Moog, Inc v. United States* (W.D.N.Y) (Misc. No. CIV–90–215E) (April 1, 1991)  1991 WL 46518.  Emphasis added.  The United States' subsequent motion for reconsideration was quickly denied.  1991 WL 255371 (Nov. 21, 1991).

In sum, when Rosenstein issued the Mueller appointment order as the "Acting Attorney

General," he had no authority to do so under Section 3345, Section 508, or case law.  Nor do the

Special Counsel regulations bestow Acting Attorney General status simply because they wrongly

suggest that mere recusal, *ipso facto,* creates an Acting Attorney General:

> **28 C.F.R. § 600.1 Grounds for appointing a Special Counsel.** The Attorney General, *or in cases in which the Attorney General is recused, the Acting Attorney General*, will appoint a Special Counsel when he or she determines that criminal investigation of a person or matter is warranted * * * *[11]

---

[11] As the government concedes, "The Special Counsel regulations . . . are not the source of authority for appointing a Special Counsel." Govt Br. at 4.  Nor are they a source for determining whether a recusal by the Attorney General triggers an Acting Attorney General status.  DAG Rosenstein may exercise all the powers of the Attorney General, "unless any such power or authority is required *by law to be exercised by the Attorney General personally*." 28 C.F.R. § 0.15(a).  The "law" here is Article II which requires Attorney General Sessions as Head of the Department to exercise his personal power to appoint inferior officers.

In short, if Special Counsel Mueller is an Inferior Officer as the government asserts, he was not appointed by Attorney General Jeff Sessions as required by Article II.[12]

### III. Robert Mueller Is A Principal Officer For Purposes Of The Appointments Clause

The government focuses all of its energy on Mueller's status as a principal officer, arguing that the special counsel is subordinate in some fashion to the Attorney General. As we demonstrate below and as noted in our opening brief and that of Concord, the government overstates the dependence of the Special Counsel on the Attorney General. More fundamentally, however, the government utterly ignores the fact that there are *two* distinct branches to the inferior officer inquiry.

First, an officer can fail to be inferior because that officer is subject to insufficient control and direction by other officers in the executive hierarchy. This is the branch addressed by cases such as *Edmond* and *Intercollegiate Broadcasting,* and we discuss that line of jurisprudence below. But, second, an officer can also fail to be inferior simply because the officer's duties and functions, whatever the chain of command might be, are too significant to bear the label "inferior." There is little case law on this dimension of inferiority, for the simple reason that Congress is typically reluctant to cede away the Senate's confirmation power for officers who exercise substantial enough power to raise a constitutional issue – which itself is sufficient reason to doubt whether 28 U.S.C. 515 or any other statutory provision cedes away that authority for special counsels with the power of Robert Mueller in the absence of clear and specific

---

[12] Even if Rosenstein were the Acting Attorney General by a strained interpretation of 5 U.S.C. 3345, the time limit provision of Section 3346 becomes operative. In particular, Section 3346(a)(1) limits the term of an Acting Officer to 210 days unless the President nominates someone for that post. Therefore, Rosenstein's Acting status expired December 13, 2017 and he is no longer able to supervise the Special Counsel as Acting Attorney General. But that anomaly underscores the point that mere recusal does not trigger Acting Officer status

language.  Cf. *Gregory v. Ashcroft* (adopting a clear statement rule).  Nonetheless, there are

officers, such as the Solicitor General and the Deputy Attorney General, who are principal

officers (the founders would have said "superior officers," *see*

http://avalon.law.yale.edu/18th_century/debates_915.asp (statement of James Madison)) under

the Appointments Clause regardless of their location in the executive hierarchy.

It is true that one meaning of "inferior" in the Appointments Clause – as well as in the

Tribunals Clause, U.S. Const. art. I, §8, cl. 9 (giving Congress power to "constitute Tribunals

inferior to the supreme Court") and Article III, *id.* art. III, § 1 (vesting the judicial power "in one

supreme Court, and in such inferior Courts as the Congress may from time to time ordain and

establish") – describes the *relationship* of one authority to another in a hierarchical chain of

command.  But that is not the only way in which the term "inferior" was used during the

founding era regarding the authority of government officials.  For example, in the late eighteenth

century, a court whose decisions were not subject to review by any other court could nonetheless

sometimes be called an "inferior court" if its jurisdiction or geographic scope was not as

extensive as those of other courts, and those courts with broader authority would therefore be

"supreme" even if they had no control over the decisions of the "inferior" courts.  *See* David E.

