# Attachment A

(with proposed redactions in red)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| *In re* GRAND JURY INVESTIGATION | Grand Jury Action No. 18-34 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**FILED UNDER SEAL** |

**Table of Contents**

I.   BACKGROUND ............................................................................................................ 3

   A. Historical Background ............................................................................................ 4

Finally, as relevant here, Section 17 provided that:.......................................................... 9

   B. Statutory Background ............................................................................................ 12

   C. The Special Counsel Regulations .......................................................................... 13

   D. The Special Counsel's Appointment ...................................................................... 17

   E. The Subpoenas at Issue .......................................................................................... 19

II.  LEGAL STANDARD .................................................................................................. 23

III. DISCUSSION ............................................................................................................... 24

   A. The Witness's Second Motion to Quash is Timely ................................................ 24

   B. The Special Counsel is an Inferior Officer ............................................................ 26

      1. The Attorney General's Authority to Direct and Supervise a Special Counsel .......... 28

         a. The Attorney General Has Plenary Statutory Power of Direction and Supervision . 31

         b. The Attorney General Retains Broad Authority Under The Regulations to Direct

            and Supervise a Special Counsel……………………………………………………34

      2. The Other *Morrison* Factors All Weigh Toward Inferior Officer Status .................... 48

         a. Limited Duties……........……………………………...............................……………49

         b. Limited Jurisdiction……………………………………………………………….53

         c. Limited Tenure………………………………………………………..…………54

      3. Inferior Officer Status Does Not Turn on the Significance of an Officer's Duties and

         Functions ....................................................................................................................... 56

   C. Congress By Law Vested the Special Counsel's Appointment in the Attorney General .. 67

      1. 28 U.S.C. § 533(1)....................................................................................................... 67

      2. 28 U.S.C. § 515(b)....................................................................................................... 70

      3. No Clear Statement Rule Regarding Inferior Officers' Appointment Exists............... 76

      4. Congress's Enactment of Special Counsel Statutes for Specific Purposes Casts No

         Doubt on the Attorney General's Authority to Appoint the Special Counsel............. 80

   D. The Special Counsel Was Validly Appointed By a Head of Department ........................ 83

      1. 28 U.S.C. § 508(a) Allows the DAG to Serve as Acting Attorney General Where the

         Attorney General is Recused .......................................................................................... 84

      2. 28 U.S.C. § 510 Allows the Attorney General to Delegate to the DAG Authority to

         Appoint the Special Counsel ...................................................................................... 90

IV. CONCLUSION.............................................................................................................. 92

## MEMORANDUM OPINION

This matter comes before the Court on a second motion by a grand jury witness to quash subpoenas issued by the Special Counsel to provide testimony and documents to the grand jury as part of the ongoing investigation into Russian interference with the 2016 presidential election, and related matters, with which the Special Counsel was tasked.  This time, the witness seeks to quash the grand jury subpoenas on the grounds that the Special Counsel lacks authority to issue the subpoenas as his appointment is unconstitutional, in violation of the Appointments Clause.

"[T]he Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one."  *Edmond v. United States*, 520 U.S. 651, 660 (1997); *see also Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) (Thomas, J., concurring) ("[T]he Appointments Clause maintains clear lines of accountability—encouraging good appointments and giving the public someone to blame for bad ones.").  The exercise of prosecutorial power, just like the exercise of other forms of government authority, is ultimately accountable to elected officials.  Federal prosecutors are granted broad authority under our laws to choose their targets and pursue their investigations.  As former Attorney General Robert H. Jackson stated, "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America.  His discretion is tremendous."  Robert H. Jackson, The Federal Prosecutor, Address at Conference of United States Attorneys (Apr. 1, 1940).  Such power, left unchecked, is susceptible to abuse.  "Under our system of government, the primary check against prosecutorial abuse is a political one."  *Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting).  Prosecutors must wield broad powers to investigate effectively criminal activity, but elected officials must exercise sufficient control over prosecutors, principally by setting boundaries in law, to enable the public to know who to credit or blame for exercises of prosecutorial authority.

Here, the witness essentially argues that the Special Counsel wields too much power with too little accountability.  Specifically, the witness contends that the Special Counsel was appointed unlawfully, under the Appointments Clause of the Constitution, U.S. CONST. art. II, § 2, cl. 2, because (1) the Special Counsel is a principal rather than inferior officer, and thus was required to be nominated by the President and confirmed by the Senate; (2) no statute authorized the Special Counsel's appointment, as the Constitution requires; and (3) the Department of Justice official who appointed the Special Counsel lacked authority to do so.

The witness raises legitimate questions, but his concerns are not legally sustainable.  The scope of the Special Counsel's power falls well within the boundaries the Constitution permits, as the Special Counsel is supervised by an official who is himself accountable to the elected President.  The witness's remaining arguments fare no better.  Multiple statutes authorize the Special Counsel's appointment, and the official who appointed the Special Counsel had power to do so.  For these reasons, explained in further detail below, the witness's motion to quash the grand jury subpoenas is denied.

## I.    BACKGROUND

Consideration of the constitutional and statutory issues the witness raises benefits from review of the historical development of the Attorney General's authority to direct and supervise the federal government's law enforcement responsibilities, and to appoint attorneys to assist him in this task.  Following this is an overview of relevant statutes and the internal Department of Justice Special Counsel regulations.  Finally, the circumstances surrounding the Special Counsel's appointment, as well as the events giving rise to the instant dispute, are recounted.

## A. Historical Background

The Attorney General did not always possess the centralized authority he enjoys today to direct the United States' law enforcement and litigation responsibilities.  Rather, such authority developed and expanded over time.  The Judiciary Act of 1789 created the office of Attorney General, who was authorized—

> to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned, and to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.

An Act to Establish the Judicial Courts of the United States ("Judiciary Act"), ch. 20, § 35, 1 Stat. 73, 93 (1789).  Edmund Randolph, the first United States Attorney General appointed by the first President, George Washington, had neither clerical staff nor office space, and had to write out "[a]ll his opinions, letters, and briefs . . . in his own hand."  Sewell Key, *The Legal Work of the Federal Government*, 25 VA. L. REV. 165, 176 (1939).

The Judiciary Act also provided for the appointment in each district of a district attorney, later to be known as U.S. Attorney, "learned in the law to act as attorney for the United States in such district . . . whose duty it shall be to prosecute in such district all delinquents for crimes and offences, cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned, except before the supreme court in the district in which that court shall be holden."  Judiciary Act § 35.  The Act gave the Attorney General "no supervisory control over" the district attorneys, who "functioned independently" and could be directed only by the President.  *United States v. Hawthorne*, 449 F. Supp. 1048, 1051 (S.D. Cal. 1978), *aff'd*, 626 F.2d 87 (9th Cir. 1980).  The Act thus "created a system in which the Attorney General was specifically authorized to represent the United States only in judicial proceedings which took place in the Supreme Court," the district attorneys having exclusive "[p]ower to initiate federal

criminal prosecutions, including the right to appear before a grand jury." *Id.* Indeed, "[s]ince the Attorney General was required to appear only in the Supreme Court, there was doubt about his ability to appear in other courts" at all. *In re Persico*, 522 F.2d 41, 53 (2d Cir. 1975).[1] The result was that "prior to the Civil War, federal prosecutorial efforts were almost completely decentralized, with authority vested in the hands of local United States Attorneys." *Id.*[2]

In 1861, prompted by "[t]he crisis of the Civil War," *id.*, Congress began to concentrate federal litigation authority in the Attorney General, giving him "general superintendence and direction of the attorneys . . . of all the districts in the United States and the Territories as to the manner of discharging their respective duties." An Act Concerning the Attorney-General and the Attorneys and Marshals of the Several Districts ("DA Act"), ch. 37, 12 Stat. 285, 285 (1861). The Act also required the district attorneys "to report to the Attorney-General an account of their official proceedings, and the state and condition of their respective offices." *Id.* Finally, the Act authorized the Attorney General "to employ and retain (in the name of the United States) such attorneys and counsellors-at-law as he may think necessary to assist the district-attorneys in the discharge of their duties." *Id.* § 2.[3]

With the DA Act, the Attorney General could for the first time both direct the district attorneys' work and hire attorneys. The Attorney General's hiring authority, however, was

---

[1] "Early Attorneys General," however, "did not view the Judiciary Act as limiting their ability to appear before federal courts other than the Supreme Court." *Persico*, 522 F.2d at 53. "They took active roles prosecuting a number of early cases in federal trial courts . . . . participat[ing] in the drafting of indictments," and possibly even "appear[ing] before grand juries in a few cases." *Id.*; *see also Hawthorne*, 449 F. Supp. at 1055 n.10. Given that "Attorneys General were provided with only skeletal staffs until after the Civil War," however, and "were preoccupied with growing requests for advisory opinions and with expanding Supreme Court litigation, the local district attorneys remained all but completely independent." *Persico*, 522 F.2d at 53.

[2] Presidents and Attorneys General, beginning with Edmund Randolph, lobbied over the course of decades to give the Attorney General control and supervision over the district attorneys. *See* Seth Waxman, "Presenting the Case of the United States As It Should Be": The Solicitor General in Historical Context, Address to the Supreme Court Historical Society (June 1, 1998). Congress resisted these efforts, but enacted piecemeal legislation during this period giving the Attorney General control over specific areas of litigation on an *ad hoc* basis. *See id.* n.34.

[3] Congress briefly repealed this authority in 1869, but restored it shortly thereafter, *see* Waxman, *supra*.

limited to hiring attorneys to "assist the district attorneys."  *Id.*  The Attorney General still lacked attorneys under his own immediate control and was required instead to rely on the district attorneys and their assistants to execute his directives.  In addition, the Attorney General himself still had no explicit statutory authority to litigate outside the Supreme Court.

Congress empowered the Attorney General in 1868 to litigate in the Court of Claims and gave him two assistants, to be nominated by the President and confirmed by the Senate rather than chosen by the Attorney General himself, *see* Act of June 25, 1868, ch. 71, § 5, 15 Stat. 75, 75–76 ("1868 Act"), but the Attorney General's litigation authority and staff otherwise remained essentially unchanged between 1789 and 1870, *see United States v. 1,960 Acres of Land in Riverside Cty.*, 54 F. Supp. 867, 875 (S.D. Cal. 1944).  As the Supreme Court stated in the *Confiscation Cases*:

> [p]ublic prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney, and even after they are entered in court, they are so far under his control that he may enter a *nolle prosequi* at any time before the jury is empanelled for the trial of the case, except in cases where it is otherwise provided in some act of Congress.
>
> Civil suits, in the name and for the benefit of the United States, are also instituted by the district attorney, and, in the absence of any directions from the Attorney-General, he controls the prosecution of the same in the district and circuit courts, and may, if he sees fit, allow the plaintiffs to become nonsuit, or consent to a discontinuance.
>
> Settled rule is that those courts will not recognize any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business, in his absence, as may appertain to the duties of his office.

74 U.S. 454, 457 (1868).  Federal litigation authority, while more concentrated in the Attorney General than before, thus remained largely decentralized.

In 1870, concern "over the great number of overlapping and conflicting law offices of the Government working independently of and at odds with the local District Attorneys and the

Attorney General," *1,960 Acres*, 54 F. Supp. at 875, led Congress to create the Department of

Justice, with the Attorney General at its head, *see* An Act to Establish the Department of Justice

("DOJ Act"), ch. 150, 16 Stat. 162, 162 (1870).  The DOJ Act's proponents "were principally

concerned with consolidating the legal offices of the executive branch to promote greater

consistency and efficiency."  Randolph D. Moss, *Executive Branch Legal Interpretation: A

Perspective from the Office of Legal Counsel*, 52 ADMIN. L. REV. 1303, 1310 (2000).  One

supporter described the DOJ Act as "necessary to secure uniformity in the legal opinions given

to the President, the heads of Departments, the heads of bureaus, and other officers of the

Government for the guidance of their official action," and "to save the unnecessary expenditure

of more than one hundred thousand dollars annually for extra official fees to counsel."  CONG.

GLOBE, 41st Cong., 2d Sess. 3065 (1870) (statement of Rep. William Lawrence of Ohio).

Another supporter described the DOJ Act as needed to "cut off . . . outside [legal] work" and

establish a "unity of jurisprudence."  *Id.* at 3035–36 (statement of Rep. Thomas Jenckes of

Rhode Island); *see also 1,960 Acres*, 54 F. Supp. at 875 ("The principal cause for the passage of

the Act was the multiplicity of conflicting legal opinions given by the law officers in the several

departments[,] expenditures for special counsel, including large retainers paid eminent lawyers

who at times rendered little service in return—numerous private counsel appointed by Cabinet

officers." (alterations and internal quotation marks omitted)).

The DOJ Act centralized federal authority to conduct litigation under the Attorney

General's control, creating a Solicitor General position "to assist the Attorney-General in the

performance of his duties;" maintaining two Assistant Attorney General positions to assist the

Attorney General and Solicitor General; transferring various solicitors, law officers, and clerical

workers in other departments into the Department of Justice; and reassigning other departments'

law duties to the Department.  1870 Act §§ 2–3, 7.  Whereas the Judiciary Act of 1789 had

authorized the Attorney General to argue only before the Supreme Court, the district attorneys

being authorized to argue before other courts, the DOJ Act expressly authorized the Attorney

General to "conduct and argue any case in which the government is interested, in any court of the

United States," or to "require the solicitor-general or any officer of his Department to do so," and

to send any officer "to attend to the interests of the United States in any suit pending in any"

federal or state court or "attend to any other interest of the United States."  *Id.* § 5.  The Act gave

the Attorney General additional power to direct and supervise his subordinates, including broad

authority to delegate them responsibility to provide legal opinions, and to "make all necessary"

departmental "rules and regulations."  *Id.* §§ 4, 6, 8, 14.  The Act reaffirmed the Attorney

General's "supervision of the conduct and proceedings" of the district attorneys, extending such

supervision over "all other attorneys and counselors employed in any case or business in which

the United States may be concerned," and further strengthened the Attorney General's power

over the district attorneys by transferring to him "the supervisory powers . . . over the[ir]

accounts," along with those of "other officers of the courts of the United States."  *Id.* §§ 15, 16.

Section 17 of the DOJ Act prohibited the other departments from "employ[ing] attorneys

or counsel at the expense of the United States," requiring the departments instead to "call upon

the Department of Justice" for "counsel or advice," and obligating the Department to "attend to

the same."  *Id.* § 17.  Section 17 also provided that "no counsel or attorney fees shall hereafter be

allowed to any person or persons, beside the respective district attorneys and assistant district

attorneys, for services in such capacity to the United States, or any branch or department of the

government thereof, unless hereafter authorized by law, and then only on the certificate of the

Attorney-General that such services were actually rendered, and that the same could not be

8

performed by the Attorney-General, or solicitor-general, or the officers of the department of justice, or by the district attorneys." *Id.*

Finally, as relevant here, Section 17 provided that:

> every attorney and counselor who shall be specially retained, under the authority of the Department of Justice, to assist in the trial of any case in which the government is interested, shall receive a commission from the head of said Department, as a special assistant to the Attorney-General, or to some one of the district attorneys, as the nature of the appointment may require, and shall take the oath required by law to be taken by the district attorneys, and be subject to all the liabilities imposed upon such officers by law.

*Id.* The Attorney General retained authority under the DA Act "to appoint attorneys to assist the United States Attorney," but now could appoint "attorneys to assist the Attorney General" directly as well. *Hawthorne*, 449 F. Supp. at 1052. The DA Act and DOJ Act were "separate and distinct statutory bases for the Attorney General, as head of the Department of Justice, to appoint attorneys to assist either himself or a United States attorney." *Id.*; *see Persico*, 522 F.3d at 58 ("Congress, in establishing the Department of Justice, apparently showed no concern that its employees would interfere with the functions of the district attorneys and gave the Attorney General power to use the persons he employed to attend to any interest of the United States.").

"Armed with" this new authority, "Attorneys General made extensive use of special attorneys . . . . in grand jury proceedings as well as trials." *Persico*, 522 F.2d at 54. "[T]he first widespread use of prosecutorial authority by the Attorney General" occurred under President Ulysses S. Grant, when "Department of Justice staff were dispatched to the South to assist local United States attorneys" in "supervis[ing] the enforcement of Reconstruction laws designed to protect newly-enfranchised black citizens from widespread Ku Klux Klan terrorism in Southern states." *Id.* "More recently, important tax, civil, land, antitrust and civil rights cases have been increasingly controlled from Washington through the various divisions in the Department of Justice set up for that purpose." *Id.*

As the DOJ Act allowed the Attorney General to retain attorneys "to assist in the *trial* of any case in which the government is interested," DOJ Act § 17 (emphasis added), dispute arose as to whether specially-retained attorneys could participate on the Attorney General's behalf in grand jury proceedings.  In *United States v. Rosenthal*, the Circuit Court for the Southern District of New York held that the Attorney General, regular Department of Justice officers, and specially-retained attorneys could participate only in trials but not in grand jury proceedings, as the latter were the exclusive province of the district attorneys and their assistants.  121 F. 862, 868 (C.C.S.D.N.Y. 1903).  *Rosenthal* construed the DOJ Act to "indicate attentive and jealous regard for the primary policy of limiting the conduct of matters before grand juries to the local officers," reasoning that "the exclusive power of the District Attorney to initiate proceedings before the grand jury" was "a fundamental policy of the government" that Congress had not intended the DOJ Act to "derogat[e]."  *Id.* at 866–67.  *Rosenthal* did not doubt that the DOJ Act "enable[d] the Attorney General to appoint a special assistant to the Attorney General," holding only that such special assistants could not participate in grand jury proceedings.  *Id.* at 868.  Two other courts rejected *Rosenthal*'s reasoning shortly thereafter, holding that specially-retained attorneys could conduct grand jury proceedings.  *See United States v. Twining*, 132 F. 129, 131–32 (D.N.J. 1904); *United States v. Cobban*, 127 F. 713, 717 (D. Mont. 1904).

Congress, "acting on the Attorney General's request," responded to *Rosenthal* in 1906 by enacting a statute authorizing the Attorney General, regular Department of Justice officers, and specially-retained attorneys to conduct grand jury proceedings, "[t]he express purpose of" which "was to overrule the broad holding in *Rosenthal*."  *Persico*, 522 F.2d at 59.  The 1906 Act provided

> [t]hat the Attorney General or any officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney-General under any

> provision of law, may, when thereunto specifically directed by the Attorney-
> General, conduct any kind of legal proceeding, civil or criminal, including grand
> jury proceedings and proceedings before committing magistrates, which district
> attorneys now are or hereafter may be by law authorized to conduct, whether or not
> he or they be residents of the district in which such proceeding is brought.

An Act to Authorize the Commencement and Conduct of Legal Proceedings Under the Direction of the Attorney-General ("1906 Act"), Pub. L. No. 59-404, ch. 3935, 34 Stat. 816, 816–17 (1906).  The language requiring the Attorney General to "specifically direct[]" that special counsel conduct grand jury proceedings likely was added to assuage "fears that an unbounded prosecutorial force was being created." *Hawthorne*, 449 F. Supp. at 1055; *see also id.* at 1054 ("It appears likely that this requirement was meant to respond in some measure to the reservations of a minority of the House Committee which had strongly objected to granting specially appointed counsel the right to appear before a grand jury.").  "In this manner, the Attorney General would supervise the work of these assistants, and bear ultimate responsibility for their conduct." *Id.* at 1055.

Between 1921 and 1964, Congress annually appropriated money to the Department of Justice to employ officials to detect and prosecute crime.  Language from the Department's 1964 appropriation bill, for example, provided money "[f]or expenses necessary for the detection and prosecution of crimes against the United States." Act of Aug. 31, 1964, Pub. L. No. 88-527, tit. II, 78 Stat. 711, 717.  In 1965, Congress embarked on a comprehensive recodification of the U.S. Code.  S. Rep. No. 89-1380, at 18 (1966); *accord* H.R. Rep. 89-901, at 1 (1965).  In the course of those efforts, Congress codified language from the Department's 1964 appropriation act into statute at 28 U.S.C. § 533(1).  Although the appropriation act had included this provision under the header "Federal Bureau of Investigation" ("FBI"), 78 Stat. at 717, neither the appropriation act itself nor Section 533(1) textually limited the Attorney General's hiring authority to the FBI.

## B.  Statutory Background

Today, the Attorney General remains the head of the Department of Justice.  28 U.S.C.

§§ 501, 503.  The Deputy Attorney General ("DAG") is the Department's second-in-command,

and "may exercise all the duties of" the Attorney General "[i]n case of a vacancy in the office."

*Id.* §§ 504, 508.  "All functions of other officers of the Department of Justice" and of "employees

of the Department of Justice," with the exception of certain relatively minor functions not

relevant here, "are vested in the Attorney General," who "may from time to time make such

provisions as he considers appropriate authorizing the performance by any other officer . . . of

the Department of Justice of any function of the Attorney General."  *Id.* §§ 509, 510.  "[T]he

conduct of litigation in which the United States, an agency, or officer thereof is a party, or is

interested, and securing evidence therefor, is reserved to officers of the Department of Justice,

under the direction of the Attorney General," except as the law may otherwise provide.  *Id.* §

516.  The Attorney General, in turn, "shall supervise all litigation to which the United States, an

agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United

States attorneys, and special [assistants to U.S. Attorneys] in the discharge of their respective

duties."  *Id.* § 519; *see also id.* § 547 ("United States attorney[s]" shall "make such reports as the

Attorney General may direct.").

"The Attorney General may appoint officials . . . to detect and prosecute crimes against

the United States," *id.* § 533(1), and may "specially retain[]" attorneys "under authority of the

Department of Justice," who "shall be commissioned as special assistant to the Attorney General

or special attorney," *id.* § 515(b).  The Attorney General may also "specifically direct[]" that

"any other" regular "officer of the Department of Justice, or any attorney specially appointed by

the Attorney General under law, . . . conduct any kind of legal proceeding, civil or criminal,

including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought," or else may himself do the same. *Id.* § 515(a).