Engdahl, *What's in a Name? The Constitutionality of Multiple "Supreme" Courts*, 66 Ind. L.J.

457, 466-72 (1991).  Many states during the founding era had exactly this kind of non-

hierarchical court system in which courts labeled "supreme" did not necessarily have ultimate

review authority over "inferior" courts but simply had wider and broader jurisdiction.  *See id.* at

468-72.  This is why an early draft of Article III at the Constitutional Convention proposed

creating "one *or more* supreme tribunals," The Records of the Federal Convention of 1787, at 21

(Max Farrand ed., rev. ed. 1966) (emphasis added), recognizing that one could have co-existing

18

"supreme" authorities. Inferior does not *exclusively* mean "subject to control, direction, and review." It means that much, to be sure. But it also means more.

This is why an officer with great power who answers to another officer can still be a principal, or superior, officer. The Solicitor General is the fourth ranking official in the Justice Department and answers to the Attorney General, who is "the head of the Department of Justice," 28 U.S.C. § 503, and can displace or direct the Solicitor General in the representation of the United States. *See id.* at §518. But given the Solicitor General's vast power to supervise the conduct of litigation on behalf of the United States, including binding the United States position on the interpretation of the law, deciding what cases to appeal to the courts of appeals and the Supreme Court, and confessing error in litigating positions taken in previous cases and by prior Administrations,[13] it seems obvious that he or she is a Principal Officer notwithstanding the hierarchical superiority of the Attorney General. The same is true, for the same reasons, of the Deputy Attorney General and the Assistant Attorneys General (and of U.S. Attorneys as well, discussed *infra*).

Does the government maintain that they are all inferior officers because they answer to the Attorney General? Is the government's position that there is one and only one Principal Officer – the Attorney General – in the entire Department of Justice? Does it maintain that there is one and only one Principal Officer in all of the Cabinets despite centuries of practice treating Deputy and Assistant Cabinet Secretaries as Principle officers? The Government's position confuses the constitutional "Heads of Departments," who can receive power to appoint inferior

---

[13] *See generally* Seth P. Waxman,"*Presenting the Case of the United States As It Should Be":
The Solicitor General in Historical Context*, Address to the Supreme Court Historical Society
(June 1, 1998). https://www.justice.gov/osg/about-office.

officers, with the much larger class of principal officers. James Madison made no such mistake. When the inferior officer provision of the Appointments Clause was introduced at the Constitutional Convention, Madison worried that "[i]t does not go far enough if it be necessary at all – Superior Officers below Heads of Departments ought in some cases to have the appointment of lesser offices." http://avalon.law.yale.edu/18th_century/debates_915.asp. Not only does this recognize that there are "Superior [non-inferior] Officers below Heads of Departments," it also recognizes that inferior offices are "lesser," meaning having less power or authority however that authority is reviewed, than "Superior" officers.

By this criterion, Robert Mueller is a principal, or superior, officer. The authorities cited by the government simply do not address this point.   As discussed in our opening brief, Mueller wields more power than are any of the permanent U.S. Attorneys because he has nationwide and foreign jurisdiction, indicting three Russian business entities and more recently, a dozen Russian military intelligence officers on the very eve of our President's Summit Meeting with the President of Russia.

### A. Permanent United States Attorneys are Principal Officers

United States Attorneys, because of their vast power, are also superior officers.  When the first 13 were first appointed as "district attorneys" by George Washington along with U.S. Marshals in 1789, there was no Department of Justice, and thus no "Head" of that Department until 1870.  The Attorney General did not have supervisory control over them.[14] Because of the default provision of the Appointments Clause, these "officers" were superior officers and not

---

[14] *See* Waxman, *supra*.  Section 35 of the Judiciary Act of 1789 "created United States district attorneys to conduct the government's legal business in the lower courts, it did not authorize the Attorney General to supervise" them. *Id.* Indeed, the Attorney General was only authorized to appear and argue cases in the Supreme Court. *Id.*

inferior officers either in hierarchy to the Attorney General or their power.  See Section 35 of

The Judiciary Act of 1789.  And they did not suddenly revert to being inferior officers in 1870

when the Justice Department was created and headed by the Attorney General.[15]  U.S. Attorneys

are to be appointed by the President with the advice and consent of the Senate 28 U.S.C. 541.