The Attorney General is required to "promulgate rules and regulations which require the disqualification of any officer or employee of the Department of Justice . . . from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof." 28 U.S.C. § 528. Pursuant to this statutory requirement, the Attorney General promulgated 28 C.F.R. § 45.2, which provides, in relevant part, that "no employee shall participate in a criminal investigation or prosecution if he has a personal or political relationship with . . . [a]ny person or organization substantially involved in the conduct that is the subject of the investigation or prosecution" or "[a]ny person or organization which he knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution." 28 C.F.R. § 45.2(a); *see also* Disqualification Arising From Personal or Political Relationships, 48 Fed. Reg. 2,318, 2,319 (Jan. 19, 1983) (citing 28 U.S.C. § 528 as authority for the regulation's promulgation). The regulation defines the term "[p]olitical relationship" to mean "a close identification with an elected official, a candidate . . . for elective, public office, a political party, or a campaign organization, arising from service as a principal adviser thereto or a principal official thereof." 28 C.F.R. § 45.2(c)(1).

### C.  The Special Counsel Regulations

In 1999, shortly before the Independent Counsel provisions of the Ethics in Government Act of 1978 ("EIGA"), Pub. L. No. 95-521, § 601(a), 92 Stat. 1824, 1867–73; *see* 28 U.S.C. § 591–599 (expired), lapsed, the Department of Justice promulgated regulations "to replace" the

expiring provisions, attempting "to strike a balance between independence and accountability in certain sensitive investigations, recognizing that there is no perfect solution to the problem," Office of Special Counsel, 64 Fed. Reg. 37,038, 37,038 (July 9, 1999).[4]  The regulations seek to achieve "day-to-day independence" of the Special Counsel, who is "appointed to investigate and, if appropriate, prosecute matters when the Attorney General concludes that extraordinary circumstances exist such that the public interest would be served by removing a large degree of responsibility for the matter from the Department of Justice." *Id.*  The regulations leave a Special Counsel "free to structure the investigation as he or she wishes and to exercise independent prosecutorial discretion to decide whether charges should be brought, within the context of the established procedures of the Department," while retaining in the Attorney General "ultimate responsibility for the matter and how it is handled." *Id.*  The regulations thus "explicitly acknowledge the possibility of review of specific decisions reached by the Special Counsel." *Id.*  The regulations also contemplate that the Acting Attorney General would assume responsibility over a Special Counsel matter "if the Attorney General is personally recused in the matter." *Id.*  The Department of Justice promulgated the regulations without either notice and comment or a 30-day delay in the effective date as "rule[s] relat[ing] to matters of agency management or personnel." *Id.* at 37,041.

The regulations allow the Attorney General to establish a Special Counsel's jurisdiction, and to determine whether "additional jurisdiction beyond that specified in" the Special Counsel's "original jurisdiction is necessary in order to fully investigate and resolve the matters assigned."

---

[4]        The EIGA created the position of Special Prosecutor, to sunset in five years.  *See* EIGA § 601(a).  Congress reauthorized this provision in 1983, renaming the Special Prosecutor the Independent Counsel, and then again in 1987 and 1994.  *See* Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, § 7, 96 Stat. 2039, 2042; Independent Counsel Reauthorization Act of 1987, Pub. L. No. 100-191, § 2, 101 Stat. 1293, 1306; Independent Counsel Reauthorization Act of 1994, Pub. L. No. 103-270, § 2, 108 Stat. 732, 732.

28 C.F.R. § 600.4(a), (b).  A Special Counsel is required to "comply with the rules, regulations, procedures, practices and policies of the Department of Justice," and to "consult with appropriate offices within the Department for guidance with respect to established practices, policies and procedures of the Department, including ethics and security regulations and procedures."  *Id.* § 600.7(a).  A Special Counsel may "consult directly with the Attorney General" if the Special Counsel "concludes that the extraordinary circumstances of any particular decision would render compliance with required review and approval procedures by the designated Departmental component inappropriate."  *Id.*

Although a Special Counsel is not "subject to the day-to-day supervision of any official of the Department," nonetheless "the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued."  *Id.* § 600.7(b).  The Attorney General must "give great weight to the views of the Special Counsel."  *Id.*  A Special Counsel is not unbounded but is "subject to disciplinary action for misconduct and breach of ethical duties under the same standards and to the same extent as are other employees of the Department of Justice," with "[i]nquiries into such matters . . . handled through the appropriate office of the Department upon the approval of the Attorney General."  *Id.* § 600.7(c).  The Attorney General may "discipline[]" a Special Counsel, as well as "remove a Special Counsel for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies," in which event the Attorney General must "inform the Special Counsel in writing of the specific reason for his or her removal."  *Id.* § 600.7(d).

A Special Counsel must, within 60 days of appointment, "develop a proposed budget for the current fiscal year . . . for the Attorney General's review and approval." *Id.* § 600.8(a)(1). The Attorney General, upon consideration of the Special Counsel's budget proposal, then "shall establish a budget for the operations of the Special Counsel." *Id.* "Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel shall report to the Attorney General the status of the investigation, and provide a budget request for the following year." *Id.* 600.8(a)(2). The Attorney General then "determine[s] whether the investigation should continue and, if so, establish[es] the budget for the next year." *Id.* In addition to providing a budget to be approved by the Attorney General, a Special Counsel must "notify the Attorney General of events in the course of his or her investigation in conformity with the Departmental guidelines with respect to Urgent Reports," *id.* § 600.8(b), which Department of Justice litigating divisions must submit "to inform Department leadership, including the Attorney General and the [DAG], of (1) major developments in significant investigations and litigation, (2) law enforcement emergencies, and (3) events affecting the Department that are likely to generate national media or Congressional attention," U.S. ATTORNEY'S MANUAL § 1-13.100. "At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 U.S.C. § 600.8(c).

The Attorney General must notify "the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" upon either appointing or removing a Special Counsel, and provide "an explanation for each action." *Id.* § 600.9(a)(1)–(2). In addition, the Attorney General must, "[u]pon conclusion of the Special Counsel's investigation," provide "a description and explanation of instances (if any) in which the Attorney General concluded that a

proposed action by a Special Counsel was so inappropriate or unwarranted under established

Departmental practices that it should not be pursued."  *Id.* § 600.9(a)(3); *accord id.* § 600.7(b).

The Special Counsel regulations "are not intended to, do not, and may not be relied upon

to create any rights, substantive or procedural, enforceable at law or equity, by any person or

entity, in any matter, civil, criminal, or administrative."  *Id.* § 600.10.

### D.  The Special Counsel's Appointment

On March 2, 2017, Attorney General Jeff Sessions announced his recusal "from any

existing or future investigations of any matters related in any way to the campaigns for President

of the United States."  Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement

on Recusal ("Recusal Statement") (Mar. 2, 2017).  The Attorney General announced that

"[c]onsistent with the succession order for the Department of Justice, [the] Acting Deputy

Attorney General . . . shall act as and perform the functions of the Attorney General with respect

to any matters from which I have recused myself to the extent they exist."  *Id.*  The Attorney

General confirmed that he "ha[d] taken no actions regarding any such matters, to the extent they

exist."  *Id.*  In subsequent testimony before the U.S. Senate Select Committee on Intelligence,

the Attorney General explained that he had recused himself as "required" by 28 C.F.R. § 45.2,

which the Attorney General understood to mandate "that Department employees should not

participate in investigations of a campaign if they have served as a campaign advisor."  Jeff

Sessions, Attorney General, Prepared Remarks to the United States Senate Select Committee on

Intelligence ("Attorney General's Remarks") (June 13, 2017).[5]  The Attorney General further

---

[5]      The Attorney General did not file a formal order of recusal.  *See* Gov't Ltr. Mem. at 1, ECF No. 21.
Neither 28 C.F.R. § 45.2 nor any other statutory or regulatory provision require that a recusal be memorialized in a
written order or other memorandum.  *Cf.* 5 C.F.R. § 2635.502(e)(2) ("An employee [generally] need not file a
written disqualification statement," but "may elect to create a record of his actions by providing written notice to a
supervisor or other appropriate official.").

testified that between the day after he became Attorney General to the date of his recusal, he

"was never briefed on any investigative details and did not access information about the

investigation," and "received only the limited information that the Department's career officials

determined was necessary to inform [his] recusal decision." *Id.*

On March 20, 2017, then-FBI Director James B. Comey testified before the U.S. House

of Representatives Permanent Select Committee on Intelligence that he

> ha[d] been authorized by the Department of Justice to confirm that the FBI, as part
> of our counterintelligence mission, is investigating the Russian government's
> efforts to interfere in the 2016 presidential election, and that includes investigating
> the nature of any links between individuals associated with the Trump campaign
> and the Russian government and whether there was any coordination between the
> campaign and Russia's efforts.

James B. Comey, Dir., FBI, Statement Before the House Permanent Select Committee on

Intelligence (Mar. 20, 2017).  "As with any counterintelligence investigation," the Director

testified, "this will also include an assessment of whether any crimes were committed."  *Id.*

Almost two months after the Attorney General's recusal from any campaign-related

matters, and over one month after the FBI Director's revelatory testimony about the ongoing

counterintelligence investigation of Russian efforts to interfere in the 2016 presidential election,

Rod J. Rosenstein was sworn in as DAG on April 26, 2017.  *See Meet the Deputy Attorney

General*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/dag/staff-profile/meet-deputy-attorney-

general (last visited July 31, 2018).  The DAG became Acting Attorney General, by operation of

law, as to those matters for which the Attorney General was recused.  *See* Recusal Statement; 28

U.S.C. § 508(a); *see also* Attorney General's Remarks.

Invoking "the authority vested in me as Acting Attorney General, including 28 U.S.C. §§

509, 510, and 515," the DAG on May 17, 2017, appointed Robert S. Mueller III to serve as

Special Counsel for the U.S. Department of Justice.  U.S. Dep't of Justice, Office of the Deputy

Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian

Interference with the 2016 Presidential Election and Related Matters ("Appointment Order")

(May 17, 2017).  The DAG specifically authorized the Special Counsel:

> to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including
>
> (i)    any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and
>
> (ii)   any matters that arose or may arise directly from the investigation; and
>
> (iii)  any other matters within the scope of 28 C.F.R. § 600.4(a).

*Id.* ¶ (b).  The DAG also authorized the Special Counsel "to prosecute federal crimes arising

from the investigation of these matters."  *Id.* ¶ (c).  The DAG specified that 28 C.F.R. §§ 600.4–

600.10 "are applicable to the Special Counsel," *id.* ¶ (d), but did not invoke the regulations as

authority for the Special Counsel's appointment.  The Special Counsel has since "investigat[ed]

foreign interference in the 2016 presidential election and potential collusion in those efforts by

American citizens."  *In re Grand Jury Investigation*, 17-mc-2336 (BAH), 2017 WL 4898143, at

*1 (D.D.C. Oct. 2, 2017).

### E.  The Subpoenas at Issue

The Special Counsel, on May 10, 2018, served on the witness two grand jury subpoenas

to produce documents and appear before the grand jury on May 18, 2018.  Gov't's Mot. Compel

("Mot. Compel") ¶ 2, ECF No. 1; *see also generally* Mot. Compel, Ex. A, Grand Jury

Subpoenas, dated May 10, 2018 ("First Subpoenas"), ECF No. 1-1.[6]  The witness agreed to meet

voluntarily with the Special Counsel on May 14, 2018.  Shortly before the meeting date, on May

---

[6]    The witness is Andrew Miller, "a former employee of Roger Stone, a political strategist and consultant who has been actively involved in U.S. politics for decades" and who worked on Donald J. Trump's 2016 presidential campaign.  Mot. Compel ¶ 1.  Miller worked in various capacities for Stone during the presidential campaign.  *Id.*

11, 2018, the witness's attorney ("Attorney 1") contacted the Special Counsel on the witness's behalf to advise that she was considering representing the witness in connection with this matter, and that the witness no longer wished to meet with the Special Counsel on May 14.  Mot. Compel ¶ 2.[7]  On May 14, 2018, the Special Counsel called Attorney 1 to inquire about her representation of the witness, but Attorney 1 did not return that call.  *Id.* ¶ 3.

The witness failed to appear before the grand jury on May 18, 2018, as one of the first subpoenas has required.  *Id.* ¶ 4.  The Special Counsel tried to contact Attorney 1, who was unavailable, but Attorney 1's employee informed the Special Counsel that Attorney 1 represented the witness and would respond to the Special Counsel on May 21, 2018.  *Id.*  The employee did not explain the witness's failure to appear before the grand jury.  *Id.*

Despite the employee's representation, Attorney 1 failed to contact the Special Counsel on May 21, 2018.  *Id.* ¶ 5.  Instead, the Special Counsel emailed Attorney 1 a second subpoena on May 23, 2018, for the witness to testify and produce documents on June 1, 2018.  Mot. Compel, Ex. B, Grand Jury Subpoenas, dated May 23, 2018 ("Second Subpoenas"), ECF No. 1-2.  Two days later, the Special Counsel, having received no response from Attorney 1, again emailed Attorney 1 to confirm receipt of the second subpoenas.  Mot. Compel ¶ 7.  Attorney 1 responded by requesting additional time to comply with the subpoena given the volume of responsive documents.  *Id.*  The Special Counsel agreed to adjourn the witness's document production until June 5, 2018, and the witness's grand jury appearance to June 8, 2018.  *Id.*  Attorney 1 did not acknowledge this schedule change, and on May 31, 2018, the Special Counsel contacted Attorney 1 to confirm the witness's appearance before the grand jury on June 8, 2018.  *Id.* ¶ 8.  Attorney 1 expressed concerns over certain "patently irrelevant" responsive materials,

---

[7]        Attorney 1 is Alicia Dearn of the law firm Bellatrix P.C.

and in response, the Special Counsel agreed that the witness need not produce the identified materials. *Id.* ¶¶ 8–9.  Attorney 1 did not confirm the witness's appearance as the grand jury subpoena required.

On June 5, 2018, the Special Counsel emailed Attorney 1 new subpoenas reflecting the June 5, 2018, production date and the June 8, 2018, appearance date. *Id.* ¶ 10; *see also generally* Mot. Compel, Ex. C, Grand Jury Subpoenas, dated June 8, 2018 ("Third Subpoenas"), ECF No. 1-3.  The Special Counsel again emailed Attorney 1 the next day to confirm the witness's June 8, 2018 appearance as required, and to arrange for the witness's travel.  Mot. Compel ¶ 11.  On June 8, 2018, the witness again failed to appear before the grand jury. *Id.* ¶ 12.  An FBI agent informed the witness by phone that the witness was scheduled to appear before the grand jury, but the witness stated that he was not in Washington, DC, and that his attorney handled matters related to his grand jury appearance. *Id.*

When the witness failed to appear a second time, the Special Counsel emailed Attorney 1 on June 11, 2018, at approximately 8:50 a.m., requesting that Attorney 1 contact the Special Counsel immediately regarding her client's absence. *Id.* ¶ 13.  The Special Counsel reiterated this request at 2:15 p.m. that same day, asserting that "the government would seek an order to show cause as to why [the witness] should not be held in contempt" should Attorney 1 fail to respond by 9:00 a.m. the next day. *Id.* ¶ 14.  At 9:07 a.m. the next day, Attorney 1 informed the Special Counsel that she would provide correspondence within an hour, but by 12:44 p.m. had failed to do so. *Id.* ¶ 15.  In response to another request from the Special Counsel, Attorney 1 again stated, at 2:15 p.m., that she would send the correspondence within an hour, but "provided no communication explaining her client's failure to appear as subpoenaed on June 8, 2018" as of noon the following day. *Id.* ¶¶ 15–16.

21

On June 13, 2018, the Special Counsel moved to compel and for an order to show cause why the witness should not be held in contempt for failure to appear before the grand jury.  Mot. Compel at 1.  As ordered by the Court, the witness filed an opposition to the Special Counsel's motion on June 14, 2018, styled as a motion to quash, or in the alternative, to modify the grand jury subpoenas due to burdensomeness.  *See generally* Witness's First Mot. Quash, ECF No. 4.  The Special Counsel agreed to modify the subpoenas as requested, Gov't's Reply Supp. Mot. Compel ¶ 3, ECF No. 3, and the parties appeared for a hearing on their motions on June 18, 2018, at which time the Court granted the Special Counsel's motion, denied the witness's motion as moot, and directed the witness to appear before the grand jury on June 28, 2018 and to perform the agreed-upon searches.

On or about June 28, 2018, the witness retained additional counsel, Attorney 2, who on June 28, 2018, filed a motion to quash the pending grand jury subpoenas and to stay the Court's order directing his appearance before the grand jury that day, arguing that the Special Counsel's appointment violates the Appointments Clause of the U.S. Constitution on the grounds that (1) the Special Counsel is a principal officer who had not been appointed by the President upon Senate confirmation, and, in the alternative, (2) Congress had not "by law" authorized the Special Counsel's appointment.  Witness's Second Mot. Quash ("Witness's Mot.") at 1, ECF No. 10.[8]  The witness "adopt[ed] and incorporate[d] by reference th[e] same arguments" advanced in a motion recently filed by a defendant, Concord Management and Consulting LLC, in a criminal case being prosecuted by the Special Counsel in this Court.  *Id.* at 2 (citing *United States v. Internet Research Agency, LLC, et al.*, No. 18-cr-32, Mem. Points & Authorities Supp. Def. Concord Mgmt. & Consulting LLC's Mot. Dismiss Indictment ("Concord Mem.") (D.D.C. filed

---

[8]        Attorney 2 is Paul Kamenar of the Law Office of Paul D. Kamenar.

June 25, 2018), ECF No. 36).[9]  The Court imposed a scheduling order, requiring the parties to

appear for an in-person status hearing on June 29, 2018.  *See* Minute Order (June 28, 2018).

With Attorney 2 appearing telephonically, the Court set a briefing schedule on the witness's

pending Motion to Quash.  *See* Minute Order (June 29, 2018).  The witness raised for the first

time in his reply brief a new argument against the lawfulness of the Special Counsel's

appointment, asserting that the Special Counsel had not been appointed by a "Head of

Department" because the Attorney General's recusal had not made the DAG the Acting Attorney

General.  *See* Witness's Reply Gov't's Opp'n Witness's Mot. Quash ("Witness's Reply") at 12,

ECF No. 19.  Following a hearing on July 18, 2018, and supplemental filings by the parties to

address questions raised at the hearing, the witness's motion to quash is ripe for review.

## II.   LEGAL STANDARD

"On motion made promptly, the court may quash or modify [a] subpoena if compliance

would be unreasonable or oppressive."  FED. R. CRIM. P. 17(c)(2).  "[T]he claim that a subpoena

was applied for and issued under the signature of unauthorized persons would constitute a

cognizable claim of undue burden or unlawfulness."  *In re Sealed Case*, 827 F.2d 776, 778 (D.C.

Cir. 1987); *accord In re Sealed Case*, 829 F.2d 50, 53–55 (D.C. Cir. 1987) (same).

---

[9]      This Court's Local Rules limit memoranda of points and authorities in support of a motion to 45 pages.
*See* LCrR 47(e).  The witness's incorporation of Concord's memorandum, which is 50 pages long, into the witness's
own 21-page memorandum thus could be seen as an "effort to evade and undermine the purpose of the Local
Rules."  *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 53 (D.D.C. 2006), *aff'd*, 530
F.3d 980 (D.C. Cir. 2008); *see also Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161, 1167 (D.C. Cir. 2013)
(concluding that parties may not "incorporat[e] argument presented in the district court, . . . as this would
circumvent the court's rules, . . . regarding the length of briefs, where they fail, as here, to persuade the court that
they could not have presented their challenge within the word limits for their briefs").  Sifting through Concord's
arguments to determine which apply here poses little difficulty, however, as the witness and Concord raise
overlapping, if not entirely identical, arguments that turn on pure issues of law common to both litigants rather than
facts peculiar to them.  Thus, despite the page limit's unsanctioned exceeding, the Court exercises discretion to hear
arguments raised in Concord's memorandum to the extent such arguments overlap with those the witness presents.

III.    **DISCUSSION**

The witness raises three arguments against the constitutionality of the Special Counsel's appointment under the Appointments Clause.  The witness argues that the Special Counsel is a principal officer who must be, but was not, nominated by the President and confirmed by the Senate.  Witness's Mot. at 14.  In the alternative, the witness contends that if the Special Counsel is an inferior officer, Congress did not "by Law" vest his appointment in the Attorney General. *Id.* at 8.  Finally, the witness posits, even if Congress statutorily authorized the Special Counsel's appointment, the DAG did not validly appoint him, as the Attorney General's recusal did not allow the DAG to serve as Acting Attorney General.  Witness's Reply at 12.  The Special Counsel, in turn, asserts that the witness's challenges are untimely, and urges that the motion be dismissed for lack of good cause to raise new arguments.  Gov't Opp'n Witness's Mot. Quash ("Gov't Opp'n") at 9–10 n.5, ECF No. 18.  As explained in further detail below, beginning with the Special Counsel's timeliness challenge, each of these arguments fail.

**A.  The Witness's Second Motion to Quash is Timely**

The Special Counsel argues that the witness's motion should be treated "as effectively a motion to reconsider [the witness's] prior motion to quash," and, as such, denied "for lack of good cause for [the witness] to raise a new argument."  Gov't Opp'n at 9 n.5.  Emphasizing the untimeliness of the witness's challenge to the subpoenas, the Special Counsel asserts that "[t]he constitutional nature of [the witness's] claim does not require the Court to entertain it at this juncture."  *Id.*  A motion for reconsideration "is not a vehicle to present a new legal theory that was available prior to judgment."  *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018) (internal quotation marks omitted).  Nonetheless, "Appointments Clause objections" fall within "the category of nonjurisdictional structural constitutional objections that c[an] be

considered . . . whether or not they were" timely presented, as "[t]he roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878–79 (1991) (internal quotation marks omitted). The witness presents "a constitutional challenge that is neither frivolous nor disingenuous," and that "goes to the validity of the . . . proceeding that is the basis for this litigation." *Id.* at 879. The Court thus "exercise[s] [its] discretion to hear [the witness's] challenge to the" Special Counsel's "constitutional authority," notwithstanding the witness's failure to raise that challenge in his initial motion. *Id.*

*Blair v. United States*, which held that a grand jury witness is "not entitled to raise any question about the constitutionality of the statutes under which the grand jury's investigation was conducted," 250 U.S. 273, 283 (1919), is relied upon by the Special Counsel but does not dictate a result contrary to that the Court reaches here. The grand jury witnesses in *Blair* did not challenge the lawfulness of the grand jury's existence or of the prosecutor's authority, only the constitutionality of a statute the alleged violations of which the grand jury was investigating. *Id.* at 277. Here, in contrast, the witness does not allege that the grand jury is investigating violations of an unconstitutional statute, but rather challenges the constitutionality of the Special Counsel's appointment and thus power to enforce subpoenas. The issue is more analogous to *Class v. United States*, which held that a "valid guilty plea does not, by itself, bar direct appeal of [a defendant's] constitutional claim[] . . . . which, judged on its face based upon the existing record, would extinguish the government's power to constitutionally prosecute the defendant if the claim were successful." 138 S. Ct. 798, 805–06 (2018) (internal quotation marks omitted). *Class*, to be sure, involved a criminal defendant facing imprisonment, supervised release, and the attendant relinquishment of certain rights, *id.* at 802, rather than a request merely to testify before

the grand jury.  Yet, if *Class* and the instant situation are not on all fours with one another, nor are they altogether different.  The witness here may face imprisonment for contempt should he defy the subpoena.  Moreover, the witness's arguments, if meritorious, would "extinguish the [Special Counsel's] power to constitutionally" seek to compel his compliance with grand jury subpoenas or to hold him in contempt for failing to comply.  *See id.* at 806.  Even construing the witness's second motion to quash as a motion to reconsider, as the Special Counsel urges, the merits of the witness's claims thus warrant addressing.