Congress merely codified Article II's requirement.[16]  Interim U.S. Attorneys have been

considered to be inferior officers appointed by the local District Court since 1863, and Alexia

Morrison was deemed an inferior officer by the Supreme Court.  Nevertheless, from 1789 to

2018 all permanent U.S. Attorneys are, and always have been principal officers.  Robert Mueller

is not an Interim Special Counsel:  he is a Permanent Special Counsel.  And, he is far more than

being just a 94th U.S. Attorney.  He exercises more power than any of the Senate confirmed

Assistant Attorney Generals and some Cabinet officers.

---

[15] At the time of the Founding, Presidents George Washington, John Adams, and Thomas Jefferson all ordered the stopping or the starting of prosecutions by the District Attorneys, thus supervising and directing these principal officers in a very detailed way.  *Steven G. Calabresi & Christopher S. Yoo, The Unitary Executive:  Presidential Power from Washington to Bush* (2008).  For example, in the Neutrality Proclamation of 1793, President Washington ordered the District Attorneys to prosecute anyone who did not obey the command of his Neutrality Proclamation.   President Adams ordered the prosecution of several named Jeffersonian newspapers under the Alien and Sedition Acts.  And, President Jefferson explicitly order the stopping of a Sedition Act prosecution on constitutional grounds.  Jefferson also huddled closely with the District Attorney in his former Vice President Aaron Burr's Treason trial and was intimately involved with the management of that case.  Jefferson, moreover, began the tradition whereby an incoming administration of a different political party would fire the U.S. Attorneys of his predecessors.  Thus, Jefferson fired Adams' District Attorneys to bring in principal officer District Attorneys who shared his values and the values of the American people who had elected him president.  *Id.* at 66-74.

[16] "Words 'The President may appoint, by and with the advice and consent of the Senate.' *were inserted to conform section with the Constitution.* See article II, section 2, clause 2." Historical and Revision Notes to 1948 Act. Emphasis added.
https://www.law.cornell.edu/uscode/text/28/541.

Cases finding that interim U.S. Attorneys are inferior officers for purposes of 28 U.S.C.

§546(d), *see United States v. Hilario*, 218 F.3d 19, 25-26 (1st Cir. 2000); *United States v. Gantt*,

194 F.3d 987, 999 (9th Cir. 1999), address only the extent to which U.S. Attorneys are subject to

the control and direction of the Attorney General.  For example, the court in *Gantt*, citing only an

1878 case from the Court of Claims, *Collins v. U.S.*, 14 Ct.Cl. 568, 574 (1878), asserted "[t]he

Constitution does not use the term 'inferior' 'in the sense of petty or unimportant' but in the

sense of a subordinate to a principal officer." 194 F.3d at 999.  If taken as a broad generalization,

that is flatly untrue, as we have shown.  *Hilario*, by the same token, argued that "[a]n officer's

status as inferior or principal is not absolute, but relative to those around him. If Congress

designs a government position in order to provide a supervisor for a group of officers who

formerly were independent, those officers become inferior to the new officer." 218 F.3d at 26.

That is true *if* the reason why an officer is inferior is grounded in the officer's location within the

executive hierarchy.  It is plainly not true if the officer's status is determined by the scope of the

powers exercised by the officer.[17]  The Deputy Attorney General is himself a Senate confirmed

---

[17] In 1863, at the height of the Civil War when extra-constitutional things happened almost daily, Congress enacted a statute that allowed for federal circuit courts to appoint Acting Interim U.S. Attorneys, who were inferior and not principal officers, for short periods of time.  This statute was amended during the Reagan and second Bush Administration to forbid courts from making interim appointments of U.S. Attorneys as inferior officers.  After the perceived scandal of former Attorney General Alberto Gonzales firing of seven U.S. Attorneys, Congress amended the law back and gave the courts again the very limited power to appoint Interim U.S. Attorneys in highly unusual circumstances for short periods of time who were inferior officers.

The current law is 28 U.S.C. 546.  It allows the Attorney General to make interim appointments to vacancies of U.S. Attorney positions for 120 days.  After that, if there is no presidential appointment, the district courts can make the appointment.  In 2005, the Patriot Act had removed the courts from the process, allowing only the Attorney General to make interim appointments and placing no time limit on how long the interim appointees can serve.  Senate Democrats rushed through an amendment in 2007 in the wake of the Bush U.S. attorney controversy.

principal officer for purposes of the Appointments Clause even if the Attorney General or one of

special assistants exercises an oversight role over the Deputy Attorney General.