### B.  The Special Counsel is an Inferior Officer

The witness contends that the Special Counsel is a principal officer, who was neither nominated by the President nor confirmed by the Senate, and thus was appointed in violation of the Appointments Clause of Article II.  *See* Witness's Mot. at 14.[10]  Article II distinguishes between principal and inferior officers in prescribing the manner of an officer's appointment. *See* U.S. CONST. art. II, § 2, cl. 2.  Under the Appointments Clause, the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint
> . . . all [Principal] Officers of the United States, whose Appointments are not herein
> otherwise provided for, and which shall be established by Law; but the Congress
> may by Law vest the Appointment of such Inferior Officers, as they think proper,
> in the President alone, in the Courts of Law, or in the Heads of Departments.

*Id.*  This two-tier appointments scheme was "designed to preserve political accountability relative to important Government assignments" by ensuring that all officers either had been approved by the President and Senate or else are responsible to such officers.  *Edmond*, 520 U.S. at 663.  The "administrative convenience" of bypassing the process of presidential nomination and senatorial confirmation the so-called "Excepting Clause" provided, however, "was deemed

---

[10]     The Special Counsel does not dispute that he is an officer of the United States.  *See* Gov't Opp'n at 10. Indeed, if the Independent Counsel at issue in *Morrison* was held to be an inferior officer, 487 U.S. at 672, little doubt exists that the Special Counsel is at least an officer as well.

to outweigh the benefits of the more cumbersome procedure only with respect to the appointment of 'inferior Officers.'" *Id.* at 660. "The line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn." *Morrison*, 487 U.S. at 671. *Morrison* identified four factors a court considers in determining whether an officer is principal or inferior: whether the officer is (1) "subject to removal by a higher Executive Branch official," (2) "empowered . . . to perform only certain, limited duties," (3) "limited in jurisdiction," and (4) "limited in tenure." *Id.* at 671–72.

*Edmond* clarified that the first of these factors—whether an officer is "subject to removal by a higher . . . official"—is by far the most important to a Court's determination of principal-inferior status, while reformulating that factor into a broader inquiry into whether an officer's "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." 520 U.S. at 663. "Generally speaking," *Edmond* explained, "the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Id.* at 662; *accord Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.* ("*PCAOB*"), 561 U.S. 477, 510 (2010) (applying *Edmond* to conclude that certain officials were inferior rather than principal due to the SEC's "oversight authority" and "power to remove . . . at will").[11]   Indeed, *Edmond* held that an officer with a presidentially-nominated, Senate-confirmed superior is inferior even if all three other *Morrison* factors—the magnitude of an officer's duties,

---

[11]     *Edmond*'s use of the term "Generally speaking," 520 U.S. at 662, seemingly left open the possibility that circumstances might exist in which an officer who has a superior nonetheless is a principal officer.  More recently, however, the Supreme Court has reiterated *Edmond*'s holding without using the qualifying "Generally speaking" language, suggesting that "whether he has a superior" is the exclusive criterion to determine "whether one is an 'inferior' officer."  *PCAOB*, 561 U.S. at 510 (quoting *Edmond*, 520 U.S. at 662) (alterations and internal quotation marks omitted); *but see United States v. Libby*, 429 F. Supp. 2d 27, 37 (D.D.C. 2006) ("Neither *Morrison* nor *Edmond* established a bright-line test under which Appointments Clause challenges are resolved . . . . Neither case states explicitly, nor even suggests, that the factors relied upon are exclusive . . . . *Edmond* did not reject the validity of the *Morrison* factors.").

jurisdiction, and tenure—weigh toward principal officer status.  520 U.S. at 661–62 (concluding

that a Coast Guard Court of Criminal Appeals judge was an inferior officer despite that "the last

two [*Morrison* factors—limited jurisdiction and tenure] do not hold . . . here" and that such

judges "are charged with exercising significant authority on behalf of the United States").

The witness contends that the Special Counsel is a principal officer who was neither

nominated by the President nor confirmed by the Senate, and thus was unconstitutionally

appointed.  *See* Witness's Mot. at 14.  As explained in more detail below, however, the Attorney

General has ample legal authority to "direct[] and supervis[e]" the Special Counsel, which makes

the Special Counsel an inferior officer.  *Edmond*, 520 U.S. at 663.  To the extent relevant, the

remaining three *Morrison* factors each weigh in favor of inferior officer status.  Nor does the

breadth of the authority the Special Counsel wields negate his inferior officer status.  The

witness's argument that the Special Counsel is a principal officer thus does not pass muster.

**1.  The Attorney General's Authority to Direct and Supervise a Special Counsel**

The primary criterion to determine principal-inferior officer status is whether an officer

"is directed and supervised at some level by others who were appointed by Presidential

nomination with the advice and consent of the Senate."  *Id.* at 663.  *Edmond* "emphasized three

factors" in applying this standard: whether an officer is (1) "subject to the substantial supervision

and oversight of" another Executive officer who is, or is "subordinate" to, a principal officer; (2)

"removable . . . without cause;" and (3) subject to "another executive branch entity's . . . power

to reverse the [officer's] decisions," such that the officer has "'no power to render a final

decision on behalf of the United States unless permitted to do so by other Executive Officers.'"

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012)

(citing *Edmond*, 520 U.S. at 664–65).

At the outset, determining the extent of the Attorney General's authority to direct and supervise the Special Counsel requires looking solely to statutes, rather than to any regulations, which can neither augment nor detract from the Attorney General's powers in this regard.[12]  Any authority the Attorney General might claim under the Special Counsel regulations beyond that which statutes already grant him would be invalid, and the regulations themselves *ultra vires*, as the Attorney General cannot give himself greater powers than statutes already provide.  *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("Agencies may act only when and how Congress lets them."); *see also Rosenthal*, 121 F. at 869 ("Powers that are nonexistent cannot be delegated by a superior to an inferior.  A principal conveys to his agent what he has, and not what is denied him, and what he has not.").

At the same time, if statutes give the Attorney General power to direct and supervise the Special Counsel, the regulations could not possibly diminish such authority, as the Attorney

---

[12]     The Special Counsel was appointed pursuant to, and his powers flow from, the Attorney General's statutory authority, not the regulations.  *See* Appointment Order (appointing the Special Counsel "[b]y virtue of the authority vested in [the] Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515").  Sections 600.4 through 600.10 of the regulations, though made "applicable" to the Special Counsel, *id.* ¶ (d), do not themselves authorize the Special Counsel's appointment, but are merely procedural rules establishing internal Department of Justice policies.  *See id.*; 28 C.F.R. §§ 600.4–600.10; *id.* pt. 600 (citing 28 U.S.C. §§ 509 and 510 as authority for the regulations' promulgation); *United States v. Manafort*, No. 1:18-cr-83, 2018 WL 3126380, at *11 (E.D. Va. June 26, 2018) ("The Special Counsel's legal authority is not grounded in the procedural regulations at issue here, but in the Constitution and in the statutes that vest the authority to conduct criminal litigation in the Attorney General and authorize the Attorney General to delegate these functions when necessary."); *United States v. Manafort*, No. 1:17-cr-0201-01, 2018 WL 2223656, at *11 (D.D.C. May 15, 2018) ("[T]he regulations . . . are internal rules intended solely to guide the Attorney General and other Department personnel.").  Indeed, Attorneys General have appointed Special Counsels without relying at all on the current Special Counsel or similar regulations.  *See, e.g.*, *In re Sealed Case*, 829 F.2d at 52–53, 55 (Iran-Contra); *Libby*, 429 F. Supp. 2d at 28–29 (leak of Valerie Plame's CIA affiliation); *United States v. Nixon*, 418 U.S. 683, 694 & n.8 (1974) (Watergate).

General's ability to rescind the regulations at will, immediately and without notice or comment, guarantees that he retains ultimate powers of direction and supervision. *See* 64 Fed. Reg. at 37,041 ("This rule relates to matters of agency management or personnel, and is therefore exempt from the usual requirements of prior notice and comment and a 30-day delay in the effective date."); *see also United States v. Nixon*, 418 U.S. 683, 696 (1974) ("[T]he Attorney General [may] amend or revoke the regulation defining the Special Prosecutor's authority."); *Morrison*, 487 U.S. at 721 (Scalia, J., dissenting) ("[T]he President or the Attorney General could have removed [the Watergate Special Prosecutor] at any time, if by no other means than amending or revoking the regulation defining his authority."); *Sealed Case*, 829 F.2d at 56 ("[T]he Independent Counsel: Iran/Contra serves only for so long as the March 5, 1987, regulation remains in force. Subject to generally applicable procedural requirements, the Attorney General may rescind this regulation at any time, thereby abolishing the Office of Independent Counsel: Iran/Contra.").

This is not to deny that the regulations have "force of law" so long as "extant," *Nixon*, 418 U.S. at 695, but only to recognize that shackles the Attorney General may remove anytime, for any reason, do not meaningfully restrict. "[L]ike Ulysses binding himself to the mast," *Sveen v. Melin*, 138 S. Ct. 1815, 1823 (2018), the Attorney General voluntarily has limited his power— but unlike Ulysses, the Attorney General can unbind himself at will. If the regulations ever prevented the Attorney General from countermanding a Special Counsel's action or firing a Special Counsel who disobeyed directives, the Attorney General could rescind the regulations immediately and direct or fire the Special Counsel as he wished.[13] The regulations reflect the

---

[13]     To be sure, the Attorney General might incur a significant *political* cost for rescinding the regulations to exercise greater control over, or remove without cause, the Special Counsel. Such reputational harm to the Attorney General is cognizable only in the court of public opinion, not a court of law. The fact that a public official might get egg on his face for making an unpopular decision is a feature, not a bug, of a constitutional system designed around

Attorney General's permissible "cho[ice] to restrain himself in his dealings with subordinates," and neither enable the Attorney General "to bind his successors by diminishing their powers," *PCAOB*, 561 U.S. at 497, nor raise any separation of powers problems, being promulgated by the Attorney General himself rather than "impos[ed]" on the Executive by another branch, *Morrison*, 487 U.S. at 691.  That the Attorney General can reassert his authority over the Special Counsel at will shows that his authority was never genuinely restricted in the first place.  The Attorney General's choice to give the Special Counsel a long leash only underscores that the choice is the Attorney General's.  As such, the regulations cannot detract from any statutory authority the Attorney General has to direct and supervise the Special Counsel.

As explained in further detail below, governing statutes give the Attorney General broad authority to direct and supervise the Special Counsel.  The Attorney General has delegated and can rescind all authority the Special Counsel enjoys, *see* 28 U.S.C. §§ 509, 510, 515(a); Appointment Order ¶¶ (b), (c), thus enabling the Attorney General to oversee the Special Counsel's work and countermand the Special Counsel's actions.  Moreover, no statute limits the Attorney General's authority to remove a Special Counsel.  The Special Counsel thus satisfies *Edmond*'s "direction and supervision" test for inferior officer status.  The regulations, being rescindable at will, do not alter this conclusion, and if anything serve to emphasize the breadth of the Attorney General's powers of direction and supervision.  The Special Counsel is therefore an inferior officer.

   *a.   The Attorney General Has Plenary Statutory Power of Direction and Supervision*

Governing statutes vest in the Attorney General broad power to oversee a Special Counsel, countermand a Special Counsel's actions, and remove a Special Counsel if necessary.

---

"the accountability of [public] officials."  *New York v. United States*, 505 U.S. 144, 168 (1992); *see also PCAOB*, 561 U.S. at 513 ("The Constitution [] makes the President accountable to the people for executing the laws").

Section 509 "vest[s] in the Attorney General" "[a]ll functions of other officers" and "employees of the Department of Justice," while Section 510 allows the Attorney General to "authoriz[e] the performance by any other officer" or "employee . . . of the Department of Justice of any function of the Attorney General."  28 U.S.C. §§ 509, 510.  Section 515(a), meanwhile, allows the Attorney General to "specifically direct[]" "any attorney specially appointed by the Attorney General under law" to "conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct."  *Id.* § 515(a).  These statutes give the Attorney General virtually plenary authority to "supervis[e] and overs[ee]," *Intercollegiate*, 684 F.3d at 1338, a Special Counsel and to countermand any action a Special Counsel takes, as the Attorney General may at any time rescind a Special Counsel's authorization to pursue any action.[14] Should a Special Counsel take an action of which the Attorney General disapproves, the Attorney General can withdraw his authorization to pursue the course of action and make his own decisions in this area.  A Special Counsel thus has "no power to render a final decision on behalf of the United States unless" the Attorney General permit[s] [him] to do so." *Intercollegiate*, 684 F.3d at 1338 (quoting *Edmond*, 520 U.S. at 665).  The Attorney General's powers to define altogether the scope of a Special Counsel's authority and rescind such authority at will give the Attorney General the effective power to oversee, supervise, and countermand a Special Counsel in exercising such authority.

The Special Counsel is, if anything, more closely overseen by a Cabinet-level official than were the Coast Guard Court of Criminal Appeals judges determined to be inferior officers in *Edmond*.  Supervisory power over those judges was split between the U.S. Court of Appeals

---

[14]     The Attorney General invoked all three statutes in appointing the Special Counsel.  *See* Appointment Order (citing 28 U.S.C. §§ 509, 510, and 515 in authorizing the Special Counsel "to conduct the [instant] investigation").

for the Armed Forces and "the General Counsel of the Department of Transportation in his capacity as Judge Advocate General," the latter of whom was "subordinate to the Secretary of Transportation." *Edmond*, 530 U.S. at 664, 666.  In contrast, the Special Counsel is supervised and overseen directly and exclusively by the Attorney General.  *See* 28 U.S.C. §§ 510, 515(a).

Finally, the Attorney General may remove a Special Counsel.  While no statute speaks specifically to a Special Counsel's removal, "the traditional default rule" is that "removal is incident to the power of appointment."  *PCAOB*, 561 U.S. at 509; *accord Myers v. United States*, 272 U.S. 52, 119 (1926) ("[The] constitutional principle [that] the power of appointment carried with it the power of removal . . . has been recognized ever since" the Constitutional Convention, as "as a rule of [both] constitutional and statutory construction."); *In re Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839) ("In the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment."); *see also Sampson v. Murray*, 415 U.S. 61, 70 n.17 (1974) (same); *Burnap v. United States*, 252 U.S. 512, 518 (1920) ("[T]he power to remove is an incident of the power to appoint."); *Reagan v. United States*, 182 U.S. 419, 424 (1901) (describing *Hennen*'s holding as a "settled rule"); *Parsons v. United States*, 167 U.S. 324, 330 (1897) ("[T]he decision of congress in 1789, and the universal practice of the government under it, had settled the question beyond any power of alteration.").  This, as *Myers* explained, is because "those in charge of and responsible for administering functions of government, who select their executive subordinates, need in meeting their responsibility to have the power to remove those whom they appoint."  272 U.S. at 119.  An Attorney General, having appointed a Special Counsel, thus has

the power of removal, "a powerful tool for control," *Edmond*, 520 U.S. at 664.[15]  For these

reasons, the Special Counsel's "work is directed and supervised" by the Acting Attorney

General, making the Special Counsel an inferior officer.  *Edmond*, 520 U.S. at 663; *see also*

*PHH Corp. v. CFPB*, 881 F.3d 75, 176 n.3 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)

(distinguishing the EIGA's Independent Counsel "from the traditional special counsels who are

appointed by the Attorney General for particular matters," who "ordinarily report to and are

removable by the Attorney General or the Deputy Attorney General").

### b.  *The Attorney General Retains Broad Authority Under The Regulations to Direct and Supervise a Special Counsel*

Although, as explained above, the regulations are not relevant to a Special Counsel's

status as an inferior or principal officer, even if they were, they would only confirm that a

Special Counsel falls within the Attorney General's chain of command and that the Attorney

General exercises substantial direction and supervision over virtually every facet of a Special

Counsel's work.  The regulations authorize the Attorney General to demand "that the Special

Counsel provide an explanation for any investigative or prosecutorial step, and [to] after review

conclude that the action is so inappropriate or unwarranted under established Departmental

practices that it should not be pursued."  28 C.F.R. § 600.7(b).  The Attorney General thus may

review and countermand any action a Special Counsel pursues.  The regulations require the

Attorney General to "notify Congress" upon "conclud[ing] that a proposed action by a Special

Counsel should not be pursued."  *Id.*[16] The regulations also allow the Attorney General to

---

[15]     The regulations limit the Attorney General's ability to remove the Special Counsel to cases of "misconduct, dereliction of duty, incapacity, conflict of interest, or [] other good cause, including violation of Departmental policies."  28 C.F.R. § 600.7(d).  The legal significance of this provision is discussed *infra*.

[16]     This reporting requirement does not diminish the Attorney General's power to direct and supervise a Special Counsel, but merely acknowledges Congress's broad "power to investigate."  *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 504 (1975); *accord McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) (recognizing Congress's "power of inquiry").

discipline and remove a Special Counsel.  *Id.* § 600.7(d); *see also id.* § 600.7(c) ("The Special

Counsel and staff shall be subject to disciplinary action for misconduct and breach of ethical

duties under the same standards and to the same extent as are other employees of the Department

of Justice.").

Other provisions of the regulations further reinforce that a Special Counsel is an inferior

officer subject to the Attorney General's direction and supervision.  The regulations allow the

Attorney General to define altogether the scope of a Special Counsel's jurisdiction, and to either

approve or veto any expansion of jurisdiction a Special Counsel seeks.  *Id.* § 600.4.  "[W]ithin

the scope of [the] jurisdiction" the Attorney General confers, a Special Counsel exercises "the

full power and independent authority to exercise all investigative and prosecutorial functions of

any United States Attorney."  *Id.* § 600.6.  Notably, U.S. Attorneys are subject to the Attorney

General's "direct[ion] . . . in the discharge of their [] duties," and must "make such reports as the

Attorney General may direct."  28 U.S.C. §§ 519, 547; *see also id.* § 509 ("vest[ing]" U.S.

Attorneys' "functions . . . in the Attorney General").

The Attorney General determines a Special Counsel's budget, initially and then on an

annual basis.  28 C.F.R. § 600.8(a).  When making subsequent budget requests, a Special

Counsel must "report to the Attorney General the status of the investigation," and the Attorney

General "shall determine whether the investigation should continue" or else terminate it.  *Id.* §

600.8(a)(2).  A Special Counsel must comply with all Department of Justice "rules, regulations,

procedures, practices and policies," and must consult "for guidance with respect to established

practices, policies and procedures of the Department, including ethics and security regulations

and procedures," with either "appropriate offices within the Department" or "directly with the

Attorney General."  *Id.* § 600.7(a).

Finally, a Special Counsel must "notify the Attorney General of events in the course of his or her investigation in conformity with the Departmental guidelines with respect to Urgent Reports." *Id.* § 600.8(b). Urgent Reports must be filed "to inform Department leadership, including the Attorney General," of "major developments in significant investigations and litigation," such as initiations of investigations, filings of criminal charges, arrests, pleas, trials, verdicts, settlements, and sentencings, and of "events affecting the Department that are likely to generate national media or Congressional attention." U.S. ATTORNEY'S MANUAL §§ 1-13.100, 1-13.120. "[N]otification of proposed indictments and other significant events in the course of the investigation, with the resulting opportunity for consultation, is a critical part of the mechanism through which the Attorney General can discharge his or her responsibilities with respect to the investigation." 64 Fed. Reg. at 37,040.

The witness argues that § 600.7(b), "plainly does not authorize the [] Attorney General to countermand steps taken by the Special Counsel," but merely to "advis[e]" the Special Counsel that an action should not be pursued and "notify Congress" of the same. Concord Mem. at 32–33. The witness points to § 600.7(b)'s use of the term "should" rather than "shall"—as in, the Attorney General may conclude that an action "should not be pursued," 28 C.F.R. § 600.7(b)—as indicating that the Attorney General's conclusions are merely advisory, not mandatory. Concord Mot. at 32 (citing *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015) ("The use of language like 'may' and 'should' instead of 'shall' or 'must' suggests that the provisions that follow are meant to be precatory, not mandatory." (internal quotation marks omitted)); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty.")). The witness further argues that § 600.7's repeated use of the term "shall" in other places reinforces the conclusion that the term

36

"should" is used in a precatory rather than binding sense, because "we presume differences in language in same statutory provision to convey differences in meaning."  Concord Mem. at 32 (citing *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) (alterations and internal quotation marks omitted)); *see also Lopez v. Davis*, 531 U.S. 230, 240–41 (2001) ("Congress' use of the permissive 'may,'" which "contrasts with the legislators' use of a mandatory 'shall' in the very same section," has "significance.").

The flaw in the witness's argument about the import of Section 600.7(b) is that it ignores the context of this provision in the regulatory scheme.  Since Section 600.7(b) does not expressly allow the Attorney General to countermand a Special Counsel's actions, the witness reads the provision to allow the Attorney General merely to give a Special Counsel nonbinding advice and inform Congress whenever the Special Counsel fails to heed that advice.  For the reasons that follow, however, § 600.7(b), while no model of clarity, properly is read—in the context of surrounding provisions and the historical background against which the regulations were enacted—to allow the Attorney General to countermand the Special Counsel's actions.