*Edmond* is not to the contrary. *Edmond* recognized that an officer is not a principal

officer simply because the officer exercises significant authority: "The exercise of 'significant

authority pursuant to the laws of the United States' marks, not the line between principal and

inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley,* the line

between officer and nonofficer." 520 U.S. at 662.  There is a difference, however, between

"significant" authority that marks officer status and the extraordinary authority and power that

marks principal rather than inferior officer status.  Because Congress will almost never allow

officers whose authority extends very far beyond the level of "significant" to be appointed

without Senate confirmation, there is almost never in the case law, and was not in *Edmond*,

occasion to consider where and how the line between principal and inferior officers must be

drawn in the rare instances in which the line is crossed.  Accordingly, as the Court in *Edmond*

explained,

> *Generally speaking*, the term "inferior officer" connotes a relationship
> with some higher ranking officer or officers below the President: Whether one is
> an "inferior" officer depends on whether he has a superior. It is not enough that
> other officers may be identified who formally maintain a higher rank, or possess
> responsibilities of a greater magnitude. If that were the intention, the Constitution
> might have used the phrase "lesser officer." Rather, in the context of a Clause
> designed to preserve political accountability relative to important Government
> assignments, we think it evident that "inferior officers" are officers whose work is
> directed and supervised at some level by others who were appointed by
> Presidential nomination with the advice and consent of the Senate.

*Id*. at 662-63 (emphasis added).  *Generally speaking,* no one would ever say otherwise.  Almost

always, for the reasons that we have given, the issue in distinguishing principal from inferior

officers will focus on matters of control, direction, and supervision.  But, as Justice Souter

recognized in his concurring opinion in *Edmond*, "[i]t does not follow, however, that if one is

23

subject to some supervision and control, one is an inferior officer. Having a superior officer is necessary for inferior officer status, but not sufficient to establish it." *Id.* at 667 (Souter, J., concurring in part and concurring in the judgment). [18] The vast majority of officers appointed other than by the President with the advice and consent of the Senate will not rise to this level of importance, and their status will therefore be determined entirely by their location within the decision-making hierarchy.  For example, the judges on the Coast Guard Court of Criminal Appeals, as Justice Souter explained at length in *Edmond,* are not so powerful that they cannot be inferior officers.  That does not address, much less resolve, the present case.

The same was true in *Morrison v. Olson.*  The Court there found that the special counsel *in that case* was an inferior officer, relying on a combination of considerations involving both the counsel's degree of independence and the scope of the counsel's duties and functions.  Robert Mueller is different across both dimensions. *See* Miller Opening Brief at pp.7, 18-20 (discussing the applicability of *Morrison).*

The courts have never had to decide whether the Deputy Attorney General, the Solicitor General, the Assistant Attorneys General, and the non-interim U.S. Attorneys are inferior officers, because Congress has never tried to authorize their appointment by any method other than the method appropriate for principal officers.  If there is one and only one non-inferior officer in the entire Department of Justice, then of course Robert Mueller is not that officer.  That conclusion, of course, would have astounded James Madison, and it should equally astound the

---

[18] As Circuit Judge Brett Kavanaugh observed, "Under this mode of analysis [in *Edmond*], an independent counsel could not realistically be considered an inferior officer." *Symposium: The Independent Counsel Act: From Watergate to Whitewater and Beyond*, 86 Geo. L.J. 2133, 2147, n.21 (1998) ("Symposium").
http://online.wsj.com/public/resources/documents/2018_0628_kavanaugh_1998_president_indep
endent_counsel.pdf

Court.  Once one recognizes that there can be non-inferior officers who are not "Heads of Departments," one must determine whether a particular officer's duties extend far enough beyond "significant authority" to cross the line from inferior to principal.

Relatively few officers who Congress allows to be appointed without Senate confirmation will cross that line.  Robert Mueller, if one believes that Congress has in fact authorized his appointment, is one of the few. The Special Counsel's powers are greater than those of most United States Attorneys and he has greater leeway in carrying out his powers than U.S. Attorneys.  He can be characterized as an U.S. Attorney-at-large or a super U.S. Attorney with almost unlimited resources.  Indeed, his powers are more like of an Assistant Attorney General.  In short, Robert Mueller is a superior officer who was not appointed pursuant to the default provisions of Article II.[19]

* * * * *

## CONCLUSION

For the foregoing reasons and those in his opening brief, Andrew Miller's Motion To Quash The Subpoena should be granted.