When a regulation's "language is plain, we must enforce it according to its terms."  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).  "[O]ftentimes," however, "the 'meaning . . . of certain words or phrases may only become evident when placed in context.'"  *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).  A regulation's words thus "must be read in their context and with a view to their place in the overall [regulatory] scheme," and courts must read a regulation "as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole."  *Brown & Williamson*, 529 U.S. at 133 (internal citations and quotation marks omitted).  In particular, a regulatory "provision that may seem ambiguous in isolation is often clarified by the remainder of the [] scheme because only one of

the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (internal quotation marks omitted).  In a similar vein, a regulation "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks omitted).[17]

As an initial matter, § 600.7(b)'s use of the term "should" rather than "shall" does not necessarily indicate that the Attorney General's conclusion that a course of action should not be pursued is advisory rather than mandatory.  *See Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1348–49 (D.C. Cir. 2012) ("The use of the phrase 'should be' rather than 'shall' suggests but does not necessarily mean the Guidelines are not binding."); *United States v. Montgomery*, 462 F.3d 1067, 1069, 1070 n.2 (9th Cir. 2006) (construing the term "should" to connote "a requirement, not a suggestion," and noting that "[a] court might be especially disposed to use 'should' as gentler way for one court to tell another court what it ought to do."); *United States v. Paladino*, 401 F.3d 471, 484 (7th Cir. 2005) ("By 'should' in the quoted passage we understand 'must.'); *United States v. Smith*, 282 F.3d 1045, 1048 (8th Cir. 2002) (concluding that the term "should," as used in a provision of the U.S. Sentencing Guidelines, has a mandatory rather than advisory meaning, notwithstanding the Guidelines' use of the term "shall" in similar provisions, and noting a Circuit split on the issue, with three Circuits construing "should" as mandatory and one as advisory); *United States v. Anderson*, 798 F.2d 919, 924 (7th Cir. 1986) (construing the term "should" as used in a judicial canon to "impose[] a mandatory rule of conduct upon a judge."); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 347 (8th Cir. 1985) ("[T]he verb 'should' has various shades of meaning." (alterations and internal citation

---

[17]     Although the cases cited in this paragraph concern statutory interpretation, the principles they express are no less applicable to interpreting regulations.

omitted)); *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977) ("We of course recognize that

the provision in question employs the directory 'should be' rather than the mandatory 'shall' or

'must', but this should not be automatically determinative of the issue."); *Bord v. Rubin*, No. 97

CIV. 6401 (MBM), 1998 WL 420777, at *4 (S.D.N.Y. July 27, 1998) ("[T]he use of the word

'should' does not automatically denote either a mandatory or a permissive direction.  Rather, the

meaning depends on the context in which the words are found.").  The term "should," at the time

the regulations were enacted, commonly was used in both mandatory and advisory senses.  *See,*

*e.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) (defining "should" to mean

"*owed*, was *obliged* to, ought to" and "to express *obligation*, propriety, or expediency" (emphasis

added)); *see also* Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16

GREEN BAG 2D 419, 423–27 (2013) (identifying *Merriam-Webster's Collegiate Dictionary* (10th

ed. 1993) as amongst "the most useful and authoritative" English language dictionaries for the

period 1951–2000 to understand "meanings current at a given time").  As several courts have

recognized, context is the key to determining whether the term "should" carries a mandatory or

permissive meaning.  *See Montgomery*, 462 F.3d at 1070; *McDonnell Douglas Corp.*, 758 F.2d

at 347; *Bord*, 1998 WL 420777, at *5.

Section 600.7(b)'s language allowing the Attorney General to "conclude that the action is

so inappropriate or unwarranted *under established Departmental practices* that it should not be

pursued," 28 C.F.R. § 600.7(b) (emphasis added), parallels § 600.7(d)'s language allowing the

Attorney General to remove a Special Counsel for "violation of Departmental policies," *id.* §

600.7(d).  These provisions, read together, show that a Special Counsel's decision to proceed

with a proposed action over the Attorney General's warning that such action would violate

departmental practices would constitute "good cause," *id.*, to remove the Special Counsel.  As

previously noted, "[t]he power to remove officers," *Edmond* said, "is a powerful tool for control." 520 U.S. at 664. Here, that power is a sword dangling over a Special Counsel's head, incentivizing strongly a Special Counsel to comply with the Attorney General's "conclu[sions]." 28 C.F.R. § 600.7(b). The authority to tell a Special Counsel to refrain, upon pain of removal, from taking a particular course of action is in substance a power to countermand a Special Counsel's actions, and gives the Attorney General all power of direction and supervision necessary to make a Special Counsel an inferior officer.

To be sure, although the Attorney General may advise against an action that violates departmental "practices," *id.* § 600.7(b), the Attorney General may remove a Special Counsel only for violating departmental "policies," *id.* § 600.7(d). Not all Department of Justice practices may rise to the level of policies, so a Special Counsel's violation of a departmental practice may not itself warrant removal. However, whether a practice is so established as to constitute a policy, such that the practice's violation justifies removal is itself a judgment call the regulations vest in the Attorney General's unreviewable discretion. *See id.* §§ 600.7(d), 600.10. Moreover, the Attorney General has authority to establish new departmental policies violation of which would justify a Special Counsel's firing. *Id.* § 600.7(d). Finally, a Special Counsel's violation of departmental practices might constitute "other good cause" to justify removal even without rising to the level of a violation of departmental policies. *Id.* The Attorney General thus has an effective power to countermand a Special Counsel's actions by threatening removal for defying the Attorney General's conclusion that an action should not be pursued.

This construction gives force to the regulations' congressional notification requirement's accountability and oversight function. Should "the Attorney General conclude[] that a proposed action by a Special Counsel should not be pursued, the Attorney General shall notify Congress as

specified in § 600.9(a)(3)."  28 C.F.R. § 600.7(b).  Section 600.9(a)(3), in turn, directs the

Attorney General to provide Congress such notice only "[u]pon conclusion of the Special

Counsel's investigation."  *Id.* § 600.9(a)(3).  This provision ensures that the Attorney General

will be held accountable to Congress for interfering in a Special Counsel's work, incentivizing

the Attorney General to refrain from interfering unnecessarily.  To read § 600.7 to give the

Attorney General no ability to countermand a Special Counsel, through the implied threat of

removal for taking an action the Attorney General disapproves, would mean the Attorney

General's sole recourse when a Special Counsel pursues a disapproved action would be to notify

Congress, but not until the Special Counsel's investigation has ended.  By that time, however, a

Special Counsel will be out of office, and thus largely unaccountable to Congress for actions he

took despite the Attorney General's objections.  A Special Counsel, knowing Congress will not

learn of his defiance until he already has left office, thus would have little incentive to heed the

Attorney General's advice not to pursue an action.  The witness's interpretation of § 600.7(b)

thus would misalign (1) the authority to decide whether to proceed with an action and (2)

accountability to Congress for the decision made, training the focus of Congress's oversight on

an officer who no longer holds office.

A comparison of the regulations at issue to those that governed the Watergate Special

Prosecutor and to the statutory provisions that governed the Independent Counsel reinforces that

the Attorney General may countermand a Special Counsel through the threat of removal.  The

Watergate Special Prosecutor regulations, while in many other respects similar to the instant

regulations, contained several provisions wholly missing in the current regulations, including

that (1) "the Special Prosecutor will have the greatest degree of independence that is consistent

with the Attorney General's statutory accountability for all matters falling within the jurisdiction

of the Department of Justice," (2) "[t]he Attorney General will not countermand or interfere with the Special Prosecutor's decisions or actions," and (3) "the Special Prosecutor will not be removed from his duties except for extraordinary improprieties on his part and without the President's first consulting the Majority and the Minority Leaders and Chairmen and ranking Minority Members of the Judiciary Committees of the Senate and House of Representatives and ascertaining that their consensus is in accord with his proposed action."  Establishing the Office of Watergate Special Prosecution Force, 38 Fed. Reg. 30,738, 30,739 (Nov. 7, 1973).  Likewise, the EIGA's Independent Counsel provisions required "the Attorney General, and all other officers and employees of the Department of Justice [to] suspend all investigations and proceedings regarding" matters the Independent Counsel was investigating, except as necessary to assist the Independent Counsel.  28 U.S.C. § 597(a) (expired).  The Special Counsel regulations contain no language of this sort.  Neither the Watergate Special Prosecutor regulations nor the EIGA's Independent Counsel provisions, moreover, allowed the Attorney General to "conclude that [an] action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued," or to remove for "violation of Departmental policies."  28 C.F.R. § 600.7(b), (d).  The linguistic contrast between the Special Counsel regulations, on one hand, and the Watergate Special Prosecutor regulations and EIGA's Independent Counsel provisions, on the other hand, shows that 28 C.F.R. § 600.7 empowers the Attorney General to countermand a Special Counsel in the manner he could not countermand the Watergate Special Prosecutor or Independent Counsel—by drawing a line in the sand as to which actions the Special Counsel may pursue and removing a Special Counsel who crosses that line.

Finally, the regulations' preamble confirms that the Attorney General "intended that ultimate responsibility for the matter and how it is handled will continue to rest with the Attorney

General (or the Acting Attorney General if the Attorney General is personally recused in the matter)." 64 Fed. Reg. at 37,038. The regulations, the Attorney General explained, "explicitly acknowledge the possibility of review of specific decisions reached by the Special Counsel." *Id.* This construction is neither "plainly erroneous [n]or inconsistent with the regulation," and thus is "controlling." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Even if *Auer* did not apply, the Attorney General's understanding of how the regulations operate lends further support to the notion that a reasonable person would read § 600.7(b) as authorizing the Attorney General to countermand the Special Counsel's actions. For these reasons, § 600.7(b) properly is read to allow the Attorney General to countermand, through an implicit threat of removal or else through actual removal, a Special Counsel's actions. As such, a Special Counsel "ha[s] no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Edmond*, 520 U.S. at 665.

The witness presses his position that "the Special Counsel is a principal officer" by pointing to "the fact that the Special Counsel is not removable at will." Concord Mem. at 35. That the regulations limit the Attorney General's removal power to cases of "misconduct, dereliction of duty, incapacity, conflict of interest, or [] other good cause," *id.* (quoting 28 C.F.R. § 600.7(d)), however, does not "by itself unduly trammel[] on executive authority," *Morrison*, 487 U.S. at 691. So long as an officer "may be terminated for 'good cause,' the Executive, through the Attorney General, retains ample authority to assure that the [officer] is competently performing his or her statutory responsibilities," and therefore is not "sufficiently deprive[d]" of control "to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws." *Id.* at 692–93.

The Supreme Court repeatedly has affirmed that an inferior officer's removal may be limited to good cause and does not require "at will" employment as the witness urges.  *See id.* at 671 (holding the Independent Counsel, who was removable "only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsels duties," 28 U.S.C. § 596(a)(1) (expired), to be an inferior officer); *Freytag*, 501 U.S. at 882 (holding Tax Court Special Trial Judges, who are removable only "after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause," 26 U.S.C. § 7443, to be inferior officers); *United States v. Perkins*, 116 U.S. 483, 484 (1886) (holding naval service officers to be inferior officers and upholding a statute prohibiting their dismissal in time of peace "except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof").[18]  *Bowsher v. Synar* held that the terms "inefficiency," "neglect of duty," and "malfeasance," as used in a law limiting an officer's removal to only these reasons, "are very broad," and "could sustain removal . . . for any number of actual or perceived transgressions."  478 U.S. 714, 729 (1986); *see also Freytag*, 501 U.S. at 912 (Scalia, J., dissenting) (noting that the statute governing Tax Court Special Trial Judges' removal uses identical language).  Section 600.7(b) is, if anything, more permissive than the statutes upheld as constitutional in *Morrison*, *Freytag*, and *Perkins*.[19]

---

[18]    *Morrison* declined to decide "exactly what is encompassed within the term 'good cause,'" but construed the EIGA to allow removal for "misconduct."  487 U.S. at 692.  The Special Counsel regulations expressly allow the Attorney General to remove the Special Counsel for "misconduct."  28 C.F.R. § 600.7(d).

[19]    Judge Griffith's concurring opinion in *PHH Corp.* is instructive.  Limiting the Consumer Financial Protection Bureau ("CFPB") Director's removal to "inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. § 5491(c)(3), Judge Griffith concluded, only "minimal[ly] restrict[ed] [] the President's removal power" and did not "impermissibly interfere with the President's supervision of the Executive Branch."  881 F.3d at 124, 126 (Griffith, J., concurring in the judgment).  After reviewing historical indicia of the meaning of the term "inefficient," Judge Griffith concluded that "an officer is inefficient when he fails to produce or accomplish the agency's ends, as understood or dictated by the President operating within the parameters set by Congress."  *Id.* at 134.  This standard, Judge Griffith said, allows a President to remove the Director for "policy decisions that amounted to inefficiency," thus "creat[ing] only a minimal barrier to" removal and "preserv[ing] in the President sufficient supervisory power to perform his constitutional duties."  *Id.* at 134–35, 137.  Section 600.7(d) is phrased no less broadly.  The CFPB Director may be removed for "neglect of duty," 12 U.S.C. § 5491(c)(3); the Special Counsel for "dereliction of

Even Justice Scalia, whose words the witness cites, *see generally* Witness's Mot.; Concord Mem., would not have taken issue with § 600.7(d). While Justice Scalia objected to good-cause removal provisions that so limit a superior's power to remove an inferior as to render the latter not truly "subordinate," 487 U.S. at 716 (Scalia, J., dissenting) (equating inferiority with subordination); *id.* at 719 (same); *id.* at 720 ("'[I]nferior' means 'subordinate . . . .'"), Justice Scalia believed that an inferior officer properly may "be removable for *cause*," so long as "cause" is defined to "include . . . the failure to accept supervision," *id.* at 724 n.4.[20] The regulations satisfy this standard because, as explained above, § 600.7(d) allows the Attorney General to remove a Special Counsel for defying the Attorney General's conclusion that an action should not be pursued. Section 600.7(d)'s removal provision thus does not make the Special Counsel a principal officer.[21]

---

duty," 28 C.F.R. § 600.7(d). The CFPB Director may be removed for "malfeasance," 12 U.S.C. § 5491(c)(3); the Special Counsel for "misconduct," 28 C.F.R. § 600.7(d). The CFPB Director may be removed for "inefficiency," 12 U.S.C. § 5491(c)(3); the Special Counsel for "other good cause," 28 C.F.R. § 600.7(d), a term that seems at a minimum to encompass "inefficiency," and indeed to reach farther. The CFPB Director may be removed only for the above reasons; the Special Counsel also may be removed for "incapacity, conflict of interest," and "violation of Departmental policies." 28 C.F.R. § 600.7(d).

[20]   Justice Scalia's very next sentence reaffirmed this view by embracing *Perkins*, 487 U.S. at 724 n.4, which, as noted, affirmed the lawfulness of a statute limiting an inferior officer's removal to good cause, 116 U.S. at 484.

[21]   Even if § 600.7(d)'s removal provision did somehow elevate the Special Counsel to principal officer status, the proper remedy would be to void the removal provision rather than the Special Counsel's appointment. For example, *PCAOB*, having held unconstitutional limits on Public Company Accounting Oversight Board members' removal, held that the proper remedy was not to void the Board altogether but to sever the removal restrictions and otherwise leave the Board operative. 561 U.S. at 508–10. With these restrictions invalidated, *PCAOB* "ha[d] no hesitation in concluding that under *Edmond* the Board members are inferior officers." *Id.* at 510. Though *PCAOB* invalidated the removal restrictions before considering the Appointments Clause argument, there is no reason to believe *PCAOB* would have reached a different result on the merits had it taken up the Appointments Clause issue first. *Intercollegiate*, following *PCAOB*'s lead, held that Copyright Royalty Judges, who are removable only for "misconduct, neglect of duty, or any disqualifying physical or mental disability," 17 U.S.C. § 802(i), were principal officers, and that the proper remedy was to sever the for-cause removal provision, rendering the CRJs "inferior rather than principal officers" because the Librarian of Congress would be able "to direct, supervise, and exert some control over the [judges'] decisions." 684 F.3d at 1340–41 (internal quotation marks omitted). *Intercollegiate*, like this matter, involved an Appointments Clause claim rather than a removal power claim. *Id.* at 1336–37. Later, *PHH Corp.*, also following *PCAOB*'s lead, held unconstitutional a for-cause restriction on the President's ability to remove the CFPB director, but determined that the proper remedy was to void the restriction rather than the CFPB. 839 F.3d at 38–39, *rev'd en banc*, 881 F.3d 75 (D.C. Cir. 2018). Strengthening the case for severing § 600.7(d), were it unconstitutional, rather than voiding the Special Counsel's appointment, is the fact that the removal provision here is a product of regulation, enacted against a statutory backdrop of unfettered removal power. *See PCAOB*, 561 U.S. at 509; *Myers*, 272 U.S. at 119; *Hennen*, 38 U.S. (13 Pet.) at 259.

The witness further argues that the Special Counsel has "power to render a final decision on behalf of the United States" without being "permitted to do so by other Executive officers," *Edmond*, 520 U.S. at 665, because "the Regulations nowhere require the Special Counsel to obtain the approval or permission of the Attorney General before making final decisions about who to investigate, indict, and prosecute," Concord Mem. at 35.  The witness cites no authority, however, for the claim that an officer, to have inferior status, must obtain a superior's approval prior to making such investigative or prosecutorial decisions.  Rather, *Edmond* suggested that a superior's ability to "review[]," actions an inferior already has taken suffices to enable the superior to "direct[] and supervise[]" the inferior's work.  520 U.S. at 663–64.  Indeed, officers held to be inferior make significant decisions without a superior's prior approval.[22]  To require a superior officer personally to approve all significant decisions made by one of the "numerous," *United States v. Germaine*, 99 U.S. 508, 510 (1878), inferior officers he directs and supervises, moreover, would be infeasible given the realities of modern governance.  The Acting Attorney

---

[22]     These include (1) members of the Public Company Accounting Oversight Board, which "may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and such other requirements as the Board may prescribe," "promulgates auditing and ethics standards, performs routine inspections of all accounting firms, demands documents and testimony, and initiates formal investigations and disciplinary proceedings," and "issue[s] severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration, a permanent ban on a person's associating with any registered firm, and money penalties of $15 million ($750,000 for a natural person)," *PCAOB*, 561 U.S. at 485 (internal quotation marks omitted); (2) Coast Guard Court of Criminal Appeals judges, who render decisions in "court-martial proceedings that result in the most serious sentences, including those in which the sentence, as approved, extends to death, dismissal, dishonorable or bad-conduct discharge, or confinement for one year or more," "ensure that the court-martial's finding of guilt and its sentence are correct in law and fact, . . . which includes resolution of constitutional challenges," and "may independently weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact," *Edmond*, 520 U.S. at 662 (alterations and internal quotation marks omitted); (3) Tax Court Special Trial Judges, who render decisions in "any declaratory judgment proceeding," "any proceeding" involving certain disputes involving $50,000 or less, and "any proceeding" in which the deficiency or claimed overpayment does not exceed $10,000, *Freytag*, 501 U.S. at 873 (internal quotation marks omitted); and, most relevant here, (4) the Independent Counsel, whose powers included "conducting grand jury proceedings and other investigations, participating in civil and criminal court proceedings and litigation," "appealing any decision in any case in which the counsel participates in an official capacity," "initiating and conducting prosecutions in any court of competent jurisdiction, framing and signing indictments, filing informations, and handling all aspects of any case, in the name of the United States," *Morrison*, 487 U.S. at 662 (internal quotation marks omitted).

General's "authoriz[ation]" to "perform" those investigative and prosecutorial "functions," 28

U.S.C. § 510, set out in the Appointment Order, so long as not withdrawn, constitutes the

Attorney General's blessing to make any final decisions regarding investigations, indictments,

and prosecutions within the scope of the authority conferred.  That the Special Counsel need not

obtain the Attorney General's approval prior to making such final decisions thus is irrelevant to

the Special Counsel's status as a principal or inferior officer.

Finally, the witness argues that because the regulations create no legally enforceable

rights, *see* 28 C.F.R. § 600.10, they provide "no objective legal basis for direction and

supervision of the Special Counsel," Concord Mem. at 30.  The witness is mistaken—whether

the regulations (1) create enforceable rights and (2) have binding legal effect are separate issues.

"So long as" these regulations are "extant," they have "the force of law."  *Nixon*, 418 U.S. at

695.  The regulations have legal effect even if they "create" no new "rights," 28 C.F.R. § 600.10,

in that they "guide the Department's exercise of its discretion in determining" how to conduct

investigations and prosecutions, *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1153

(D.C. Cir. 2006); *see also id.* at 1152 (collecting cases that held similar no-rights-creating

regulatory language to be effective, without concluding that such language stripped the

regulations of legal force).  Contrary to the witness's assertion, a regulation need not "confer

substantive or procedural benefits" of any sort upon individuals to have legal force.  *Id.* at 1153.

The regulations have binding legal effect even though they create no rights enforceable in a

private right of action.

*Morton v. Ruiz*, which declared that "where the rights of individuals are affected, it is

incumbent upon agencies to follow their own procedures . . . even where the internal procedures

are possibly more rigorous than otherwise would be required," 415 U.S. 199, 235 (1974), and

which the witness cites, *see* Concord Mem. at 48, is not to the contrary.  The regulations in *Ruiz*

"required the publication of directives that 'inform the public of privileges and benefits available

and of eligibility requirements,'" a requirement "intended to benefit potential beneficiaries."

*Judith Miller*, 438 F.3d at 1154 (quoting *Ruiz*, 415 U.S. at 235).  "This reasoning has no

applicability," *id.*, to regulations that expressly disclaim any intent to create beneficiaries.

More fundamentally, whether or not the regulations have binding legal force simply is

not relevant to the Attorney General's authority to direct and supervise the Special Counsel.  As

explained above, the Attorney General derives such authority from statute, not the regulations.

*See supra* Part III.B.1.a.  Were the witness correct that § 600.10's no-enforceable-rights language

renders the regulations legal nullities, then, the Attorney General would retain plenary power to

supervise the Special Counsel under 28 U.S.C. §§ 509 and 510.  In fact, the witness concedes

that absent the regulations, the Attorney General would have "discretion" to exercise as much

"direction and supervision" over the Special Counsel as he pleases.  Concord Mem. at 30.  The

Attorney General's plenary discretion in monitoring the Special Counsel is exactly what makes

the Special Counsel an inferior officer.  *See Edmond*, 520 U.S. at 663.  For these reasons, the

Attorney General has broad powers to direct and supervise the Special Counsel's work.

### 2.   The Other *Morrison* Factors All Weigh Toward Inferior Officer Status

Given that the Attorney General directs and supervises the Special Counsel's work,

whether the remaining three *Morrison* factors need be considered is doubtful in *Edmond*'s wake.