---

[19]  As Judge Kavanaugh recommended in 1998, "Congress . . . should repeal the provision in the independent counsel statute providing for appointment of an independent counsel by the Special Division and should instead provide that a special counsel be appointed in the manner *constitutionally mandated for high-level executive branch officials: appointment by the President and confirmation by the Senate. Id.* (emphasis added). Symposium at 2147.

25

Respectfully submitted,

*Alicia I. Dearn*
Alicia I. Dearn
Bellatrix PC
Missouri Bar No. 64623
California Bar No. 235169
(***Pro Hac Vice Pending***)

231 S. Bemiston Ave., St. 850
St. Louis, MO 63105-1920
Telephone: 314.526.0040
Facsimile: 314.526.0044
AliciaDearn@bellatrixlaw.com

*/s/ Paul D. Kamenar*
Paul D. Kamenar, D.C. Bar #914200
1629 K Street, N.W.
Suite 300
Washington, DC 20006
(301) 257-9435
paul.kamenar@gmail.com

***Attorneys for Andrew Miller***


## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2018, the foregoing Reply Brief of Andrew

Miller was served via electronic mail to:

Aaron Zelinsky, Esq
US Department of Justice Special Counsel's Office
RM B-103
950 Pennsylvania Ave NW
Washington DC, 20530
ASJZ@usdoj.gov

*/s/ Paul D. Kamenar*

26

# EXHIBIT 1

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                    Thursday, March 2, 2017

## Attorney General Sessions Statement on Recusal

Attorney General Jeff Sessions today issued the following statement:

"During the course of the confirmation proceedings on my nomination to be Attorney General, I advised the Senate Judiciary Committee that '[i]f a specific matter arose where I believed my impartiality might reasonably be questioned, I would consult with Department ethics officials regarding the most appropriate way to proceed.'

"During the course of the last several weeks, I have met with the relevant senior career Department officials to discuss whether I should recuse myself from any matters arising from the campaigns for President of the United States.

"Having concluded those meetings today, I have decided to recuse myself from any existing or future investigations of any matters related in any way to the campaigns for President of the United States.

"I have taken no actions regarding any such matters, to the extent they exist.

"This announcement should not be interpreted as confirmation of the existence of any investigation or suggestive of the scope of any such investigation.

"Consistent with the succession order for the Department of Justice, Acting Deputy Attorney General and U.S. Attorney for the Eastern District of Virginia Dana Boente shall act as and perform the functions of the Attorney General with respect to any matters from which I have recused myself to the extent they exist."

**Component(s):**                                  **Press Release Number:**
Office of the Attorney General                      17-237

*Updated March 2, 2017*

# EXHIBIT 2

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                   Wednesday, May 17, 2017

## Appointment of Special Counsel

Deputy Attorney General Rod J. Rosenstein today announced the appointment of former Department of Justice official and FBI Director Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters.

"In my capacity as acting Attorney General, I determined that it is in the public interest for me to exercise my authority and appoint a Special Counsel to assume responsibility for this matter," said Deputy Attorney General Rosenstein. "My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command."

Deputy Attorney General Rosenstein added, "Each year, the career professionals of the U.S. Department of Justice conduct tens of thousands of criminal investigations and handle countless other matters without regard to partisan political considerations. I have great confidence in the independence and integrity of our people and our processes. Considering the unique circumstances of this matter, however, I determined that a Special Counsel is necessary in order for the American people to have full confidence in the outcome. Our nation is grounded on the rule of law, and the public must be assured that government officials administer the law fairly. Special Counsel Mueller will have all appropriate resources to conduct a thorough and complete investigation, and I am confident that he will follow the facts, apply the law and reach a just result."

Special Counsel Mueller has agreed to resign from his private law firm in order to avoid any conflicts of interest with firm clients or attorneys.

A copy of the order is attached.

**Attachment(s):**                                         **Press Release Number:**
Download Order 3915-2017 (Special Counsel)                 17-541

**Component(s):**
Office of the Deputy Attorney General

*Updated May 17, 2017*