*PCAOB* concluded that Public Company Accounting Oversight Board members are inferior

officers based solely on *Edmond*'s direction and supervision test, without considering any of the

remaining *Morrison* factors or even discussing *Morrison* at all.  561 U.S. at 510.  *PCAOB*

asserted that *Edmond* "held" "that whether one is an 'inferior' officer depends on whether he has

a superior," *id.* (alterations and internal quotation marks omitted), language that suggests no

other factor is relevant to the principal-inferior officer inquiry.  *Edmond* itself concluded that

Coast Guard Court of Criminal Appeals judges were inferior officers based solely on their

direction and supervision by others, despite that all three of the remaining *Morrison* factors

weighed toward principal officer status.  520 U.S. at 661–66; *see also NLRB v. SW Gen., Inc.*,

137 S. Ct. 929, 947 n.2 (2017) (Thomas, J. concurring) ("Although we did not explicitly overrule

*Morrison* in *Edmond*, it is difficult to see how *Morrison*'s nebulous approach survived our

opinion in *Edmond*.").[23]  Nonetheless, given the Supreme Court's lack of clarity as to whether

*Morrison* remains good law or is superseded by *Edmond*, the remaining *Morrison* factors—

whether an officer is limited in duties, jurisdiction, and tenure, 487 U.S. at 671–72—are

considered in turn.  As explained below, each factor only reinforces the Special Counsel's

inferior officer status.

### a. Limited Duties

As to the *Morrison* factor that assesses any limits on the officer's duties, the Special

Counsel "is empowered . . . to perform only certain, limited duties" and has no "authority to

formulate policy for the Government or the Executive Branch."  *Id.* at 671.  The Special Counsel

may wield only such power as the Attorney General has "authoriz[ed]" him to possess, 28 U.S.C.

§ 510, and the Attorney General has authorized the Special Counsel only to (1) "conduct the

investigation confirmed by then-FBI Director James B. Comey in testimony before the House

Permanent Select Committee on Intelligence on March 20, 2017," and (2) "prosecute federal

crimes arising from the investigation of these matters."  Appointment Order ¶¶ (b), (c).  These

---

[23]     Notably, while Justice Souter's concurring opinion in *Edmond* criticized the majority for holding that an officer who has a superior is an inferior officer "on that basis alone," 520 U.S. at 667 (Souter, J., concurring in part and concurring in the judgment), the majority did not indicate that Justice Souter had misunderstood its holding.

duties, though broad, are limited—by statute, *see* 28 U.S.C. § 510, contrary to the witness's

assertion otherwise, *see* Concord Mem. at 37—and include no policymaking power.  By way of

comparison, the Independent Counsel had authority to (1) investigate "any Federal criminal law

other than a violation classified as a Class B or C misdemeanor or an infraction" by persons such

as "the President and Vice President, Cabinet level officials, certain high-ranking officials in the

Executive Office of the President and the Justice Department, the Director and Deputy Director

of Central Intelligence, the Commissioner of Internal Revenue, and certain officials involved in

the President's national political campaign," and (2) "conduct a preliminary investigation of

[other] persons . . . if an investigation by the Attorney General or other Department of Justice

official 'may result in a personal, financial, or political conflict of interest.'"  *Morrison*, 487 U.S.

at 660 n.2 (quoting 28 U.S.C. § 591(a)–(c) (expired)).  The Special Counsel's authority is not

clearly greater than the Independent Counsel's, and arguably is lesser.

To be sure, the "certain, limited duties," *id.* at 671, the Attorney General authorized the

Special Counsel to perform include significant investigative and prosecutorial responsibilities,

*see* Appointment Order ¶¶ (b), (c).  That the Special Counsel's duties are limited by no means

implies that such duties are trivial.  *See Edmond*, 520 U.S. at 662 (noting that inferior officers

may wield "significant authority pursuant to the laws of the United States" (internal quotation

marks omitted)).  The question is not whether the Special Counsel's duties are significant or

trivial, however, but whether those duties are limited.  *See Morrison*, 487 U.S. at 671.  They are.

The witness compares the Special Counsel's duties to those of persons held to be inferior

officers in an effort to demonstrate that the Special Counsel's duties are greater, but this effort

falls flat.  For example, the witness asserts that the Special Counsel's duties are greater than

those of the Independent Counsel because the Independent Counsel investigated only a single

Assistant Attorney General's "testimony . . . to Congress on a particular date."  Concord Mem. at 36 (citing *Morrison*, 487 U.S. at 666–67).  This is irrelevant, however, as *Morrison* determined the scope of the Independent Counsel's duties by looking to the breadth of her statutory authority rather than to any particular investigation the Independent Counsel pursued.  *See* 487 U.S. at 671 ("[A]ppellant is empowered by the Act to perform only certain, limited duties."); *see also id.* (analyzing "[a]n independent counsel's role," not the particulars of the investigation at issue (emphasis added)).  If the Independent Counsel's duties are not too weighty to be vested in an inferior officer, the same is true of the Special Counsel's duties.

Along these lines, the witness contends that the Special Counsel, unlike the Independent Counsel, can formulate policy, which he has done by indicting "foreign nationals for funding alleged electioneering activity on a theory . . . that has never been brought before in any reported case."  Concord Mem. at 37.  The ability to raise a novel legal theory, however, is not the same as policymaking power, which, as discussed above, the Special Counsel lacks.  *See* Appointment Order ¶¶ (b), (c).  At most, the witness could argue that the Special Counsel has made policy without authorization.  This argument would fail, however, as it mistakenly conflates setting policy with merely raising a new legal theory.  The witness also asserts, as to the Special Counsel's indictment of Russians alleged to have interfered with the 2016 presidential election, that the Special Counsel "has also ignored Department of Justice guidance requiring willfulness for a charge under 18 U.S.C. § 371 of conspiracy to violate election laws based on alleged interference with the FEC."  Concord Mem. at 37.  Even assuming this allegation were true, such conduct is not the same as formulating new policy.

In another comparison, the witness argues that the Special Counsel "is much more powerful than is a permanent U.S. Attorney" and is "more akin" to "an Assistant Attorney

General," both of whom the witness asserts are principal officers.  *Id.* at 15.[24]  The witness does

not explain why either of these officers are principal officers.  The Supreme Court has indicated,

albeit in *dicta*, that a U.S. Attorney is an inferior officer, *see Myers*, 272 U.S. at 159, and at least

two Circuits have agreed, *see United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000); *United

States v. Gantt*, 194 F.3d 987, 999 (9th Cir. 1999).[25]

Even assuming Assistant Attorneys General and U.S. Attorneys are principal officers,

this would not establish that the Special Counsel is a principal officer himself, as the witness

fails to show that the Special Counsel's duties are greater than, or even equal to, those of

Assistant Attorneys General or U.S. Attorneys.  The witness's assertion that the Special

Counsel's duties are greater than those of U.S. Attorneys rests on the claim that the Special

Counsel (1) "has nationwide jurisdiction" and (2) "can seek indictments of foreign citizens and

corporations," which "can have a major effect on U.S. foreign policy."  Witness's Mot. at 15.

Both are true of U.S. Attorneys as well.  U.S. Attorneys may "prosecute for all offenses against

the United States," 28 U.S.C. § 547(1), including for offenses committed by foreign citizens and

corporations.  The Special Counsel, in contrast, is authorized to investigate and prosecute a far

smaller set of offenses.  *See* Appointment Order ¶¶ (b), (c).  Although a U.S. Attorney may only

prosecute defendants over whom venue lies "within his district," *id.*; *see also* U.S. CONST.

amend. VI; FED. R. CRIM. P. 18, this limit does not significantly restrict a U.S. Attorney's

---

[24]     Elsewhere, the witness asserts that the Special Counsel's powers are in fact *greater* than those of Assistant Attorneys General.  *See* Witness's Reply at 21.  The witness also asserts that the Special Counsel is exercising this vast power "with little, if any, oversight or control."  Witness Mot. at 14.  This claim is incorrect; as explained above, the Attorney General exercises significant oversight and control over the Special Counsel.

[25]     The witness concedes that an interim U.S. Attorney appointed by a district court may be an inferior officer, but argues that interim U.S. Attorneys, unlike permanent U.S. Attorneys, serve only "for a short period of time."  Witness's Mot. at 15.  An interim U.S. Attorney serves indefinitely "until the vacancy is filled."  28 U.S.C. § 546(d).  A Special Counsel, meanwhile, serves until "th[e] task is over," at which point "the office is terminated."  *Morrison*, 487 U.S. at 672.  In any event, if an officer who wields the power of a U.S. Attorney cannot be an inferior officer, as the witness insists, an interim U.S. Attorney's relatively short tenure does not seem relevant.  The increasingly *ad hoc* nature of the witness's proposed comparative power test only underscores the test's untenability.

investigative authority, given the ability to refer an investigation to another U.S. Attorney for prosecution, *see* U.S. ATTORNEY'S MANUAL § 9-27.200 (instructing attorneys to "consider whether to . . . refer the matter for prosecutorial consideration in another jurisdiction").[26] Meanwhile, the witness does not explain how a Special Counsel is greater than or equal in duties to an Assistant Attorney General at all, other than a conclusory assertion that both wield significant power. *See* Witness's Reply at 21.

As a final comparison, the witness argues that the Special Counsel is more powerful than Copyright Royalty Judges, whom *Intercollegiate* held to be principal officers "even though they have a superior officer." Witness's Mot. at 16. *Intercollegiate* held Copyright Royalty Judges to be principal officers because (1) the Librarian of Congress and Register of Copyright's supervision "f[e]ll short of the kind that would render [such judges] inferior officers," (2) such judges' removal was limited to "misconduct or neglect of duty," and (3) no official could countermand such judges' decisions. 684 F.3d at 1339–40. As discussed above, the Special Counsel differs from the Copyright Royalty Judges by satisfying all three of these factors.

### b. Limited Jurisdiction

As to the next *Morrison* factor, the Special Counsel's "office is limited in jurisdiction." 487 U.S. at 672. *Morrison* reasoned that "[n]ot only is the [EIGA] itself restricted in applicability to certain federal officials suspected of certain serious federal crimes, but an independent counsel can only act within the scope of the jurisdiction that has been granted by the Special Division pursuant to a request by the Attorney General." *Id.* The Special Counsel likewise can act only within the scope of the jurisdiction the Attorney General granted through

---

[26]     Although Section 9-27.200 specifically contemplates circumstances in which the attorney "concludes that there is probable cause to believe that a person has committed a federal offense within his/her jurisdiction," U.S. ATTORNEY'S MANUAL § 9-27.200, the attorney also may deem referral to be warranted where the attorney believes a person has committed a federal offense outside her or his jurisdiction.

the Appointment Order and any additional jurisdiction the Attorney General chooses to confer. *See* Appointment Order ¶¶ (b), (c).  A U.S. Attorney, who can investigate and prosecute any federal crime, 28 U.S.C. § 547(1), has far broader jurisdiction.

The witness notes that the Independent Counsel's investigation in *Morrison* focused on a single person, who was then out of government, and that the Attorney General had conducted his own preliminary investigation prior to concluding that an Independent Counsel's appointment was necessary.  Concord Mem. at 38.  *Morrison*, however, determined that the Independent Counsel's jurisdiction was limited solely by assessing the scope of the Independent Counsel's formal investigatory and prosecutorial powers, not who or how many targets the Independent Counsel investigated or whether the Attorney General conducted any prior investigation.  *See* 487 U.S. at 672.  The witness further notes that the Attorney General enjoyed unreviewable discretion to decline to allow the Independent Counsel to investigate other officials.  Concord Mem. at 38.  The Special Counsel is similar in this respect, as the Attorney General's discretion to delegate to the Special Counsel certain responsibilities but not others, "as [the Attorney General] considers appropriate," 28 U.S.C. § 510, likewise is unreviewable.

### c.  *Limited Tenure*

The final *Morrison* factor also weighs in favor of inferior officer status because the Special Counsel's "office is limited in tenure."  487 U.S. at 672.  The EIGA provided "no time limit on the appointment of a particular counsel," but *Morrison* concluded that the office "is 'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated, either by the counsel herself or by action of the Special Division."  *Id.*  "Unlike other prosecutors," *Morrison* reasoned, the Independent Counsel "has no ongoing responsibilities that extend beyond the accomplishment of

the mission that she was appointed for and authorized by the Special Division to undertake." *Id.*
The Special Counsel likewise was appointed "to accomplish a single task," *id.*: to (1) "conduct
the investigation confirmed by then-FBI Director James B. Comey in testimony before the House
Permanent Select Committee on Intelligence on March 20, 2017," and (2) "prosecute federal
crimes arising from the investigation of these matters," Appointment Order ¶¶ (b), (c).  The
Special Counsel's position will be "terminated," 487 U.S. at 672, once this task is complete.

To conclude that the Special Counsel's office is "temporary" in the sense that the Special
Counsel's "office is limited in tenure," *Morrison*, 487 U.S. at 672, does not conflict with
recognizing the Special Counsel as an officer of the United States, who "must occupy a
*continuing* position," *Lucia*, 138 S. Ct. at 2051 (internal quotation marks omitted, emphasis
added).  *Lucia* suggested that one holding a "temporary" position may not qualify as an officer at
all, but only as an employee.  *Id.*  "Temporary" has a somewhat different meaning in the context
of *Morrison*'s principal-inferior officer test than in the context of *Lucia*'s officer-employee test,
however; indeed, if the term "temporary" meant the same thing in both contexts, *Morrison*'s
"limited in tenure" factor would always weigh toward principal officer status, as a determination
that one is an officer in the first place requires a determination that one's position is not
"temporary."  Instead, for purposes of determining whether an officer is principal or inferior, a
position is "temporary" if limited in duration, *i.e.*, the position eventually will be "terminated."
*Morrison*, 487 U.S. 672.  For purposes of determining whether one is an officer of any kind,
however, a position is "temporary" if the position's "duties" are "occasional," "intermittent"
*Germaine*, 99 U.S. at 512 (equating "temporary" with "intermittent"), "or "episodic," *Freytag*,
501 U.S. at 881.  *Germaine*, for example, held that a surgeon who was "only to act when called
on by the Commissioner of Pensions in some special case, as when some pensioner or claimant

of a pension presents himself for examination," was a mere employee rather than an officer. *Id.* The Special Counsel's position is "temporary" in the sense that it eventually will terminate when his "task is over," *Morrison*, 487 U.S. 672, but it is not occasional, intermittent, or episodic, as the Special Counsel's work remains ongoing and regular until complete.

The witness argues that the Special Counsel's mandate "is far-reaching and could involve countless lines of investigation, many of which . . . are far afield from the Russian government and links to President Trump's 2016 campaign," Concord Mem. at 39, but that is neither here nor there. What matters is that "when that task is over the [Special Counsel's] office is terminated." *Morrison*, 487 U.S. at 672. The witness further argues that "there is no end provided for in any statute or regulation—the investigation will apparently continue until the Special Counsel himself declares that he is finished." Concord Mem. at 39. The same was true of the Independent Counsel. *Morrison*, 487 U.S. at 672.

*     *     *

In sum, the remaining *Morrison* factors, if relevant, only confirm the Special Counsel's inferior officer status.

### 3. Inferior Officer Status Does Not Turn on the Significance of an Officer's Duties and Functions

On a final note, not satisfied with the outcome under the *Morrison* or *Edmond* tests, the witness has come up with his own test for identifying principal officers under the Appointments Clause. Specifically, he contends that some officers have "duties and functions" that, "*whatever the chain of command might be*, are too significant to bear the label 'inferior.'" Witness's Reply at 17. The Special Counsel, the witness contends, is such an officer, "exercising so much prosecutorial power that he must be a principal officer," even if he otherwise satisfies *Edmond* and *Morrison*. Witness's Mot. at 14. Adopting the witness's proposed test would make no

56

difference here, as the degree of power the Special Counsel enjoys is entirely consistent with inferior officer status, for the reasons explained above.  The witness's proposed test should not be adopted, however, as that test runs contrary to binding precedent, is historically unsound, and supplies no determinate, judicially-manageable rule of decision.

As an initial matter, binding Supreme Court precedent squarely forecloses the witness's argument.  *Edmond* stated unequivocally that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  520 U.S. at 663.  This unqualified definition leaves no room for exceptions—one who satisfies each element of the definition is an inferior officer. *Edmond* also stated that "[g]enerally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior."  *Id.*  Seizing upon the phrase "Generally speaking," the witness argues that an officer who wields sufficiently great power might be a principal officer despite having a superior.  Witness's Reply at 23–24.  However, *PCAOB* later omitted the term "Generally speaking" altogether in characterizing *Edmond* to have "held" that "whether one is an 'inferior' officer depends on whether he has a superior."  561 U.S. at 510 (alterations omitted).  Thus, even if *Edmond* suggested possible exceptions to the "direction and supervision" test, *PCAOB* clarified otherwise.  The witness notes that Justice Souter's *Edmond* concurrence asserted that "[i]t does not follow, [] that if one is subject to some supervision and control, one is an inferior officer," and that "[h]aving a superior officer is necessary for inferior officer status, but not sufficient to establish it."  520 U.S. at 667 (Souter, J., concurring in part and concurring in the judgment).  No other Justice joined Justice Souter's opinion, however. Justice Souter's views thus are not the law.

Aside from Justice Souter's *Edmond* concurrence, the witness cites no case law to support his proposed test.  The witness raises several historical arguments, but none have merit. First, the witness notes that when the Excepting Clause was proposed at the Constitutional Convention, James Madison objected that "[i]t does not go far enough if it be necessary at all— *Superior Officers below Heads of Departments* ought in some cases to have the appointment of the lesser offices."  2 The Records of the Federal Convention of 1787, at 627 (Max Farrand ed., rev. ed. 1966) ("Records") (emphasis added).  Gouverneur Morris responded, "There is no necessity.  Blank Commissions can be sent."  *Id.*  From the phrase "Superior Officers below Heads of Departments," *id.*, the witness infers that the Framers contemplated principal officers directed and supervised by other principal officers, meaning that being subject to another's direction and supervision does not necessarily make one an inferior officer.  Witness's Reply at 20.  The witness also contends that Madison's words show that inferior officers were understood to have less power than "Superior Officers."  *Id.*  Justice Scalia also read Madison's words this way, citing them for the proposition that "it is not a *sufficient* condition for 'inferior' officer status that one be subordinate to a principal officer.  Even an officer who is subordinate to a department head can be a principal officer."  *Morrison*, 487 U.S. at 722 (Scalia, J., dissenting).

Put aside that the Constitution does not mention "Superior Officers" anywhere, that Madison spoke on "the last day of the Convention before the proposed Constitution was signed, in the midst of a host of minor changes that were being considered," *id.* at 720, that the term "Superior Officers" was not uttered any other time during the Convention, that "[n]o great debate ensued" when Madison spoke, *id.*, that the discussion was "relative[ly] br[ief]," *id.*, and that there is little indication that anyone at the Convention but Morris agreed with Madison.  The witness's logic rests on the assumption that "Superior Officers" and inferior officers are mutually

exclusive groups, such that a superior officer necessarily is not an inferior officer and vice versa. *See id.* (describing Madison's reference to "Superior Officers" as an "apparent contrast to the 'inferior officers' covered by the provision").  A thing can be both superior and inferior at the same time, however, because "superior" and "inferior" are "relational word[s]," in that each "describes how one entity is connected to a different entity."  *Ocasio v. United States*, 136 S. Ct. 1423, 1441 (2016); *see also Electromation, Inc. v. NLRB*, 35 F.3d 1148, 1162 (7th Cir. 1994) ("[R]elational terms . . . require consideration of both the subject and the object for their complete meaning.").  For example, suppose Ms. A directs and supervises Ms. B, who directs and supervises Mr. C.  One fairly could say that Ms. B is both a superior officer and an inferior officer, as she directs and supervises Mr. C and is herself directed and supervised by Ms. A.  If "[w]hether one is an 'inferior' officer depends on whether he has a superior," *Edmond*, 520 U.S. at 662, it stands to reason that whether one is a "superior" officer similarly depends simply on whether one has an inferior.  For any chain of command, everyone but the person at the very top and the person at the very bottom can be both superior and inferior, with only the person at the very top being a solely superior officer (*i.e.*, a principal officer) and only the person at the very bottom being a solely inferior officer.  Madison's words thus provide no basis to conclude that the degree of power an officer wields, rather than where an officer falls in the chain of command, determines principal or inferior office status.[27]

---

[27]      Notably, while Justice Scalia's *Morrison* dissent cited Madison's words to assert that "it is not a *sufficient* condition for 'inferior' officer status that one be subordinate to a principal officer," as "[e]ven an officer who is subordinate to a department head can be a principal officer," 487 U.S. at 722 (Scalia, J., dissenting), Justice Scalia's majority opinion in *Edmond*, which otherwise adopted the principal-inferior officer test Justice Scalia had proposed in *Morrison*, did not include this qualifier, but instead articulated a clearer bright-line rule.  Nor could this have been an oversight, as Justice Souter's *Edmond* concurrence asserted that "[h]aving a superior officer is necessary for inferior officer status, but not sufficient to establish it."  520 U.S. at 667 (Souter, J., concurring in part and concurring in the judgment).  Indeed, Justice Souter threw Justice Scalia's words from *Morrison* back at him, to no avail.  *See id.* (citing *Morrison*, 487 U.S. at 722 (Scalia, J., dissenting)).  Perhaps Justice Scalia had come to reconsider this aspect of his *Morrison* dissent.

Second, the witness argues that during the Founding Era, English and state courts often were labeled "Supreme" or "Inferior" based on the scope of their geographic or subject-matter jurisdictions, without regard to whether they reviewed or were reviewed by other courts. Witness's Reply at 18 (citing David E. Engdahl, *What's in a Name? The Constitutionality of Multiple "Supreme" Courts*, 66 IND. L.J. 457, 466–72 (1991)). The Constitution, however, used the terms "Supreme" and "inferior" in a hierarchical sense in describing the federal judiciary, "plainly connot[ing] a relationship of subordination." *Morrison*, 487 U.S. at 719 (Scalia, J., dissenting). The Constitution vests "[t]he judicial power of the United States" in "one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish," with the Supreme Court being primarily a body of "appellate jurisdiction." U.S. CONST. art. III, §§ 1, 2, cl. 2. While Congress might create "exceptions" to the Supreme Court's appellate jurisdiction, *see id.* § 2, cl. 2, such exceptions are, by definition, exceptional rather than the rule. In Federalist No. 81, Alexander Hamilton described Article III's "inferior" courts as "subordinate tribunals," and then as "subordinate to the Supreme" Court. THE FEDERALIST NO. 81, at 485 n.*, 486 (Alexander Hamilton) (Clinton Rossiter ed., 1961). In Federalist No. 82, meanwhile, Hamilton variously referred to the inferior federal courts as "subordinate courts of the Union," "subordinate courts," "subordinate federal courts," "subordinate federal judicatories," and "subordinate national tribunals." THE FEDERALIST NO. 82, at 492, 494–95 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The witness observes that "an early draft of Article III at the Constitutional Convention proposed creating 'one *or more* supreme tribunals.'" Witness's Reply at 18 (quoting 1 RECORDS, *supra*, at 21 (emphasis added)). Putting aside that the Convention rejected this language in favor of "one Supreme Court," U.S. CONST. art. III, § 1, having multiple "supreme tribunals" is no less consistent with hierarchy and subordination than

is having multiple "heads of departments," *id.* art. II, § 2, cl. 2.  Multiple courts each can be "supreme" if each has appellate jurisdiction over other "inferior" courts and none have appellate jurisdiction over one another.  Historical evidence thus shows that Article III used the terms "Supreme" and "inferior" in a hierarchical sense, suggesting that Article II did so as well.

The witness alludes to "centuries of practice [of] treating Deputy and Assistant Cabinet Secretaries as Princip[al] officers," Witness's Reply at 19, but fails to support this assertion with any authority.[28]  The witness argues that "it seems obvious that" officers such as the DAG, the Solicitor General, the Assistant Attorneys General, and non-interim U.S. Attorneys are principal officers "notwithstanding the hierarchical superiority of the Attorney General," given the "great power" they wield.  *Id.*  This litigation presents no need to determine whether any of these officers are principal or inferior, as the Attorney General's power to remove a Special Counsel gives the Attorney General greater direction and supervision over a Special Counsel than over any of these officers.  *See supra* Part III.B.1.a.[29]

The witness claims that some officers are so important that they "need to be principal officers and subject to scrutiny at appointment, Senate advice and approval, and impeachment." Witness's Mot. at 14.  Congress, however, is free to subject inferior officers' appointments to the advice-and-consent process—this, indeed, is "the default manner of appointment for inferior officers."  *Edmond*, 520 U.S. at 660.  Should Congress decide that an officer whose appointment is vested "in the heads of departments," U.S. Const. art. II, § 2, cl. 2, should instead be subject to senatorial confirmation, Congress is free to pass a law to that effect.  Congress's power to

---

[28]   The witness notes that "Cabinet Secretaries have always been appointed as principal officers even though they can be fired by the President at will."  Witness's Mot. at 14.  This is a non-sequitur—the fact that only the President can remove a Cabinet Secretary cuts in favor of, not against, Cabinet Secretaries being principal officers.
[29]   The same is true with respect to the "Deputy and Assistant Cabinet Secretaries, Ambassadors," and pre-*Intercollegiate* Copyright Royalty Judges the witness mentions.  Witness's Mot. at 14, 16.

impeach likewise is not textually limited to principal officers.  *See id.* art. I, §§ 2, cl. 5, 3, cl. 6,

art. II, § 4.[30]  Finally, inferior officers' political accountability is ensured by vesting their

direction and supervision in "others who were appointed by Presidential nomination with the

advice and consent of the Senate."  *Edmond*, 520 U.S. at 663; *see also Morrison*, 487 U.S. at 724

n.4 (Scalia, J., dissenting) (describing inferior officers as "subordinate to, *i.e.*, subject to the

supervision of, principal officers who (being removable at will) have the President's complete

confidence").

    A more fundamental problem with the witness's proposed test is that it is too subjective,

indeterminate, and unadministrable to provide a workable standard for resolving disputes over

who is an inferior officer.  How much power, exactly, an officer must wield before ceasing to

qualify as inferior is not only unclear but in any realistic sense altogether unknowable.  The

witness's proposed test would in practice produce not coherent, consistent analysis but a body of

"adjudications . . . good for this day and train only."  *Smith v. Allwright*, 321 U.S. 649, 669

(1944) (Roberts, J., dissenting).  Indeed, the witness's proposed test is plagued by the very same

characteristic Justice Scalia criticized in *Morrison*, lending itself to "ad hoc, standardless

---

[30]    Article II, section 4 provides that "all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."  U.S. CONST. art. II, § 4.  To be sure, whether the term "all civil Officers," as used in Section 4 of Article II, and "Officers," as used in Sections 2 and 3, are coextensive is an unsettled question.  Joseph Story, writing in *Commentaries on the Constitution of the United States*, believed that "all civil Officers" included "[a]ll officers of the United States . . . who hold their appointments under the national government, . . . in the highest or in the lowest departments of the government, with the exception of officers in the army and navy."  1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 792, at 558 (Thomas M. Cooley ed., 4th ed. 1873) (1827).  Likewise, early American lawyer William Rawle asserted that those subject to impeachment included "[a]ll executive . . . officers, from the president downwards."  WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 213 (2d ed. 1829) (1825).  The view that impeachment extended to all officers of the United States was not unanimous, however.  At the North Carolina Ratification Convention, for example, Archibald Maclaine asserted that "impeachments cannot extend to inferior officers of the United States," describing the notion "that every officer, however trifling his office, is to be impeached for every petty offense" as "the most horrid ignorance."  4 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 43–44 (2d ed. 1836) (1827).  How widely Maclaine's view was shared, however, is unclear, and beside which, Story and Rawle's understanding better accords with Section 4's plain text.

judgment," "ungoverned by rule," as to whether, in a court's "unfettered wisdom," an officer has "too much" power to be inferior.  487 U.S. at 712, 733 (Scalia, J., dissenting).

The witness offers little guidance on this front, variously asserting that an officer cannot qualify for interior status if the officer is "important and powerful," Witness's Mot. at 14; *see also id.* ("[T]he importance of the office they hold is so great that the officers in question need to be principal officers."), "exercises as much power as is exercised by the 93 permanent U.S. Attorneys, the Deputy and Assistant Cabinet secretaries, or lower federal court judges," *id.* at 17; *see also id.* ("If a prosecutor has as much power as an Assistant Attorney General or a permanent U.S. Attorney, he is by definition a principal officer."), "exercise[s] substantial enough power," Witness's Reply at 17, has "great power," *id.* at 19, or has "vast power," *id.* at 19, 20.  Other guidelines the witness proposes, such as whether an officer "exercis[es] much more power than any inferior officer," Witness's Mot. at 14, "exercise[s] too much power to be denominated [an] inferior officer[]," *id.* at 15, "occup[ies] an office that is unimportant enough that it can be held by an inferior officer," *id.* at 17, or has "duties and functions" that "are too significant to bear the label inferior," Witness's Reply at 17, are entirely circular, failing to provide any guidance whatsoever as to which powers are too great for an inferior officer to wield.  The witness acknowledges that, as *Edmond* explained, "[t]he exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, . . . the line between officer and nonofficer," *id.* at 23 (quoting 520 U.S. at 662), but asserts a distinction "between 'significant' authority that marks officer status and the extraordinary authority and power that marks principal rather than inferior officer status," *id.*  The witness admits, to his credit, that his proposed test "is somewhat subjective in close cases."  Witness's Mot. at 17.  This is an understatement.  To thread the

needle between duties that are merely "significant," which an inferior officer permissibly can enjoy, *Edmond*, 520 U.S. at 662, and "duties [that] extend [so] far enough beyond 'significant authority'" as to rise to the level of "extraordinary," which the witness asserts an inferior officer may not enjoy, Witness's Reply at 23, 25, "seems akin to counting angels dancing on the head of a pin," *Kedra v. Schroeter*, 876 F.3d 424, 446 n.17 (3d Cir. 2017).[31]

The need for objective, determinate, and administrable rules to differentiate between principal and inferior officers is particularly pressing given the role principal officers can be called upon to play at times of national emergency. The Twenty-Fifth Amendment provides:

> Whenever the Vice President and a majority of either the *principal officers of the executive departments* or of such other body as Congress may by law provide, transmit to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office, the Vice President shall immediately assume the powers and duties of the office as Acting President.

> Thereafter, when the President transmits to the President pro tempore of the Senate and the Speaker of the House of Representatives his written declaration that no inability exists, he shall resume the powers and duties of his office unless the Vice President and a majority of either the *principal officers of the executive department* or of such other body as Congress may by law provide, transmit within four days to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office. . . .

U.S. CONST. amend. XXV, § 4 (emphasis added). The Twenty-Fifth Amendment was ratified following President Kennedy's assassination, when "the nation was confronted with . . . concerns over the health of the new chief executive and his potential successors." CONG. RES. SERV., RS20260, PRESIDENTIAL DISABILITY: AN OVERVIEW 3 (July 12, 1999). In particular, the Amendment sought to clarify the process of "succession" in the event of a presidential

---

[31]     To be sure, the "significant authority" prong of the officer-employee test is itself "framed in general terms." *Lucia*, 138 S. Ct. at 2051. However, the indeterminacy of asking merely whether one's authority rises to the level of "significant," *id.*, pales in comparison to that of asking whether one's authority rises to the level of "significant" but *not* to the level of "extraordinary."

"disability."  *Id.*  Section 4 authorized Congress to designate by law a body to determine, along with the Vice President, whether a President could no longer discharge his office's powers and duties.  U.S. CONST. amend. XXV, § 4, cl. 1.  Section 4 did not assume that Congress would enact such a law, however, and provided as a backup that "the principal officers of the executive departments" would serve as such body.  *Id.*

The delicacy and urgency of any circumstance in which Section 4 would be invoked creates great need for a conclusive and easily-administrable test to determine speedily who is and is not a "principal officer[]," *id.*, entitled to vote on questions of presidential removal.  Any delays in the Section 4 process to deliberate at length over whether one or more particular officers are entitled to participate could exacerbate and extend the crisis over presidential leadership, while any lingering uncertainty as to whether any officers who participated in that process were entitled to do so inevitably would cast a pall of illegitimacy on the President's tenure, especially if the vote on removal was decided narrowly.  While the political question doctrine might shield the Section 4 process from any judicial review, *cf. Baker v. Carr*, 369 U.S. 186, 217 (1962) (identifying "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question" as contexts in which a dispute might raise non-judicially reviewable political questions), judicial review's unavailability hardly would erase the stain of illegitimacy a suspect Section 4 process might leave on the public imagination.

*Edmond*'s "direction and supervision" test, while not altogether free of indeterminacy in close cases, is far more amenable to straightforward and conclusive application than the

witness's nebulous "extraordinary" powers standard, Witness's Reply at 23, which requires

helplessly subjective judgment calls as to just how much power is *too much* for an inferior

officer to wield.[32]  *Edmond*'s test thus facilitates a quicker and more certain identification of

principal officers entitled to participate in Section 4's process as necessary in a time of the

particular kind of national crisis this constitutional amendment guides.  The witness's proposed

test, in contrast, would only exacerbate and prolong confusion during such times, and potentially

cast doubt on the legitimacy of an emergency's eventual resolution.  The Twenty-Fifth

Amendment thus provides additional reason to believe *Edmond*'s relatively bright-line principal-

inferior officer test better accords with the Constitution's design than the witness's indeterminate

standard.[33]

* * *

For these reasons, the Special Counsel is an inferior officer within Article II's meaning.

His appointment, without presidential appointment and senatorial confirmation, thus did not

violate the Appointments Clause.

---

[32]     The only other constitutional provision to refer expressly to principal officers as such is Article II's
Opinion Clause, which allows the President to "require the Opinion, in writing, of the principal Officer in each of
the executive Departments, upon any Subject relating to the Duties of their respective Offices."  U.S. CONST. art. II,
§ 2, cl. 1.  The witness's proposed principal-inferior officer test would generate confusion as to whom the Opinion
Clause covers, although such confusion would be less problematic than that which would arise in the Twenty-Fifth
Amendment context, as the President could always obtain an inferior officer's opinion by directing the relevant
principal officer to procure an opinion from her subordinate, or else by directing the relevant principal officer to
direct her subordinate to procure the opinion from the subordinate's subordinate, however far down the chain of
command is necessary.  Uncertainty as to which officers are entitled to vote on questions of presidential removal, in
contrast, has far more dire implications.
[33]     At oral argument, the witness's counsel estimated that around 500 Executive branch officials could be
principal officers under the witness's proposed test.  Hr'g Tr. at 24:7–16.  When confronted with the Twenty-Fifth
Amendment administrability problems this would create, the witness's counsel changed his tune, asserting that such
officers actually would not be principal officers at all, but "superior" officers, a third type of constitutional officer
distinct from principal and inferior officers.  *Id.* at 27:11–28:22.  This argument, which the witness raised for the
first time at oral argument, fails because the Constitution recognizes no distinct third category of non-principal, non-
inferior "superior" officers.  As explained above, an officer can be superior by virtue of supervising a subordinate,
but such an officer necessarily also either (1) is directed and supervised by another, and thus inferior, or (2) is not,
and thus a principal officer.  Thus, all officers are principal or inferior.

### C. Congress By Law Vested the Special Counsel's Appointment in the Attorney General

The Excepting Clause provides that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. The witness argues that if the Special Counsel is an inferior officer, he was not properly appointed as such because Congress has not "by Law," *id.*, vested in the Attorney General the power to appoint a Special Counsel. This is incorrect, as two statutes—28 U.S.C. §§ 515(b) and 533(1)—vest in the Attorney General the power to appoint a Special Counsel.[34] The Special Counsel's appointment thus satisfies the Excepting Clause.

#### 1. 28 U.S.C. § 533(1)

Section 533(1), which provides that "[t]he Attorney General may appoint officials . . . to detect and prosecute crimes against the United States," 28 U.S.C. § 533(1), authorizes the Special Counsel's appointment. The DAG appointed the Special Counsel as an "official[]" authorized "to detect and prosecute" certain "crimes." *Id.*; *see* Appointment Order ¶¶ (b), (c). Although Section 533(1)'s language does not specifically mention Special Counsels, a statute need "not specifically mention" particular officers by name "to give [a Head of Department] power to appoint them." *Edmond*, 520 U.S. at 656; *see also id.* (construing 49 U.S.C. § 323(a),

---

[34]     At oral argument, the Court asked the witness whether any statutes, if not Sections 533(1) and 515(b), authorize the Attorney General to appoint Trial Attorneys to staff non-U.S. Attorney's Office components of the Department of Justice and instructed the witness to file later that day a letter identifying such statutes. Hr'g Tr. at 10:11–12:14. The witness's submission identifies the following "statutes that relate or refer to the hiring or employment of 'attorneys' at the Department of Justice except where otherwise noted:" (1) 28 U.S.C. § 515(a), which the witness denies authorizes the Attorney General to appoint any attorney, *see* Witness's Mot. at 10–12; (2) 28 U.S.C. § 533, which the witness denies authorizes the Attorney General to appoint any attorney, *see* Witness's Reply at 6–7; (3) 28 U.S.C. § 541, which authorizes the President to appoint U.S. Attorneys; (4) 28 U.S.C. § 542, which authorizes the Attorney General to appoint Assistant U.S. Attorneys; (5) 28 U.S.C. § 543, which authorizes the Attorney General to appoint attorneys to assist U.S. Attorneys; and (6) 28 U.S.C. § 546, which authorizes the Attorney General and district courts to appoint Interim U.S. Attorneys, *see* Witness's Post-Hr'g Subm'n, ECF No. 20. To accept the witness's argument thus would compel a conclusion that the Department of Justice lacks statutory authority to appoint any of the hundreds of Trial Attorneys at Main Justice who do not assist a U.S. Attorney.

which authorized "[t]he Secretary of Transportation [to] appoint and fix the pay of officers and employees," to appoint Coast Guard judges because the statute's "plain language" swept broadly enough to reach such officers).  Section 533(1) is if anything more specific than the statute in *Edmond* authorizing the Secretary of Transportation to appoint Coast Guard judges.

*United States v. Nixon*, 418 U.S. 683 (1974), confirms that Section 533 authorizes the Special Counsel's appointment.  *Nixon*, in recognizing the validity of the Watergate Special Prosecutor's appointment, cited Section 533 specifically to explain that Congress has "vested" in the Attorney General "the power to appoint subordinate officers to assist him in the discharge of his duties."  *Id.* at 694 (citing 28 U.S.C. § 533, among other statutes).[35]  While no party in *Nixon* had disputed that Congress had authorized the Attorney General to appoint the Watergate Special Prosecutor, *Nixon*'s determination that Section 533 provided such authority was necessary to the Court's conclusion that a justiciable controversy existed between the President and the Watergate Special Prosecutor, and thus was not mere dicta.  *See Six Cos. of Cal. v. Joint Highway Dist. No. 13 of Cal.*, 311 U.S. 180, 187 (1940) (recognizing that a court's "statement of the ground of its decision" is not "a mere dictum").

The witness argues that Section 533(1) does not authorize the appointment of "officers or attorneys," but only of "officials," a term the witness construes to exclude the Special Counsel.

---

[35]        Although *Nixon* did not specify the subsection of Section 533 pursuant to which the Watergate Special Prosecutor was appointed, Section 533(1) seems to be the most natural choice, as the other subsections authorize the Attorney General to appoint officials to "assist in the protection of the person of the President," "assist in the protection of the person of the Attorney General," and "conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General," respectively.  28 U.S.C. § 533(2)–(4).  The witness criticizes the government for failing to cite Sections 533(2) and 533(3), which authorize the appointment of officials to protect the President and Attorney General, characterizing these statutes as Section 533's "principal provisions."  Witness's Reply at 6–7.  The government does not discuss these statutes because the government does not rely upon them, and the witness does not explain how these statutes limit Section 533(1)'s broad compass.  At oral argument, the government disclaimed reliance on Section 533(4), Hr'g Tr. at 50:2–21, which allows the Attorney General to appoint officials "[t]o conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General," 28 U.S.C. § 533(4), so no discussion of that provision is needed either.

Witness's Reply at 6. The terms "official" and "officer," however, often are used virtually interchangeably. *See, e.g.*, BLACK'S LAW DICTIONARY (7th ed. 1999) (defining "officer" as "[a] person who holds an office of trust, authority, or command," and "official" as "[o]ne who holds or is invested with a public office"); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) (defining "officer" as "one who holds an office of trust, authority, or command," and "official" and "one who holds or is invested with an office"). The witness's assertion that the term "official" does not encompass an attorney is untenable, as Section 533(1) authorizes the appointment of officials to "prosecute crimes," 28 U.S.C. § 533(1), and only attorneys prosecute crimes. The term "officials" is best understood simply to reflect a word choice broad enough to cover any Department of Justice officer or employee, and reaches the Special Counsel.

The witness further contends that Section 533(1) does not authorize the Special Counsel's appointment because the statute "focus[es] on FBI agents and operations," only authorizing the Attorney General to appoint "law enforcement officials connected with the [FBI]." Witness's Reply at 6–7. Section 533(1)'s text is not so limited. The words "officials" who "detect and prosecute crimes against the United States," 28 U.S.C. § 533(1), naturally reach beyond the appointment of FBI officials. *See, e.g.*, *Nixon*, 418 U.S. at 694; *United States v. Hasan*, 846 F. Supp. 2d 541, 546 n.7 (E.D. Va. 2012), *aff'd*, 718 F.3d 338 (4th Cir. 2013) (recognizing that Section 533(1) authorizes the Attorney General to appoint Bureau of Alcohol, Tobacco, Firearms and Explosives agents); *United States v. Fortuna*, No. CRIM. 12-636 NLH/JS, 2013 WL 1737215, at *2 n.8 (D.N.J. Apr. 22, 2013) (same). Although Section 533 is located in a chapter of the U.S. Code titled "Federal Bureau of Investigation," 28 U.S.C. ch. 33, nestled amidst statutes concerning the FBI, *see, e.g.*, *id.* § 532 (providing for appointment of "a Director of the Federal Bureau of Investigation"), this context does not limit Section 533's unambiguous plain

meaning, which does not solely concern FBI officials. *See, e.g.*, *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) ("[S]ection headings cannot limit the plain meaning of a statutory text."); *Fla. Dep't of Revenue v. Picadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[A] subchapter heading cannot substitute for the operative text of the statute."); *Bd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947) (explaining titles and headings "are but tools available for the resolution of a doubt," and "cannot undo or limit that which the text makes plain"); *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 822 (D.C. Cir. 2001) (noting "customary reluctance to give great weight to statutory headings"); *Nat'l Ctr. for Mfg. Scis. v. Dep't of Defense*, 199 F.3d 507, 511 (D.C. Cir. 2000) ("The plain meaning of a statute cannot be limited by its title . . . provisions in a statute do not always align with its title.").[36]

Finally, the witness observes that the DAG did not cite Section 533 specifically in appointing the Special Counsel. Witness's Reply at 7. This is beside the point, however, as the DAG invoked "the authority vested in me as Acting Attorney General, *including* 28 U.S.C. §§ 509, 510, and 515," to appoint the Special Counsel. Appointment Order pmbl. (emphasis added). In this way, the DAG invoked all his available statutory authority, not just the cited provisions, to appoint the Special Counsel.

### 2.   28 U.S.C. § 515(b)

Section 515(b) also authorized the DAG to appoint the Special Counsel. Section 515(b) provides that "[e]ach attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall

---

[36]    The witness asserts that Section 533 "should not to be read as a carte blanche authority under Article II to hire any number of powerful Special Counsels unrelated to FBI operations." Witness's Reply at 7. The Special Counsel, however, was appointed "to conduct the investigation confirmed by then-FBI Director James B. Comey." Appointment Order ¶ (b). Thus, even if the witness were correct that Section 533 only "concerns [] law enforcement officials connected with the Federal Bureau of Investigation," Witness's Reply at 6, the Special Counsel satisfies this standard, *see* Appointment Order ¶ (b).

take the oath required by law."  28 U.S.C. § 515(b).  Section 515(b) thus plainly contemplates

that the Attorney General has power to appoint special assistants to the Attorney General and

special attorneys, as the term "retain," being commonly used in reference to an attorney's hiring,

is synonymous in this context with the term "appoint."[37]

  That Section 515(b) uses the past participle form "specially retained" rather than active

voice phrasing, such as "may specially retain," does not limit the statute's application to

attorneys who already have been retained under a separate statute, as the witness argues, *see*

Witness Reply at 4.  "Past participles . . . are routinely used as adjectives to describe the present

state of a thing."  *Henson*, 137 S. Ct. at 1722.  Here, the term "attorney specially retained" can

mean either "attorney who *is now* specially retained" or "attorney who *previously had been*

specially retained."  The former construction is more sensible, as no other statute in existence at

the time Section 515(b)'s predecessor, Section 17 of the DOJ Act, was enacted authorized the

Attorney General to appoint such attorneys.  *See supra* Part I.A.  Moreover, Section 515(b) does

not require subject attorneys to be retained "under law," which might imply need for separate

statutory authority, *see, e.g.*, 28 U.S.C. § 515(a) ("[A]ny attorney specially appointed by the

Attorney General under law, may . . . conduct any kind of legal proceeding . . . ."), but only

"under authority of the Department of Justice," *id.* § 515(b).

  Section 515(b)'s commissioning provision is consistent with this construction.  Section

515(b) provides that each specially-retained attorney "shall be commissioned."  *Id.*[38]  Where the

powers to appoint an officer and to commission that officer are vested in the same actor, signing

---

[37] Although Section 515(b) does not specify who possesses the power to "retain[]" attorneys, 28 U.S.C. § 515(b), this power must belong to the Attorney General, as the attorneys in question are "retained under authority of the Department of Justice," *id.*, and "[t]he Attorney General is the head of the Department of Justice," *id.* § 503, "vested" with "[a]ll" of the Department's "functions," *id.* § 509.

[38] Section 515(b) does not specify who possesses the power to commission specially-retained attorneys, but this power, like the power to retain such attorneys, *see supra* note 37, must belong to the Attorney General, both being "functions" of the Department of Justice "vested in the Attorney General."  28 U.S.C. § 509.

the officer's commission completes the officer's appointment. *See Marbury v. Madison*, 5 U.S.

(1 Cranch) 137, 157 (1803) ("[T]he constitutional power of appointment . . . . has been exercised

when the last act, required from the person possessing the power, has been performed. This last

act is the signature of the commission."); *see also* U.S. CONST. art. II, § 2, cl. 3 ("The President

*shall have Power to fill up all Vacancies* that may happen during the Recess of the Senate, *by*

*granting Commissions* which shall expire at the End of their next Session." (emphasis added)).[39]

Section 515(b) thus authorizes the Attorney General to retain attorneys and to complete such

attorneys' appointments by commissioning those attorneys.[40]

Section 515(b)'s history confirms this understanding. Before the DOJ Act was enacted,

the Attorney General had no authority to hire attorneys to serve under his immediate command.[41]

*See supra* Part I.A. The Attorney General could appoint attorneys "to assist the district-attorneys

in the discharge of their duties," DA Act § 2, but not to assist himself. The DOJ Act greatly

expanded the Attorney General's power to direct the government's law enforcement and

litigation responsibilities, consolidating these responsibilities underneath the Department of

Justice's umbrella and placing the Attorney General at the Department's head. *See generally*

---

[39]    Nor is there any doubt that Section 515(b) uses the term "commission" in the *Marbury* sense, as *Marbury* long has been recognized to have settled the law in this area. *See, e.g., Nat'l Treasury Employees Union v. Reagan*, 663 F.2d 239, 242 (D.C. Cir. 1981) ("For more than one hundred and seventy-five years, the rule as to when an appointment takes place has been clear: 'when the last act to be done by the (appointing authority) was performed.'" (citing *Marbury*, 5 U.S. (1 Cranch) at 157)); *Goutos v. United States*, 552 F.2d 922, 924–25 (Ct. Cl. 1976) ("[I]t has long been the law that an appointment is not made until the last act required by the person or body vested with the appointment power is performed." (citing *Marbury*)); *D'Arco v. United States*, 441 F.2d 1173, 1175 (Ct. Cl. 1971) ("Chief Justice Marshall's reasoning teaches that, even if the office had been for a term of years, like Marbury's, the executive could still refuse to complete the appointment, after Senate confirmation, by failing to prepare or sign the commission." (citing *Marbury*, 5 U.S. (1 Cranch) at 155–57, 162)); *see also* 2 STORY, *supra*, § 1553 n.1, at 363 (noting the "very general approbation" *Marbury* "received at the time . . . from the profession," and describing *Marbury*'s reasoning "absolutely irresistible").

[40]    Nor can it be maintained that Congress has not authorized an attorney specially retained under Section 515(b) to wield the breadth of authority the Special Counsel possesses, as Section 510 expressly allows the Attorney General to "authoriz[e] the performance by *any* other officer, employee, or agency of the Department of Justice of *any* function of the Attorney General." 28 U.S.C. § 510 (emphasis added).

[41]    The Attorney General could not even hire the two assistants the 1868 Act gave him; instead, these assistants were nominated by the President and confirmed by the Senate. *See* 1868 Act § 5.

DOJ Act.  The Act created the position of Solicitor General, transferred various law officers

from other departments into the Department of Justice, assigned the Department law-related

responsibilities other departments previously had exercised, authorized the Department to

conduct all litigation in which the government is interested in any federal court, and charged the

Department with providing legal advice and counsel to all the other departments, which were

prohibited from themselves employing attorneys at the government's expense.  *Id.* §§ 2–7, 14,

17.  The Act also gave the Attorney General broad powers to manage the Department and to

supervise the Department's officers and employees.  *Id.* §§ 4–6, 8, 11, 14.  Section 17, using

language that remains in Section 515(b) almost unchanged, contemplated that the Attorney

General would "specially retain[]" attorneys "under the authority of the Department of Justice, to

assist in the trial of any case in which the government is interested" and "commission" those

attorneys as "special assistant[s] to the Attorney-General."  *Id.* § 17.  In this context, Section 17

most naturally is read as a source of authority to appoint attorneys to serve under the Attorney

General's immediate control.  Indeed, no other statute then in existence authorized the Attorney

General to appoint his own assistants.  Failing to read Section 17 to provide such authority thus

would render the statute superfluous and yield nonsensical results, allowing the Attorney General

to "commission" attorneys the Department had "specially retained," *id.*, but denying the

Attorney General any authority to appoint those attorneys in the first place.[42]

---

[42]     At least one court, over one hundred years ago in another circuit, reached a contrary conclusion, construing Section 17 to provide the Attorney General no additional authority to appoint attorneys, but that opinion, *United States v. Virginia-Carolina Chemical Co.*, 163 F. 66 (C.C. M.D. Tenn. 1908), which the parties neither cite nor discuss, is singularly unpersuasive.  Determining that the DA Act's Section 2, codified at Rev. Stat. 363, which authorized the Attorney General to appoint attorneys "to assist the district attorneys in the discharge of their duties," and the DOJ Act's Section 17, codified at Rev. Stat. 366, "should be considered as parts of the same act and construed together," the court reasoned that Rev. Stat. 366 "does not authorize the appointment of any one, but provides for the arming of the attorneys and counsellors appointed under [Rev. Stat. 363] with commissions as evidence of their appointment, prescribes the character of oath they shall take, and defines their duties and liabilities."  *Id.* at 73–74 (quoting Rev. Stat. 363).  The court thus construed Rev. Stat. 366 not to authorize the Attorney General to hire additional special assistants, but only to limit the power of attorneys appointed pursuant to

Post-DOJ Act statutory history further confirms that Section 515(b) authorizes the

Attorney General to appoint attorneys under his immediate control.  As explained *supra* Part I.A,

*Rosenthal* had held that only the district attorneys and their assistants could participate in grand

jury proceedings.  121 F. at 865–69.  The attorney at issue in *Rosenthal* was "a special assistant

to the Attorney General" appointed under Section 515(b)'s predecessor.  *Id.* at 863.  Congress

responded by enacting Section 515(a)'s predecessor, authorizing "the Attorney-General or any

officer of the Department of Justice, or any attorney or counselor specially appointed by the

Attorney-General under any provision of law" to "conduct any kind of legal proceeding, . . .

including grand jury proceedings . . . which district attorneys now are or hereafter may be by law

authorized to conduct."  1906 Act.  Congress enacted this Act specifically to overturn *Rosenthal*.

*See* H.R. Rep. No. 59-2901, at 2 (1906) ("[*Rosenthal*] makes the proposed legislation necessary

if the Government is to have the benefit of the knowledge and learning of its Attorney-General

Rev. Stat. 363.  *Id.*  This construction would support the view that Section 515(b) applies only to attorneys appointed under a separate statute, such as 28 U.S.C. § 542 (authorizing the appointment of Assistant U.S. Attorneys) or 28 U.S.C. § 543 (authorizing the appointment of "attorneys to assist United States attorneys").

    *Virginia-Carolina*'s assumption that Section 2 and Section 17 were enacted as parts of the same statute, and thus should be construed together, 163 F. at 73, was clearly erroneous.  Section 2 was enacted in 1861, as part of the DA Act, and Section 17 was enacted in 1870, as part of the DOJ Act.  *Virginia-Carolina* incorrectly found otherwise by relying on the Supreme Court's observation, in *United States v. Crosthwaite*, that the DOJ Act was codified in part at Rev. Stat. 363, which authorized the Attorney General to appoint "such attorneys and counselors at law as he may think necessary to assist the district attorneys in the discharge of their duties" and to "*have supervision of their conduct and proceedings.*"  168 U.S. at 378 (quoting Rev. Stat. 363 (emphasis added)).  The italicized language did indeed come from the DOJ Act, *see* DOJ Act § 16, but the rest came from Section 2 of the DA Act and is found nowhere in the DOJ Act.  *Virginia-Carolina* thus erred in misreading *Crosthwaite* to say that Section 2 and Section 17 were enacted as parts of the same statute.  The DOJ Act's plain text further refutes the notion that only attorneys appointed to assist the district attorneys were subject to its provisions.  Specifically, Section 17 authorized the Attorney General to commission an attorney as a "special assistant" either "to the Attorney General, or to some one of the district attorneys, as the nature of the appointment may require," a provision that makes little sense if the statute applies only to assistants to district attorneys.  *Id.* § 17.  The DOJ Act identified "the district attorneys" and "the officers of the department of Justice" as distinct groups, *id.*, suggesting that their assistants likewise are distinct. The DOJ Act "transferred" various law officers "from the Departments with which they [were] associated to the Department of Justice," *id.* § 3; *see also id.* § 9, but did not fold the district attorneys into the Department, providing only that the Attorney General would "have supervision of the[ir] conduct and proceedings," *id.* § 16.  Finally, *Virginia-Carolina*'s construction of Section 17 would make that the only provision of the DOJ Act to diminish rather than expand the Attorney General's authority, as every other part of that statute aggrandized the Attorney General.  Section 17 thus more naturally is read, like every other provision of the DOJ Act, to expand rather than restrict the Attorney General's authority.

and his assistants, or of such special counsel as the Attorney-General may deem necessary . . . . The law proposed by the bill under consideration seems to be very necessary, because of the decision in the *Rosenthal* case.").[43]  Congress specifically intended the Act to apply to "special assistant[s] to the Attorney General, or special counsel[s]" who "act independently of the United States Attorney, particularly in criminal matters."  S. Rep. No. 59-3835, at 1 (1906).  "When Congress amends legislation, courts must 'presume it intends the change to have real and substantial effect.'"  *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).  Given that the attorney in *Rosenthal* had been appointed under Section 515(b)'s predecessor, *see* 121 F. at 868, the 1906 Act, currently codified at 28 U.S.C. § 515(a), properly is viewed as congressional confirmation that Section 515(b) authorizes such attorneys' appointment.  To conclude otherwise "would render the [1906 Act] an exercise in futility." *Pierce Cty. v. Guillen*, 537 U.S. 129, 145 (2003).

Subsequent amendments to Section 515(b)'s predecessor show that Congress understood that statute to authorize the Attorney General to appoint attorneys under his immediate control and repeatedly ratified that understanding.  In 1930, Congress authorized the Attorney General to commission "special attorneys" in addition to "special assistants to the Attorney General."  An Act to Amend Section 366 of the Revised Statutes, Pub. L. No. 71-133, ch. 174, 46 Stat. 170, 170 (1930).  The bill's purpose, the House Report explained, was to end "confusion and misunderstanding due to the prestige and authority which is indicated by" the term "special assistants to the Attorney General."  H.R. Rep. No. 71-229, at 1 (1930).  "The bill does not

---

[43]     Even those in the House who voiced concerns over the 1906 Act did not dispute the Attorney General's power to appoint special assistants, objecting only to letting such attorneys participate in grand jury proceedings. *See* H.R. Rep. No. 59-2901, at 3 (minority report) ("There is no objection to the employment by the Government of special counsel and the giving to such counsel all the rights and privileges named in the bill, save the right to appear before the grand jury, and in its room have the prerogatives and powers of the district attorney.").

provide authority for any new appointments," the House Report continued, "but merely permits commissions to issue to attorneys as special attorneys in those cases where the Attorney General feels that it is undesirable to use the title of 'special assistant to the Attorney General.'"  *Id.*  Congress amended the statute once more in 1948 merely to simplify the law's phrasing.  *See* An Act to Revise, Codify, and Enact Into Law Title 28 of the United States Code Entitled "Judicial Code and Judiciary," Pub. L. No. 80-773, ch. 646, § 3, 62 Stat. 869, 985–86 (1948).  Neither bill evidenced any concern over the Attorney General's by-then regular use of special counsels appointed under Section 515(b)'s predecessor.  *See Persico*, 522 F.2d at 54.  To the extent that the meaning of Section 515(b)'s predecessor was still unclear, these bills "effectively ratified" the Attorney General's "long-held position" that the statute authorized him to appoint special attorneys.  *Brown & Williamson*, 529 U.S. at 144; *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of an administrative . . . interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).[44]

### 3.  No Clear Statement Rule Regarding Inferior Officers' Appointment Exists

---

[44]     The Special Counsel argues that 5 U.S.C. § 301 authorizes the Special Counsel's appointment as well, citing two Circuits holding that Section 301 provides statutory authority for a Head of Department to create and appoint inferior officers.  *See* Gov't's Opp'n at 16 (citing *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 492 (5th Cir. 2005); *Varnadore v. Sec'y of Labor*, 141 F.3d 625, 631 (6th Cir. 1998)).  In both *Willy* and *Varnadore*, the Head of Department invoked Section 301 in conjunction with other agency-specific statutes to appoint inferior officers.  *See Willy*, 423 F.3d at 491–92; *Varnadore*, 141 F.3d at 631–32.  A more recent decision, *United States v. Janssen*, 73 M.J. 221 (U.S.C.A.A.F. 2014), questioned *Willy*'s reasoning.  Noting that § 301, by its terms, "grants only the power to prescribe regulations," *Janssen* concluded that construing § 301 to authorize the appointment of officers "makes no sense in the face of the statutory structure that Congress has enacted for the Department of Defense."  *Id.* at 225. *Janssen* noted that "Chapter 4 of Title 10, United States Code, . . . sets out in great detail the officials who make up the Office of the Secretary of Defense, and the procedures to be employed for their appointment," further noted that "Congress has established three positions within the Office of the Secretary and explicitly provided that the Secretary alone shall appoint them," and questioned "why Congress would go to the trouble of enshrining the positions in statute and providing for their appointment if, as the Government argues, the Secretary already has the authority under [5 U.S.C. § 301] to do so."  *Id.*  Given that the Special Counsel lawfully was appointed pursuant to Section 533(1) and Section 515(b) without regard to Section 301, no resolution of this split of authority is necessary.

In an effort to dispute that Section 515(b) and Section 533(1) authorized the Attorney

General to appoint the Special Counsel, the witness contends that the Appointments Clause

requires Congress to make a "clear and unambiguous statement" when vesting an inferior

officer's appointment "in the President alone, in the Courts of Law, or in the Heads of

Departments." U.S. CONST. art. II, § 2, cl. 2; Concord Mem. at 12; Witness's Reply at 2, 4, 7–8.

Neither the witness nor the authorities he cites offer a sound principal to justify such a rule.  In

any event, Sections 533(1) and 515(b) would satisfy such a rule.

Courts generally require Congress to speak clearly to enact statutes that raise significant

separation of powers concerns by giving to one branch authority that otherwise would belong to

another.  *See Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("Separation-of-powers . . . caution us

against reading legislation, absent clear statement, to place in executive hands authority to

remove cases from the Judiciary's domain."); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01

(1992) ("Out of respect for the separation of powers and the unique constitutional position of the

President, we find that textual silence is not enough to subject the President to the provisions of

the APA.  We would require an express statement by Congress before assuming it intended the

President's performance of his statutory duties to be reviewed for abuse of discretion.").[45]

Vesting an inferior officer's appointment in a Head of Department raises no "danger of one

branch's aggrandizing its power at the expense of another branch," *Freytag*, 501 U.S. at 878, as

inferior officers ultimately remain accountable to the President through the Article II chain of

---

[45]     Courts impose a similar requirement as to statutes that expand federal authority into domains traditionally belonging to the states.  *See, e.g.*, *Bond v. United States*, 134 S. Ct. 2077, 2083 (2014) ("Because our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach."); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" "the usual constitutional balance of federal and state powers." (internal quotation marks omitted)).  The witness cites *Gregory*, *see* Witness's Reply at 3 n.3, 4, 18, but does not allege that vesting an inferior officer's appointment in a Head of Department raises any federalism concerns.

command, ensuring the "political accountability" the Appointments Clause was "designed to preserve," *Edmond*, 520 U.S. at 663.  *Burnap*, which the witness cites in support of his proposed clear statement rule, *see* Concord Mem. at 10, is not to the contrary, as *Burnap* involved an employee rather than officer, and thus does not bear on the specificity with which Congress must speak to vest an officer's appointment in a Head of Department.  252 U.S. at 516–18.  Indeed, while no statute "provide[d] specifically by whom the [position in question] shall be appointed," *Burnap* nonetheless held that the position's appointment was authorized by law because Congress had appropriated money for the position and then authorized the "employ[ment]" of "such number of persons for such employments, and at such rates of compensation, as may be appropriated for by Congress."  *Id.* at 517–18 (internal quotation marks omitted).

The witness argues that both *Morrison* and *Intercollegiate* "required a statute that clearly and specifically provided the authority to appoint the officer whose status is under scrutiny." Concord Mem. at 10.  This is incorrect; neither *Morrison* nor *Intercollegiate* imposed such a rule.  While the statutes at issue in those cases expressly authorized the appointment of inferior officers, *see* 28 U.S.C. § 593(b)(1) (expired) ("[T]he division of the court shall appoint an appropriate independent counsel."); 17 U.S.C. § 801(a) ("The Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges."), nothing in either *Morrison* or *Intercollegiate* suggested that such specificity was relevant to an appointment's lawfulness.  To the contrary, *Edmond* held that a statute need "not specifically mention" an officer to authorize that officer's appointment, so long as the statute's "plain language . . . appears to give the Secretary power to appoint them."  520 U.S. at 656.

Finally, the witness asserts that "the law is settled that the Attorney General cannot appoint a private attorney as special counsel and give the special counsel the Attorney General's

prosecutorial power without a clear and unambiguous directive from Congress allowing it."
Concord Mem. at 11 (internal quotation marks omitted).  The authorities on which the witness
relies to support this claim say no such thing.  *United States v. California* inquired into whether
"Congress has by implication amended its long-existing statutes which grant the Attorney
General broad powers to institute and maintain court proceedings in order to safeguard national
interests."  332 U.S. 19, 27 (1947).  *United States v. Hercules, Inc.* stated "that the statutory
authority of the Attorney General to control litigation is not diminished without a clear and
unambiguous directive from Congress."  961 F.2d 796, 798 (8th Cir. 1992).  *United States v.
International Union of Operating Engineers, Local 701* applied "a presumption against a
congressional intention to limit the power of the Attorney General to prosecute offenses under
the criminal laws of the United States."  638 F.2d 1161, 1162 (9th Cir. 1979).  These decisions
are inapposite, as the Special Counsel's appointment does not deprive the Attorney General of
any authority to "conduct" or "supervise all litigation to which the United States, an agency, or
officer thereof is a party," 28 U.S.C. §§ 516, 519, given the Attorney General's broad power to
define the scope of the Special Counsel's authority and to direct and supervise the Special
Counsel's work, *see supra* Part III.B.1.a.[46]

In sum, the witness's argument that a clear statement rule applies to the vesting of power
to appoint inferior officers in Heads of Departments is unpersuasive.  Even if such a rule applied,
moreover, Section 533(1), which authorizes the Attorney General to "appoint officials . . . to
detect and prosecute crimes against the United States," 28 U.S.C. § 533(1), and Section 515(b),
which authorizes the Attorney General to "retain[]" and "commission[]" an attorney "as special

---

[46]     For this reason, the witness's citation to The Attorney General's Role as Chief Litigator for the United
States, 6 Op. O.L.C. 47 (1982), which explained that "the 'otherwise authorized by law' language creating the
exception to the Attorney General's authority in 28 U.S.C. §§ 516 and 519 has been narrowly construed to permit
litigation by agencies only when statutes explicitly provide for such authority," *id.* at 56, also is inapposite.

assistant to the Attorney General or special attorney" "under authority of the Department of
Justice," *id.* § 515(b), plainly satisfy this test.

### 4.  Congress's Enactment of Special Counsel Statutes for Specific Purposes Casts No Doubt on the Attorney General's Authority to Appoint the Special Counsel

The witness posits that Congress's occasional enactment of statutes "that clearly and
expressly confer authority to appoint special or independent counsels" for particular purposes
show that the Attorney General lacks freestanding authority to appoint a special counsel, as
Congress "would have had no need to pass additional" statutes had Congress believed the
Attorney General already had such authority.  Concord Mem. at 19.  "The only explanation," the
witness asserts, is that Congress "believed those separate appointment-authorization statutes
were necessary because" the Attorney General otherwise lacked that power.  *Id.* at 21.  As
discussed in more detail below, however, two of the three statutes the witness identifies were
enacted specifically to insulate politically-sensitive investigations from the Attorney General's
influence, and thus imply nothing about the Attorney General's authority otherwise to appoint
special counsels.  The sole statute the witness identifies that specifically empowered the Attorney
General himself to appoint special counsel does not by itself cast doubt on the Attorney
General's freestanding authority to appoint special counsel, but properly is viewed in context as
redundancy meant to allow the Attorney General to meet recently-expanded litigation
responsibilities.

In reaction to the Teapot Dome scandal, Congress passed a Joint Resolution authorizing
and directing the President "to appoint, by and with the advice and consent of the Senate, special
counsel who shall have charge and control of the prosecution [of Teapot Dome crimes], anything
in the statutes touching the powers of the Attorney General of the Department of Justice to the
contrary notwithstanding."  *See* S.J. Res. 54 ("Teapot Dome Res."), Pub. Res. No. 4, 68th Cong.,

ch. 16, 43 Stat. 5, 6. Congress authorized the President to appoint the Teapot Dome Special Counsel not because the Attorney General lacked authority to appoint special counsel himself, but because "Congress found normal federal prosecution authority to be flawed" given that "[p]ublic confidence was lacking in Attorney General Harry Daugherty." *In re Olson*, 818 F.2d 34, 39–40 & n.7 (D.C. Cir. 1987); *see also* Donald C. Smaltz, *The Independent Counsel: A View from Inside*, 86 GEO. L.J. 2307, 2315–16 (1998) ("Congress did not trust then-Attorney General Harry Daugherty . . . . This was the first and only time that the appointment of a special prosecutor was to be with the advice and consent of the Senate. Previously, all special prosecutors were appointed either directly by the President or at the direction of the President by the Attorney General."). "Congress found it necessary to pass a special act requiring the appointment of special counsel outside government in the Teapot Dome cases" due to a lack of confidence in the Attorney General's integrity, not in the scope of his statutory authority. *Olson*, 818 F.2d at 42. Congress's grant of "charge and control of the prosecution of" the Teapot Dome wrongdoers, "anything in the statutes touching the powers of the Attorney General . . . to the contrary notwithstanding," Teapot Dome Res., reflected Congress's understanding that the Attorney General otherwise had authority to appoint a special counsel himself.

The EIGA, which authorized and directed a special division of the D.C. Circuit to "appoint an appropriate special prosecutor" upon the Attorney General's application, EIGA § 601(a); *see also* 28 U.S.C. § 593(b)(1) (expired) (replacing the Special Prosecutor with the Independent Counsel), tells a similar story. Enacted in response to the Watergate crisis, the EIGA reflected Congress's lack of confidence in "the Department of Justice and the Attorney General to function impartially with full public confidence in investigating criminal wrongdoing of high-ranking government officials of the same political party." *Olson*, 818 F.2d at 42. The

firing of Special Prosecutor Archibald Cox, along with other instances of Executive Branch misconduct, "made it obvious to Congress that if special prosecution counsel were *necessary* in the future, such counsel would have to enjoy some measure of independence from the Executive Branch." *Id.*; *see also In re Sealed Case*, 838 F.2d 476, 504 (D.C. Cir. 1988), *rev'd sub nom. Morrison*, 487 U.S. 654 (describing the EIGA as reflecting "an institutional lack of confidence in the Justice Department"). The EIGA thus did not reflect doubt as to the Attorney General's authority to appoint special counsel, but rather recognized concerns over his ability to investigate impartially the administration in which he served.

Finally, the witness cites the Payne-Aldrich Tariff Act of 1909, which authorized the Attorney General to "employ and retain . . . special attorneys and counselors at law in the conduct of customs cases." Act of Aug. 5, 1909, Pub. L. No. 61-5, ch. 6, § 28, 36 Stat. 11, 108. Unlike the Teapot Dome Resolution and the EIGA, the Tariff Act neither reflected a profound crisis of confidence in the institutions of American democracy nor vested power to appoint special counsel outside the Attorney General. The Act authorized the Attorney General to appoint special counsel, but this lone example casts no doubt on the Attorney General's authority to appoint special counsel under Section 515(b) and Section 533(1). The Act created the U.S. Court of Customs Appeals and authorized the appointments of an Assistant Attorney General, a Deputy Assistant Attorney General, and four other attorneys to represent the government in the classification and litigation work that would ensue. *Id.* at 105–08. That the Act expressly authorized the Attorney General to appoint special counsel, when Congress could simply have relied on the Attorney General's power to appoint special counsel under Section 515(b)'s predecessor, is unsurprising given the volume of litigation the new court was expected to generate. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across

statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." (internal citation omitted)). Indeed, Congress later made separate appropriations for "special attorneys and counselors at law in the conduct of customs cases" and for "assistants to the Attorney General . . . employed by the Attorney General to aid in special cases," showing that Congress viewed these as separate categories. *See, e.g.*, Act of June 25, 1910, Pub. L. No. 61-266, ch. 384, 36 Stat. 703, 747, 750; Act of July 1, 1918, Pub. L. No. 65-181, ch. 113, 40 Stat. 634, 681, 683; Act of June 3, 1948, Pub. L. 80-596, ch. 400, 62 Stat. 305, 316–17.

*     *     *

For the foregoing reasons, the Attorney General had statutory authority to appoint the Special Counsel.

### D. The Special Counsel Was Validly Appointed By a Head of Department

Finally, the witness argues that the Special Counsel was not appointed by a Head of Department, as the Excepting Clause requires, because "[t]he Head of the Department here for all relevant time periods was and is Attorney General Jeff Sessions." Witness's Reply at 12.[47] The witness contends that the Attorney General's "mere recusal" did not make the DAG Acting Attorney General, and thus that the DAG lacked "the constitutional authority to appoint a Special Counsel as an inferior officer," rendering *ultra vires* the Special Counsel's actions "in this grand jury proceeding." *Id.* The witness's argument is mistaken for two reasons: (1) 28 U.S.C. § 508(a) authorizes the DAG to serve as Acting Attorney General when the Attorney General is

---

[47]    The witness raises this argument for the first time in his reply brief. *See* Witness's Reply at 12. "[I]it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) (quoting *Lewis v. District of Columbia*, 791 F.Supp.2d 136, 139 n.4 (D.D.C. 2011)). The Special Counsel, however, has voiced no objection to entertaining this argument, and the Court exercises its discretion to do so.

recused from a matter, and (2) the Attorney General constitutionally may delegate to the DAG the exercise of his appointment power.  As such, the Special Counsel was appointed by an appropriate officer.

### 1.  28 U.S.C. § 508(a) Allows the DAG to Serve as Acting Attorney General Where the Attorney General is Recused

Section 508(a) of title 28, United States Code provides: "In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office."  28 U.S.C. § 508(a).  The witness argues that Section 508(a) does not authorize the DAG to serve as Acting Attorney General but only to exercise the Attorney General's duties, and that the Attorney General's recusal did not trigger Section 508(a) in any event because recusal is not "absence" or "disability."  Neither argument persuades.

The witness asserts that Section 508(a) "does not confer by operation of law an 'Acting' officer title or status upon the DAG."  Witness's Reply at 14.  It is well-settled, however, that statutory language authorizing one to exercise the duties of an office suffices to make that person an acting officer.  The Second Congress, for example, enacted a statute authorizing the President, "in case of death, absence from the seat of government, or sickness of the Secretary of State, Secretary of the Treasury, or Secretary of the War department, . . . whereby they cannot perform the duties of their said respective offices, . . . to authorize any person or persons at his discretion to perform the duties of the said respective offices until a successor be appointed, or until such absence or inability by sickness shall cease."  Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281.  The Supreme Court has recognized that this language authorized the President "to appoint acting officials."  *SW Gen., Inc.*, 137 S. Ct. at 935.

Congress also, in 1863, authorized the President "to authorize the head of any other Executive Department, or other officer in either of said Departments, whose appointment is

vested in the President, at his discretion, to perform the duties of the said respective offices until a successor be appointed, or until [the officer's] absence or inability by sickness shall cease." Act of Feb. 20, 1863, ch. 45, 12 Stat. 656, 656.  Subsequently, the Vacancies Act of 1868 provided "[t]hat in case of the death, resignation, absence, or sickness of the head of any executive department, the first or sole assistant thereof shall, unless otherwise directed by the President of the United States, as is hereinafter provided, perform the duties of such head until a successor be appointed, or such absence or sickness shall cease."  Act of July 23, 1868, ch. 227, 15 Stat. 168, 168.  The Supreme Court has described both of these statutes as authorizing the service of "acting officers."  *SW Gen., Inc.*, 137 S. Ct. at 935; *see also* 5 U.S.C. § 3347(a)(1)(B) (recognizing that a statute "designat[ing] an officer or employee to perform the functions and duties of a specified office" can make one an "acting official"); *English v. Trump*, 279 F. Supp. 3d 307, 312 (D.D.C. 2018) (describing 12 U.S.C. § 4, which allows the Deputy Comptrollers of the Currency to "possess the power and perform the duties" of the Comptroller "[d]uring a vacancy in the office . . . absence or disability," as a "rule[] for acting officers").

Congress enacted Section 508(a)'s predecessor statute only two years after the Vacancies Act of 1868.  *See* DOJ Act § 2 (providing that the Solicitor General, "in case of a vacancy in the office of Attorney-General, or in his absence or disability, shall have power to exercise all the duties of that office").  Although Section 508(a) does not expressly label the DAG as Acting Attorney General, Section 508(a)'s language is of the sort recognized to authorize the service of acting officers.  *See SW Gen., Inc.*, 137 S. Ct. at 935; *Cf. Bond*, 134 S. Ct. at 2088 ("The notion that some things 'go without saying' applies to legislation just as it does to everyday life."); Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 23 (1997) ("A text . . . should be construed reasonably, to contain all that it fairly means.").  Context and

common sense reinforce this conclusion.  Section 508(a) is triggered by the Attorney General's "absence or disability," 28 U.S.C. § 508(a), both situations in which there effectively is no Attorney General.  Under such circumstances, Section 508(a) most sensibly and naturally is construed to allow the DAG to act as Attorney General, rather than to hold the Attorney General's office vacant while allowing another merely to perform the Attorney General's duties.

The witness argues that "the 'Acting' designation is carefully defined and triggered by operation of law only pursuant to" the Federal Vacancies Reform Act ("FVRA"), "which is referenced in . . . Section 508," Witness's Reply at 14, and which applies only when an officer nominated by the President and confirmed by the Senate "dies, resigns, or is otherwise unable to perform the functions and duties of the office," 5 U.S.C. § 3345(a).[48]  The FVRA, however, is not "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency" where "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a)(1)(B); *see also Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) ("[Where] another statute expressly provides a means for filling such a vacancy . . . . neither the FVRA nor the [other statute] is the *exclusive* means of appointing an Acting [officer.]"); *English*, 279 F. Supp. 3d at 319 ("[T]he FVRA's exclusivity provision makes clear that it was generally intended to apply alongside

---

[48]     The Special Counsel disclaims any reliance on the FVRA, *see* Gov't's Ltr. Mem. at 4–5, due to the time limits that the FVRA imposes on an acting officer's service, *see* 5 U.S.C. § 3346.  The Special Counsel argues that "[i]t would make no sense for a limited 'Acting' role to expire after a period of time when recusal continues indefinitely," and that "where the basis for acting is a recusal, no risk exists of using the Acting position to circumvent presidential nomination and confirmation by the Senate."  Gov't's Ltr. Mem. at 5.  Section 508(a) is not by its terms limited to circumstances where the FVRA applies, as it provides that "[i]n case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, *and* for the purpose of [the FVRA] the Deputy Attorney General is the first assistant to the Attorney General."  28 U.S.C. § 508(a) (emphasis added).  Section 508(a)'s use of the term "and" shows that the DAG's designation, for FVRA purposes, as "first assistant to the Attorney General" is in addition to, but does not control the meaning of, Section 508(a)'s "absence or disability" provision.  *See id.*

agency-specific statutes . . . . Where such a statutory provision exists and . . . the FVRA applies, that can only mean that" the FVRA "is a nonexclusive means for appointing officers."). Section 508(a) is such a statute, as it "expressly" "designates" the Attorney General "to perform the functions and duties of" the Attorney General, *id.*, until the vacancy, absence, or disability ends, 28 U.S.C. § 508(a). The FVRA's Senate Report confirms that Congress intended that Section 508(a) "would be retained by" the FVRA. *See* S. Rep. No. 105-250, at 15–16 (1998). The FVRA thus does not provide the exclusive means for designating an Acting Attorney General.

The witness persists, contending that even if Section 508(a) allows the DAG to serve as Acting Attorney General, the Attorney General's recusal does not constitute a "disability" within Section 508(a)'s meaning. Witness's Reply at 14–15. As support, the witness states that the Attorney General "was not and is not physically sick or hospitalized in intensive care," but rather "decide[d] that he doesn't want to" serve as Attorney General with respect to matters from which he had recused himself "because he felt conflicted to be in charge of the Russia investigation." *Id.* at 15. The witness provides no support for the claim that "disability" carries such a narrow meaning as requiring "intensive care." *Id.* To the contrary, dictionaries in use during the period in which Section 508(a)'s predecessor was enacted defined "disability" as "[i]ncapacity; want of legal power to act or take," 1 Benjamin Vaughn Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence (1879), a definition that can encompass an Attorney General's recusal due to a legal impediment to the performance of his functions, such as 28 C.F.R. § 45.2.[49] *Dictionary of Terms and Phrases* specifically stated that "[t]he word

---

[49]    Other dictionaries of the era offered broadly similar definitions. *See, e.g.*, J. Kendrick Kinney, A Law Dictionary and Glossary (1893) ("Incapacity to do a legal act"); Henry Campbell Black, A Dictionary of Law (1891) ("The want of legal ability or capacity to exercise legal rights, either special or ordinary, or to do certain acts with proper legal effect, or to enjoy certain privileges or powers of free action."); John Bouvier, A Law Dictionary (15th ed. 1883) ("The want of legal capacity"); J.J.S. Wharton, Law Lexicon, or Dictionary of Jurisprudence (2d Am. ed. 1860) ("[I]ncapacity to do any legal act"). Wharton observed that disabilities are "divided into two classes:" "absolute" and "partial." Wharton, *supra*; *accord* Abbott, *supra*; 1 Stewart

disability, in a statute providing what shall be done in the event of death or disability of a public officer, is extensive enough to cover any cause which prevents the officer from acting."  *Id.*

The limited case law construing the term "disability" in Section 508(a) provides little additional clarity.  *United States v. Libby* stated that "[u]pon the Attorney General's recusal from participation in the investigation of the possible unauthorized disclosure of classified information, the Deputy Attorney General, pursuant to 28 U.S.C. § 508(a), was vested with all the powers of the Attorney General."  429 F. Supp. 2d 27, 31 (D.D.C. 2006).  Whether Section 508(a) covers situations of recusal was not thoroughly litigated, however; the Court appears to have assumed rather than concluded that it does.  In contrast, *Moog v. United States*, which the Witness relies upon, *see* Witness's Reply at 15–16, stated that "[i]t is readily apparent that [Section 508(a)] contemplates a *complete* inability of the Attorney General to perform his duties, such that the Deputy Attorney General must step in and exercise 'all the duties of that office.'" No. MISC. CIV-90-215E, 1991 WL 46518, at *2 (W.D.N.Y. Apr. 1, 1991).  "Were the statute construed as the respondent urges," *Moog* reasoned," every conflict of interest on the part of an Attorney General would require his deputy to assume all the duties of office, clearly a nonsensical result."  *Id.*  Properly construed, however, Section 508(a) does not require the DAG to assume "all" of the Attorney General's duties, as the *Moog* Court suggested, when the Attorney General is recused only from particular matters.  Section 508(a) provides that in the event of the Attorney General's disability, "the Deputy Attorney General *may* exercise all the duties of that office."  28 U.S.C. § 508(a) (emphasis added).  The permissive term "may" means

---

RAPALJE & ROBERT L. LAWRENCE, A DICTIONARY OF AMERICAN AND ENGLISH LAW (1883) (dividing disabilities into the categories of "general" and "special"); BLACK, *supra* (same).  Abbott observed that disability can "be used in a more limited sense" than "to indicate an incapacity for the full enjoyment of ordinary legal rights," such as "impediment[s] to marriage, or the restraints placed upon clergymen by reason of their spiritual avocations." ABBOTT, *supra*; *accord* BLACK, *supra* (same).  All of the above dictionaries have been touted as among the most useful and authoritative to understand contemporaneous legal and popular usage for the period 1851–1900.  *See* SCALIA & GARNER, *supra*, at 423, 425–26.

that the DAG need not assume all of the Attorney General's duties where only a limited conflict of interest exists.

More illustrative and persuasive are authorities construing the term "disability" as used in Rule 25(a) of the Federal Rules of Criminal Procedure, which provides that "[a]ny judge regularly sitting in or assigned to the court may complete a jury trial if," among other things, "the judge before whom the trial began cannot proceed because of death, sickness, or other disability." FED. R. CRIM. P. 25(a)(1). At least four federal circuit courts have construed the term "disability" in this context to include situations of recusal. *See In re United States*, 614 F.3d 661, 662 (7th Cir. 2010) ("The term 'other disability' in Rule 25(a) includes disability by reason of recusal." (internal quotation marks omitted)); *United States v. Hall*, 171 F.3d 1133, 1153 (8th Cir. 1999) (determining that Rule 25(a) applies where "the trial judge recuses himself or herself"); *United States v. Sartori*, 730 F.2d 973, 976 (4th Cir. 1984) (same); *Bennett v. United States*, 285 F.2d 567, 572 (5th Cir. 1960) (concluding that a trial judge properly had recused himself where the judge "appear[ed] to have had knowledge of the fact that appellant was using his name in order to obtain affidavits from certain witnesses in order to support his motion for a new trial"). The Supreme Court of Michigan has taken a similar approach. *See People v. Hicks*, 528 N.W.2d 136, 145 (Mich. 1994) ("Judge Curtis' midtrial recusal and refusal to further participate [w]as a 'disability' incurred by the factfinder during the trial.").

*United States v. Jaramillo*, 745 F.2d 1245, 1249 (9th Cir. 1984), is not to the contrary.[50] A judge presiding over a criminal trial was himself indicted by a grand jury and thereafter declared a mistrial, explaining that "it would be inappropriate for anybody to preside in a trial who is under indictment." *Id.* at 1246. The defendant moved to bar retrial on double jeopardy

---

[50]     The parties not cite or rely on this decision.

grounds, arguing that no manifest necessity to declare a mistrial had existed because another judge could have completed the trial under Rule 25(a).  *Id.* at 1247, 1249.  *Jaramillo* recognized that the trial judge's condition constituted a "disability," *see id.* at 1249 ("Where, as here, the 'disability' directly implicates the character and integrity of the judge especially in relation to criminal proceedings . . . ."), but held that the judge's failure to invoke Rule 25(a) was not erroneous "in light of the historically unique problems he faced as a judge indicted on criminal charges which called into question his moral fitness to sit as a judge."  *Id.* at 1249.  Notably, *Jaramillo* did not conclude that Rule 25(a) was unavailable under the circumstances.

### 2.  28 U.S.C. § 510 Allows the Attorney General to Delegate to the DAG Authority to Appoint the Special Counsel

In the alternative, even if the DAG were not Acting Attorney General for this matter, he still would have had authority to appoint the Special Counsel under the Attorney General's grant of authority to "act as and perform the functions of the Attorney General" within the scope of the recusal subject-matter.  *See* Recusal Statement.  Section 510 allows the Attorney General to "make such provisions as he considers appropriate authorizing the performance by any other officer  . . . of the Department of Justice of any function of the Attorney General."  28 U.S.C. § 510.  Appointing special counsel is a "function of the Attorney General," *id.*, under Section 515(b) and Section 533(1).  The DAG thus had authority to appoint the Special Counsel even if he was not formally the Acting Attorney General under Section 508(a).

The witness does not dispute that Section 510's language can encompass a delegation of authority to appoint the Special Counsel, but asserts that the DAG, not being a "Head[] of Department," U.S. CONST. art. II, § 2, cl. 2, cannot constitutionally exercise the power to appoint inferior officers, Witness's Reply at 14–15.  This argument conflates the *vesting* of a power with the *exercise* of that power.  Article II's Vesting Clause, which provides that "[t]he executive

Power shall be vested in a President of the United States of America," U.S. CONST. art. II, § 1, cl. 1, illustrates this point.  That Clause does not vest in the President "*some* of the executive power, but *all* of the executive power," *Morrison*, 487 U.S. at 705 (Scalia, J., dissenting), yet few would argue that *only* the President can *exercise* the executive power.  To the contrary, that others may exercise the executive power on the President's behalf is well-established.[51]  Likewise, the fact that the power to appoint inferior officers is vested in the Attorney General does not prevent the DAG from exercising that power on the Attorney General's behalf.  *Lucia* is not to the contrary. *Lucia* held that Administrative Law Judges ("ALJs") of the Security and Exchange Commission ("SEC") were officers subject to the Appointments Clause, and that their appointments were invalid because they were selected by SEC staff rather than by the SEC itself.  138 S. Ct. at 2050–51, 2055.  *Lucia* did not indicate, however, that the same result would have been reached had the ALJs been appointed pursuant to an express grant of authority by the SEC to staff to appoint ALJs, nor that the SEC could not do so.  For this reason, the Attorney General's delegation of power to the DAG to appoint the Special Counsel would not violate Article II even if the DAG were not the Acting Attorney General.

---

[51]     *See* U.S. CONST. art. II, § 2, cl. 2 (providing for the appointment of executive officers); *id.* art. II, § 3 (obliging the President to "take Care that the Laws *be* faithfully *executed*," (emphasis added)); *Printz v. United States*, 521 U.S. 898, 922 (1997) (explaining that the President fulfills his Take Care obligation both "personally and through officers whom he appoints." (internal citations and quotation marks omitted)); *In re Neagle*, 135 U.S. 1, 63 (1890) (describing the President's powers to appoint and commission officers and to fill vacancies as "the means of fulfilling th[e] [Take Care] obligation"); *accord Myers*, 272 U.S. at 133 (same); *see also PCAOB*, 561 U.S. at 483 (quoting President Washington to have observed "the impossibility that one man should be able to perform all the great business of the State," and the need for subordinates to "assist the supreme Magistrate in discharging the duties of his trust" (internal quotation marks omitted)); *United States v. Farden*, 99 U.S. 10, 19 (1878) ("[T]he act of the Secretary, the head of the Treasury Department, is presumed to be the act of the President."); *Wilcox v. Jackson*, 38 U.S. 498, 513 (1839) ("The President speaks and acts through the heads of the several departments, in relation to subjects which appertain to their respective duties."); *Parker v. United States*, 26 U.S. 293, 297 (1828) ("The Secretary of War, as the legitimate organ of the President, under a general authority from him, may exercise [the President's] power.").

IV.     **CONCLUSION**

For the foregoing reasons, the Witness's Second Motion to Quash Subpoena is denied.

Consequently, the witness is ordered, pursuant to the grand jury subpoenas served by the Special

Counsel, to appear before the grand jury to provide testimony at the earliest date available to the

grand jury, and to complete production of the subpoenaed records promptly.

An appropriate Order accompanies this Memorandum Opinion.

**Date:** July 31, 2018

_____
BERYL A. HOWELL
Chief Judge